**DOC # _____**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

UNITED STATES OF AMERICA

       - v. -

MARC DREIER,

      Defendant

-------------------------------------------------------X

08 MAG 2676

U.S. DISTRICT COURT
FILED
JAN 1 5 2009
S.D. OF N.Y.

## DEFENDANT'S MEMORANDUM OF LAW
## IN SUPPORT OF BAIL PENDING TRIAL

Gerald L. Shargel
570 Lexington Avenue
45th Floor
New York, NY 10022
(212) 446-2323
*Attorney for Defendant Marc Dreier*

## PRELIMINARY STATEMENT

Defendant Marc Dreier respectfully submits this Memorandum of Law in support of his application for pre-trial release on conditions pursuant to 18 U.S.C. § 3142.  As shown below, defendant's release pending trial would not pose an actual risk of flight even in the absence of the proposed conditions.   In all events, however, the conditions that defendant proposes – including home detention secured by electronic monitoring and armed security guards – clearly provide reasonable assurance that he will not flee.  His continued incarceration therefore is unwarranted.

## THE RELEVANT BACKGROUND

Defendant has been incarcerated in the Metropolitan Correctional Center since December 7, 2008.  In a sealed Complaint issued on December 4, 2008, defendant was charged with one count of securities fraud and one count of wire fraud.  It is alleged that between October 2008 and December 3, 2008, defendant participated in the sale of fictitious notes to three different hedge funds, in an aggregate amount exceeding $100 million.  The Government has since contended that there are additional such notes and that the total amount misappropriated is approximately $380 million.

The Securities and Exchange Commission filed a related action on December 8, 2008.  By Order dated December 10, 2008, Judge Cedarbaum froze all assets held directly or indirectly by the defendant, appointed a Receiver for defendant's assets, and directed defendant to provide a verified accounting of his assets as well as an accounting of the disposition of all funds obtained through the allegedly fraudulent transactions which are the subject of these proceedings.

A bail hearing was held on December 11, 2008, before this Court.  At that time, defense counsel proposed the following bail package:

1.  A $10 million bond, co-signed by defendant's son, Spencer Dreier, and his mother, Mildred Dreier;

2.  Home detention, secured by electronic monitoring, armed security guards, elimination of all computer access, the surrender of all travel documents, and the screening and searching of pre-approved visitors;

3.  Strict supervision by Pre-Trial Services; and

4.  Ongoing cooperation with the court-appointed Receiver in identifying and preserving all assets held directly or indirectly by the defendant.

At the original bail hearing, defendant argued that the foregoing conditions gave the necessary assurance of defendant's appearance in court, in accordance with the Second Circuit's decision in United States v. Sabhnani, 493 F.3d 63 (2d Cir. 2007).  Nevertheless, defendant's release on conditions was denied, subject to further consideration based on additional information.

The Court found "the defense proposal was a very serious one" (Tr. at 29) and found "a lot of similarities" between the present case and Sabhnani (Tr. at 27), but noted two distinctions as well.  First, the Court observed that in Sabhnani the defendants had provided extensive documentation in respect to their finances which gave some assurance that defendants had adequately disclosed their assets, including any assets held abroad.  Secondly, the Court noted that, unlike here, the bonds in the Sabhnani bail package were secured by $4.5 million in cash and property.

The Court concluded as follows (Tr. at 28-30):

> I think there are just too many questions that are open at the moment, and I don't rule out the possibility that sometime in the near future Mr. Pomerantz [the court-appointed Receiver] may have a better idea of the answers to all these financial questions that have been raised, but if that happens then there's an additional similarity to the <u>Sabhnani</u> case. . . .  I don't think these conditions are adequate at the present time, because the investigation is just beginning and the court-appointed Receiver hasn't had a chance to really find out whether there is any money abroad, whether there are close business associates in foreign countries who may be willing to somehow enable the defendant to go underground or to flee.  It seems unlikely, but the evidence in this case seemed very unlikely.  So I – my ruling is that I'm going to order detention based on risk of flight, but I think the defense proposal was a very serious one and maybe it will be sufficient after everyone has a chance to see exactly what the answers are to these financial questions. . . .  [A]t the present time on the present record, I think that the Government has met its burden of showing that at the present time there are no conditions that will give reasonable assurance.  I think that that might change, especially if there is cooperation with Mr. Pomerantz.  He may learn things that reduce the risk of flight or that show that the proposed safeguards really are reasonably foolproof.

As shown below, since this initial determination on December 11, 2008, there has been a thorough investigation of defendant's finances.  Every conceivable document pertaining to his assets and the disposition of funds obtained from the alleged fraud has been in the hands of the Government and the Receiver.  Defendant has met at length with the Receiver or his counsel on several occasions and has answered every question put to him regarding his assets and the disposal of revenue relevant to the accusations in this case.  The receiver found him to be fully cooperative.  His answers were forthcoming and fulsome.  He never needed to be prodded nor pushed.  In order to corroborate his account, defendant spent hours with the Receiver's counsel reviewing bank records and related documents and traced for the Receiver the receipt of all relevant proceeds and the disbursement of those funds.

Based on this examination, the Receiver found <u>no indication</u> that the defendant has available to him any substantial, unaccounted-for holdings or assets.  Further, the Receiver found

no indication that money was transferred to any offshore account controlled by the defendant, or converted to any asset that remains within defendant's control.  Indeed, the evidence was to the contrary, as substantially all of the money alleged to have been received by the defendant has been accounted for.  Accordingly, it is respectfully submitted that defendant's continued detention is unwarranted under the facts and would be at odds with the law in this Circuit, as set out in Sabhnani.

## ARGUMENT

## I. THE STANDARDS FOR PRE-TRIAL DETENTION

Section 3142(b) of the Bail Reform Act, 18 U.S.C. § 3142, provides: "The judicial officer shall order the pretrial release of the person [charged with an offense] on personal recognizance, or upon execution of an unsecured appearance bond in an amount specified by the court . . . unless the judicial officer determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." (emphasis added).  Section 3142(c)(1)(B) provides: "If the judicial officer determines that the release described in subsection (b) of this section will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community, such judicial officer shall order the pretrial release of the person . . . subject to the least restrictive further condition, or combination of conditions, that such judicial officer determines will reasonably assure the appearance of the person as required and the safety of any other person and the community." (emphasis added).

Thus, under Section 3142(b), the Court must release the defendant, even without any surety or collateral, if he is not a flight risk or a danger to the community.  Under Section 3142(c), even when risk of flight is found, the Court must release the defendant pending trial if

there is any set of conditions for his release that will "reasonably" assure his appearance and the safety of the community.

The interplay between § 3142(b) and § 3142(c) was comprehensively addressed by the Court of Appeals for the Second Circuit in Sabhnani.  The Court stated there as follows, 493 F.3d at 75 (internal citations omitted):

> Because the law thus generally favors bail release, the Government carries a dual burden in seeking pre-trial detention.  First, it must establish by a preponderance of the evidence that the defendant, if released, presents an actual risk of flight. Assuming it satisfies this burden, the Government must then demonstrate by a preponderance of the evidence that no condition or combination of conditions could be imposed on the defendant that would reasonably assure his presence in court.

The Court further stated:

> Only if a detention hearing shows 'that no condition or combination of conditions will reasonably assure the appearance of the person as required . . . shall [the court] order the detention of the person before trial.'  18 U.S.C. § 3142(e).  Under this statutory scheme, 'it is only a 'limited group of offenders' who should be denied bail pending trial.'  United States v. Shakur, 817 F.2d 189, 195 (2d Cir. 1987).

The law is thus very clear: a defendant must be released pre-trial unless it is shown both that (i) he presents an actual risk of flight and (ii) there is no condition or combination of conditions that would reasonably assure that he will not in fact flee.  Significantly, too, it is the Government that has the burden of demonstrating both of the foregoing by a preponderance of the evidence, if bail is to be denied.

In this case the Government fails to satisfy either of its burdens.  As shown below (Part II, infra), the weight of the evidence shows that the defendant is not a flight risk.  And (as shown below in Part III, infra), whether or not that is so, the evidence clearly demonstrates that the conditions of pre-trial confinement proposed by the defendant more than reasonably assure his

appearance.  Accordingly, as a matter of law, the defendant is not within that "limited group" of defendants who should be detained pending trial, and he should not be detained any longer.

## II. THE GOVERNMENT FAILS TO SHOW THAT DEFENDANT'S PRE-TRIAL RELEASE WOULD PRESENT AN ACTUAL RISK OF FLIGHT

At the initial bail hearing, the Government suggested that the defendant posed a flight risk because, according to the Government: (i) the case against the defendant is very strong; (ii) the defendant, if convicted, faces a very long prison term; and (iii) the defendant proved himself to be very adept at fraud and impersonation in connection with his alleged crime.  However, even assuming the foregoing to be true, such factors alone are not enough to detain a defendant as a flight risk.  See United States v. Friedman, 837 F.2d 48, 50 (2d Cir. 1988); see also Sabhnani, 493 F.3d at 76.  Under § 3142(g), "the history and character of the person" charged must also be considered in determining whether defendant is a flight risk.  Among the factors to be considered in that regard are the defendant's age, his citizenship, his ties to the community, his family ties, his foreign relationships, his financial resources, his prior arrest record, the nature of the offense with which the defendant is charged, and his past conduct, if any, in regard to avoiding prosecution.  United States v. Khashoggi, 717 F. Supp. 1048, 1050-51 (S.D.N.Y. 1989).

All of the foregoing factors weigh heavily against a determination that the defendant here is an actual flight risk:

1. Defendant's Age, Citizenship and Ties to the Community

Defendant is a U.S. citizen who is 58 years old and has resided his entire life in New York.  Defendant has practiced law in New York for the past 33 years.  All of his business and professional life was centered in New York.  He holds only a U.S. passport, which was seized upon his arrest.

2. Defendant's Family Ties

Defendant's entire family – including his two children (ages 19 and 16), his two siblings and his mother – reside in the United States.  Defendant is divorced and shares custody of his children with his ex-wife.  His older child, Spencer, is a college student and had been residing full-time with the defendant in Manhattan for the past six years.  His daughter, Jackie, a high school student, has been residing approximately 40% of the time with the defendant and the balance with her mother, who also resides in Manhattan.  It is undisputed that defendant has a very close relationship with his children and his extended family.

3. Defendant's Relationships Outside the United States

Defendant has no relatives living abroad.  Defendant has no business associates or friends living abroad, with the following few exceptions: For the last several years, defendant has worked with Argentine residents Freddy Langsfeld and his wife Patricia Vaga (who is an attorney) in representing investors in Argentine bonds in a class action in federal court in New York.  Defendant has also invested with Mr. Langsfeld (approximately $200,000) in a potential biodiesel business in Argentina, which was never launched.  Defendant has visited Argentina only once (more than three years ago) and has infrequent contact with these colleagues.

The Government has asserted that defendant has a "close associate located in Turkey who is a business associate" and that defendant has travelled to Turkey "multiple times" within the past year.  (Tr. at 9.)  This is false in every respect.  Defendant has not been to Turkey even once in the past several years (although he had previously visited Turkey a few times on vacation).  Defendant has no close business associate in Turkey, nor any business associate there at all – only a friend, Erinch Ozada, who lives part-time in Turkey and part-time in New York.  In the past defendant had co-invested with Mr. Ozada in a pleasure boat and in some vacation property

– but defendant had no such investments or any other business with Mr. Ozada as of the time of his arrest.[1]

The Government asserts that in the last year defendant has travelled to St. Martin, Anguilla, Qatar, the United Arab Emirates, Spain ("multiple times") and Canada.  (Tr. at 9.) However, defendant has no business associates and no friends in any of these countries. Defendant visited St. Martin only to board a boat that was docked there.  At the Receiver's request, defendant has now consented to the transfer of that boat to Ft. Lauderdale, Florida, where it has been seized by the Receiver.  In Anguilla, defendant has a share in a vacation property under construction (which, under the contract with the developer, cannot be occupied until its completion, now expected in November 2009).  Defendant visited Anguilla during the past year (while on vacation in St. Martin) only to see the status of that property.  Contrary to the Government's assertion, defendant has travelled to Spain only once in the past year (and only one other time for a brief vacation several years earlier).  The trip to Spain this past year was to accompany a law partner to Barcelona to receive an honorary award.  Defendant has no business and no associates in Spain.

Defendant visited the United Arab Emirates and Qatar for the first and only time this past November, when he met with several businesspeople, at their invitation, to discuss the possibility

---

[1]      Defendant has two other friends living abroad.  Giovanni Rubboli, approximately 70 years of age, is a financial consultant who lives in Milan.  Defendant has done no business with Mr. Rubboli other than (i) representing Rubboli as a client nearly 30 years ago, (ii) borrowing several hundred thousand dollars from Rubboli more than five years ago (for construction in defendant's law offices), which the defendant has partially repaid, and (iii) allowing Rubboli the use of an office in defendant's law office space in New York when Rubboli visits New York, for which defendant charges no rent.  Defendant has not been to Italy for at least five years, conducts no business in Italy and has no property or other assets in Italy.

Mona Wardell, defendant's former personal assistant in New York, now lives in Stockholm.  Defendant does no business with Ms. Wardell, has never visited her abroad and has been in contact with her only once since February 2007.

of opening a law office in the region and sharing investment opportunities.  Those talks were in the most preliminary stage.  Defendant has no property or other assets in those countries and has no business associates there; he knows only the handful of people he met for the first time this past November.

Finally, defendant has travelled to Canada several times during the past year.  Each trip to Canada, except the most recent, was in connection with representing a client in Canada engaged in a proxy fight for a public company.  That representation concluded during this past summer, and defendant has had no contact with this client (whom defendant first met less than a year ago) since then.  The only other occasion defendant has visited Canada during the past year was on the occasion when he was arrested on December 7, 2008.  Defendant has no property or other assets in Canada and, other than as described above, has conducted no business in Canada.

4. Defendant's Domestic and Offshore Financial Resources

Defendant currently has no money and no assets whatsoever, either in the United States or abroad.[2]  Clearly, this would be the greatest obstacle to defendant's flight, even if he were so inclined.  The Government has frozen all bank and brokerage accounts previously controlled by the defendant.  The Government has seized all property previously held by the defendant.  The defendant's business – his law firm – has been completely dismantled and put into bankruptcy.  Defendant's license to practice law has been suspended by Order of the First Department.  In short, defendant has been stripped of all means to finance any potential flight.

---

[2]      Defendant has submitted a statement of assets, attached hereto as Exhibit A, which, to the best of his knowledge, is complete and correct.  This Exhibit consists of a ten-page list of defendant's assets prepared by the Government and filed with the Court on December 29, 2008, and the defendant's few exceptions to that list.  Taken as a whole, Exhibit A details all of the assets held directly or indirectly by the defendant at the time of his arrest – all of which have since been seized by the Government.

At the initial bail hearing, the Government emphasized that one of the reasons defendant is considered a flight risk is because he exhibited "exceptional resourcefulness" in the scheme in which he is charged (Tr. at 9), but undoubtedly that resourcefulness was entirely dependent on the money, people, connections, power, position and other advantages previously at his disposal. Now, defendant has none of that.  The Government itself acknowledged at the hearing that, as a result of its investigation and intervention, the defendant now "has nothing." (Tr. at 8.)  As the Government characterized defendant's current situation: "He has gone from being an extremely rich man that flies around in private jets and meets with rich and famous people to a person who has absolutely nothing." (Tr. at 8.)  In short, one cannot flee without money or resources.  The defendant has neither.

The Government has suggested that despite its confiscation of property and a freeze order of defendant's assets, he somehow remains a flight risk, because "almost all of that money [which the Government contends the defendant has misappropriated – $380 million] is unaccounted for." (Tr. at 7.)  The Government concludes, without proof of any kind, that there must be "a pile of money" offshore.  (Tr. at 9.)

However, not only is this assertion entirely unsubstantiated, it is demonstrably wrong. There is no money abroad.  In the weeks since defendant's incarceration, the Government has offered no evidence to support this contention, despite having every document in hand which would allow them to show any offshore transfers if they existed.  At the initial bail hearing, this Court observed that in <u>Sabhnani</u> the defendants had produced some 15,000 pages of documents regarding their financial condition from which the Government could determine the extent of their assets, including, presumably, any assets held offshore.  The Court determined that this was an important distinction between <u>Sabhnani</u> and the present case.  In fact, however, at least since

defendant's arrest on December 7, 2008, the Government in this case has had in its possession every document that exists bearing on defendant's business and finances, including those documents which would disclose whether there are any offshore accounts or other assets.  All such documents were maintained at defendant's law office, and the Government has confiscated all of them.  These include all of the bank statements from defendant's personal bank and brokerage accounts and all of the bank statements from all other accounts controlled by the defendant.  In particular, it is undisputed that among the documents maintained at the law firm and confiscated by the Government are all of the bank statements for the escrow account into which all funds were deposited relating to the note transactions which are the subject of the Complaint, as well as all other records relating to those transactions.  These documents show on their face the disposition of all the funds obtained from these transactions, including in particular whether any of the funds were sent abroad.  The bank statements show that none of the funds obtained from the parties purchasing the notes which are the subject of this case were ever transferred to any offshore account under the defendant's control.

Thus, the Government has for some time had all of the records from which it could readily determine whether any of the $380 million allegedly misappropriated was transferred abroad.  Yet the Government – while insisting there must be such money – has to date failed to point to a single document indicating such a transfer.  The Government fails to identify a single wire or money transfer or check showing any funds being sent, either directly or indirectly, to any foreign account controlled, either directly or indirectly, by the defendant.

Likewise, since his appointment, the Receiver, Mr. Pomerantz, has had access to all of these documents.  The defendant met with the Receiver, as early as December 17, 2008, and has met with him or his representatives several times since.  In addition to providing the Receiver

with a complete itemization of all funds and assets that defendant held directly or indirectly as of the time of his arrest, the defendant has explained to the Receiver in great detail exactly what documents in the Receiver's possession show the disposition of all funds obtained from the transactions which are the subject of the Complaint, including, in particular, the bank statements which would disclose whether or not funds were transferred offshore.  The defendant gave the Receiver a detailed accounting of the disposition of those funds and answered every question the Receiver had in that regard.  The Receiver has never contested defendant's assertions that (i) defendant has disclosed all of his accounts and assets, and (ii) the defendant has no offshore accounts or other assets.  To the contrary, upon the conclusion of his investigation, the Receiver has now determined that there is no indication of any funds or other assets held or controlled by the defendant offshore.[3]

The bank statements for the escrow account also show the domestic disposition of the $380 million allegedly obtained from the transactions which are the subject of the Complaint.  Again, the defendant reviewed the account statements with the Receiver for this purpose and fully identified the disposition of the funds, showing that all the funds were either (i) wired to the

---

[3]        The wire instructions to the hedge funds for each of the allegedly fraudulent transactions are in the possession of the Government and the Receiver.  These wire instructions show that on all occasions the monies obtained from the hedge funds were wired into the same escrow account at the law firm.  The account statements for that escrow account show that there were very few occasions on which any of these funds were ever wired abroad.

        The only funds transferred overseas were (i) payments of principal and interest to foreign accounts designated by the hedge funds that had purchased certain of the allegedly fraudulent notes, and (ii) payments for a few works of art obtained from certain foreign art galleries, which pieces were shipped to New York and have since been confiscated by the Government.

        Inasmuch as this same escrow account was also used for deposits of law firm clients in the ordinary course of law firm business, the bank statements also show (i) transfers in the ordinary course of business in connection with closings or other transactions for clients of the law firm, at the direction of these clients, who had deposited funds into the account; and (ii) occasional transfers in relatively small amounts for foreign patents and trademark registrations for law firm clients.

accounts of hedge funds at their direction to make principal and interest payments on note purchases; (ii) transferred to other accounts for the law firm or its affiliates to cover millions of dollars in deficits incurred by the firms from operating expenses, capital expenditures, construction costs and security deposits; (iii) invested and, for the most part, lost in the stock market; or (iv) used for the defendant's acquisition of real property, artwork and other property, all of which have now been seized by the Government and are fully accounted for in the defendant's statement of assets submitted herewith.  (See Exhibit A.)

Thus, the money at issue is in fact fully accounted for, and the Government's inference that there must be a "pile of money" hidden somewhere is simply unsupported.

It bears repeating that the Government has the burden of proof to show by a preponderance of the evidence that defendant is a flight risk.  The Government puts forth no such evidence.  Instead, the Government rests its assertion that defendant is a flight risk on its assumption that some of the money allegedly misappropriated from these hedge funds must be hidden somewhere, but there is a clear paper trail of all the monies obtained from the funds, and the Government fails to point to any wire transfer or other evidence of any funds diverted offshore or to other undisclosed accounts, despite having all the documents which would show any such transfer.  Defendant has made an unequivocal representation to the Receiver that he holds no funds or other assets outside the United States, either directly or indirectly; indeed, he no longer has any funds anywhere at all.[4]

---

[4]     Insofar as any portion of the funds alleged to have been illegally obtained was transferred to other domestic accounts controlled by the defendant, the account statements for these accounts and the associated ledgers – all of which are in the possession of the Government and the Receiver – show on their face that no monies were transferred from these accounts to any foreign accounts controlled by the defendant.

Based on the foregoing, it is unreasonable to find or assume that the defendant has or has access to any offshore funds or property or any other hidden assets in considering whether he is a flight risk.

5. No Criminal History

Defendant has no criminal record.  To the contrary, putting aside (without minimizing) the alleged behavior with which defendant is charged here, defendant has distinguished himself as a lawyer, having graduated from Harvard Law School in 1975, having attained partnership at two large New York law firms between 1983 and 1995, having founded a firm bearing his name in 1996 (which grew to more than 250 lawyers), and having been a highly regarded litigator in the federal and state courts in New York for more than 30 years.  There is certainly no reason to believe that defendant has any criminal connections to enable him to flee the country and live as a fugitive.

6. Defendant's Prior Conduct Evidencing a Willingness to Face Prosecution

Finally, the facts show not only that defendant is highly unlikely to flee the country and avoid prosecution but that indeed, on the several occasions during the past several months when he was already out of the country, fully knowing that he was facing the prospect of prosecution, he nevertheless returned to the United States.  In fact, he did this four times during the several weeks before his arrest in New York, each time foregoing any opportunity to avoid prosecution.

As the Government itself observed during the initial bail hearing (Tr. at 11), in late October or early November 2008, the defendant was directly confronted with allegations of fraud by the principal of the real estate development company whose notes he is charged with fraudulently issuing and by a principal of the accounting firm whose audit letters he is charged with falsifying.  At that time a lawyer for the accounting firm, Thomas Manisero, told the

defendant on the phone (with principals of the real estate firm and accounting firm also on the line) that a representative of the hedge fund identified in the Complaint as Hedge Fund #1 had informed them of an alleged attempt by the defendant to use the false financial statements to sell a bogus note. Mr. Manisero stated that the matter was extremely serious and that the accounting firm was inclined to "turn the matter over to enforcement" if the defendant could not conclusively demonstrate his innocence.

A series of phone calls followed over the next several weeks between the defendant and Mr. Manisero (some of which were evidently recorded, although the Government has not turned these recordings over to defendant), during which the defendant endeavored to give an explanation. Each time, Mr. Manisero stated that he was dissatisfied with the explanation and that the defendant was leaving him no choice but to report to the accounting firm that there was no innocent explanation for defendant's conduct, thereby implicitly renewing Mr. Manisero's threat to report the defendant to law enforcement.

Furthermore, in one of these phone calls, Mr. Manisero identified by name Hedge Fund #2 and asked defendant if he had engaged in any bogus transactions with that firm as well. Defendant therefore knew perfectly well that this second hedge fund was also reporting to the real estate firm and the accounting firm that defendant had engaged in an alleged fraud. It was also very clear to defendant from his own phone calls with representatives of Hedge Fund #2 at about this time that Hedge Fund #2 was highly suspicious of the defendant. On one occasion, a representative of Hedge Fund #2 informed the defendant that he too had contacted the real estate firm directly (which was confirmed to the defendant by his being copied on an email from the hedge fund to the real estate firm), thereby leaving no doubt in the mind of the defendant that at

least two hedge funds had addressed the transactions directly with the real estate firm and the accounting firm.

During the several weeks that these calls occurred, when the defendant knew full well that he was facing the prospect of criminal charges, the defendant was in foreign countries no less than four times.  Nevertheless, realizing his exposure, the defendant still chose to return to the United States each time.  He did so from St. Martin, from the United Arab Emirates, from Qatar and from Canada.  Indeed, defendant had at least one of his phone calls with Mr. Manisero while the defendant was in the United Arab Emirates and on his way to Qatar (in late November), and defendant knew from that phone call that he had failed to persuade Mr. Manisero to drop the matter, yet defendant still returned to the United States.[5]  Defendant also received an email from Mr. Manisero while he was in Canada during the first week of December 2008, which suggested that Mr. Manisero would be bringing the matter to the authorities, but he nevertheless returned to the United States.  In fact, defendant had a private plane waiting for him at the airport in Toronto on December 2, 2008, which could have taken him to any destination, but instead of fleeing, the defendant remained in Toronto to face questions from the Ontario Teachers Pension Fund even after representatives of the Fund had told him on the phone they believed he had engaged in impersonation and fraud.  Finally, after defendant was arrested in Toronto, he agreed to return to the United States rather than remain in Toronto or flee from Toronto – even after he knew very well, from conversations with his attorney, that he would be arrested upon his arrival in New York.

---

[5]   It is noteworthy that the United States has no extradition treaty with either Qatar or the United Arab Emirates, but the defendant nevertheless chose to return from these countries to the United States.  See Sabhnani, 493 F.3d at 67.

All of the foregoing amply demonstrates that the defendant is not a flight risk.  He has rejected every opportunity to flee the country – indeed to remain out of the country – when he knew for certain that he was about to be arrested.  Certainly, defendant was aware that he would face serious charges and the possibility of a long term of imprisonment.  But at 58 years old, with his only family in the United States, he is neither prepared nor able to meet the demands posed by fugitivity.

In these circumstances, there is no factual or legal basis to find defendant a flight risk. Indeed, in similar circumstances the Second Circuit, in <u>United States v. Friedman</u>, 837 F.2d 48 (2d Cir. 1988), reversed the lower court and found no risk of flight where the defendant was a lifetime New York resident, had no prior criminal record, had no passport or apparent ability to evade surveillance, had worked gainfully in the New York area for 25 years, had children living in the New York area, and had taken no steps to leave the jurisdiction after he knew he was in jeopardy of arrest on federal charges, notwithstanding the prospect of lengthy incarceration and the apparent strength of the government's case.  <u>Id.</u>

Likewise, in <u>United States v. Khashoggi</u>, 717 F. Supp. 1048, 1051-52 (S.D.N.Y. 1989), the Court found that "it would be an abuse of discretion to order detention of [the] defendant pending trial," despite the fact that he was facing charges of mail fraud and other offenses with the risk of a lengthy prison term.  In all respects the present case presents an even more compelling case against finding the defendant a flight risk.  Unlike here, the defendant in <u>Khashoggi</u> (i) was not a U.S. citizen but rather a citizen of Saudi Arabia (which has no extradition treaty with the United States), (ii) was an "enormously wealthy man" with the "means to procure staggering amounts of cash in fewer than 24 hours" which "could facilitate a hasty departure from the jurisdiction," (iii) had a wife and siblings living abroad, (iv) had not

even visited the United States for several years prior to his arrest and (v) had resisted extradition to the United States after being arrested abroad.

### III. THE GOVERNMENT FAILS TO SHOW THAT THE CONDITIONS FOR HIS RELEASE PROPOSED BY DEFENDANT WOULD NOT REASONABLY ASSURE HIS APPEARANCE

As shown above, the Government has failed to sustain its burden of showing, by a preponderance of the evidence, that defendant is an actual flight risk, even if released on his own recognizance. However, that is only half of the Government's burden. Sabhnani makes clear that under 18 U.S.C. § 3142:

> If the court determines that a defendant's release on an unsecured bond presents a risk of flight, the concern at issue in this case, the law still favors pre-trial release 'subject to the least restrictive further condition, or combination of conditions, that [the court] determines will reasonably assure the appearance of the person as required.' Only if a detention hearing shows 'that no condition or combination of conditions will reasonably assure the appearance of the person as required . . . shall [the court] order the detention of the person before trial." 493 F.3d at 75 (internal citations omitted).

The law is thus clear that it is only in the rare case in which no set of conditions would reasonably assure defendant's appearance in court that pre-trial detention should be ordered. This is not such a case.

The defendant has proposed a set of conditions for his release which give more than reasonable assurance of his appearance. It is submitted, for the various reasons put forth in Section II, above, that defendant is not an actual flight risk even in the absence of any such conditions for his release. However, any doubt must be resolved against detention in light of the conditions that defendant has offered as part of his bail package.

A. Defendant's Proposed Bond and Sureties Give Reasonable Assurance of His Appearance in Court

Defendant will sign a $10 million bond which will also be signed by his son, Spencer Dreier, and his mother, Mildred Dreier.  Spencer is a 19-year-old college student who has an extremely close relationship with his father.  While he does not have sufficient available assets to cover the amount of the bond, his signature, in any event, carries particular moral suasion.  See United States v. Batista, 163 F. Supp. 2d 222, 224-25 (S.D.N.Y. 2001) (noting the importance of "moral suasion to ensure the defendant's presence at trial.").  It is unreasonable to believe that defendant would risk his son's future by violating the conditions of his release and subjecting his son to a $10 million judgment before he even graduates from college.  Further, defendant's mother will sign the bond, secured by her home in Florida.  This home and her other assets would not cover the amount of the bond, but her close relationship with her son provides significant moral suasion – he simply would not risk leaving his elderly mother homeless by violating the conditions of his release.  "Appropriate factors to consider when weighing whether a proposed suretor exercises moral suasion vary from case to case, but may include the strength of the tie between the suretor and defendant (i.e. family or close friend, close or estranged), the defendant's roots in the community, and the regularity of contact between suretor and defendant."  Id.  Defendant's relationship with his son and his mother certainly meet this standard.

As noted above, the Court at the earlier bail hearing observed that one distinction between the present case and Sabhnani is that the bond in Sabhnani was secured by $4.5 million in cash and assets.  However, the cash and assets posted in Sabhnani were the property of the defendants themselves, inasmuch as, unlike here, most of defendants' assets in that case were not seized.  Given that the Court in Sabhnani recognized that defendants there had "significant

wealth", 493 F.3d at 65, the potential surrender of this collateral belonging to the defendants themselves would hardly seem a significant deterrent to their flight from a potentially long prison term, particularly in light of findings by the court there that the defendants conducted much of their business abroad, had relatives abroad, and would be able to sustain themselves abroad financially, "with relatively little disruption" even without the collateral they posted. Id. at 77.

Here, neither the defendant nor his family has been able to fully secure the bond with cash or other assets, but the pledge of his son and his mother should have at least the value of the pledge in Sabhnani. If defendant fled, their lives would be ruined. His son would be accountable for a $10 million judgment at the very outset of his adult life. Defendant's mother, in her eighties, would lose her home and all her savings with no source of income in the later stages of her adult life. The indisputably close relationship defendant shares with his son and his mother clearly suggests that defendant would be more restrained by these consequences to his relatives than the defendants in Sabhnani were restrained by the $4.5 million in cash and property that they themselves posted.

B. Defendant's Proposed Conditions of Confinement Give the Court More than the Necessary Reasonable Assurance that He Will Not Flee

Under defendant's bail proposal, he would be under house arrest. Armed security guards, approved by the Government (and paid for by defendant's family) will be on duty full-time to assure defendant's confinement and compliance with the conditions of confinement. Defendant will wear an electronic monitoring device, will be denied all computer access, and will have only pre-approved visitors. His passport was already seized at the time of his arrest.

These are the same conditions of confinement that the Second Circuit found in Sabhnani were sufficient to reasonably assure a defendant's appearance in court.[6]  As here, the Government argued in Sabhnani that the defendants had a strong motive to flee because "the evidence of their guilt was compelling and upon conviction they faced a significant term of incarceration," 493 F.3d at 66, but the Government failed to meet its burden that the conditions of confinement still did not reasonably assure the defendants' appearance in court.

Likewise, the Government fails to meets that burden here.  To meet that burden, Sabhnani makes clear that the Government cannot merely put forth the conclusory assertion, as it has done here, that the defendant is a flight risk notwithstanding strict home confinement.  The Government must come forward with some facts which actually demonstrate that the conditions of confinement fail to reasonably assure his appearance.  Here, the Government has not and cannot do that.  The Government has not pointed to a single case where a defendant has failed to appear for trial under similar conditions of confinement.  The Government has not put forth even a hypothetical scenario under which the defendant here could possibly flee under these conditions of physical confinement, such that the Government would not be reasonably assured of his appearance.[7]

---

[6]      The court in Sabhnani found these conditions of confinement to be adequate to reasonably assure appearance at trial even though in Sabhnani other factors not present here posed a greater risk of flight.  In Sabhnani, unlike here, the defendants had immediate family living abroad, did substantial business abroad (including in countries with no extradition treaties) and had access to substantial funds and assets which were not confiscated.

[7]      Here it is so clear that the physical restrictions proposed by the defendant would assure his appearance that the limited collateral for the bond and the Government's wholly unsupported contention that the defendant must have money offshore become largely unimportant.  As Sabhnani makes clear: "[T]he more effectively a court can physically restrain these defendants, the less important it becomes to identify and restrain each and every asset over which defendants may exercise some control in order to mitigate the risk of flight."  493 F.3d at 77.

It bears repeating that the Government has the burden of proof not only to show that defendant is a flight risk but, even if he was so found, to also separately and independently show that no conditions, or combination of conditions, could be imposed to reasonably assure his appearance.  Certainly, if that burden of proof is to mean anything, the Government must be required to come forward with some evidence, some precedent or some logic that would show the conditions proposed by the defendant to still be inadequate, but the Government fails to do so.

The bond and sureties put forth as part of defendant's bail proposal provide a very substantial deterrent to defendant's flight in light of their obvious moral suasion.  The fact that they may not be backed by cash or other collateral in the amount of the bond should not diminish their significance, so long as they are a condition of defendant's release which meaningfully contributes to assuring his appearance in court.  Surely, the combination of the surety with the extraordinary conditions of home confinement proposed by the defendant provide that reasonable assurance.

## **CONCLUSION**

For the foregoing reasons, it is respectfully submitted that defendant is entitled to pretrial release under the conditions proposed herein.


Dated: New York, New York
          January 15, 2009

                                        Respectfully submitted,

                                        *Gerald Shargel* /RMK

                                        Gerald L. Shargel
                                        570 Lexington Avenue
                                        45th Floor
                                        New York, NY 10022
                                        (212) 446-2323
                                        *Attorney for Defendant Marc Dreier*

## EXHIBIT A

The following ten pages (captioned "Schedule A"), listing Marc Dreier's assets, were filed with the Court by the United States Attorney's Office on December 29, 2008, as an attachment to the Ex Parte Pre-Indictment Restraining Order.  To the best of defendant's knowledge, this statement of assets is complete and correct, with the following exceptions:

1. Defendant is not the owner of, has no interest in, and indeed has no connection to, the listed property at 9 Clearview Drive, Sag Harbor, New York 11963.  Defendant has informed the Receiver that he has no idea why this property should be listed among his assets.

2. On October 8, 2008, defendant transferred all shares in the corporation that owns the property at 111 Dune Road, East Quogue, New York 11942 (and possibly the adjacent property at 109 Dune Road) to his son, Spencer Dreier.  Defendant and his son both understand that this asset has been frozen by Order of the Court, and that ultimate ownership will be determined by a court at some point in the future.

3. In addition to the listed assets, defendant is also the 100% owner of all property currently located at or in use by Dreier LLP and its affiliated law firms.  This includes the firms' furniture, equipment and computers.  Significantly, this also includes the law firms' receivables, unbilled time, and security deposits.  Defendant has informed the Receiver that these sizeable assets are his property.

4. The list of artwork at paragraphs 22-172 may not be exhaustive.  At the time of his arrest, art owned by defendant was housed in various locations (all known to the Receiver), was fully catalogued by an art consultant previously retained by defendant, and to the best of defendant's knowledge has all been seized by the Government.

## SCHEDULE A

### (Subject Property)

1. 2005 Heesen Motor Yacht "Seascape," Registration No. 737657, located at Pier 66, Fort Lauderdale, Florida;

2. 2008 Novurunia Equator 530 Yacht Tender;

3. 2008 Blue Yamaha FX1100-G Waverunner, ID No. F1X-829554;

4. 2008 Blue Yamaha SJ700 Waverunner, ID No. F2F-500725;

5. 2002 Yamaha FX140 Waverunner, Registration No. NY2645UY;

6. 2004 Yamaha FX160HO Waverunner, Registration No. NY5285MB;

7. 2000 Mercedes Benz S500 Sedan, Vehicle ID No. WDBNG75J6YA094319;

8. 1997 Mercedes Benz SL500 Roadster, Vehicle ID No. WDBFA67F6VF147477;

9. 2006 BMW 650i Convertible, Vehicle ID No. WBAEK13406CN76888;

10. 2007 Aston Martin DB9 Volante, Vehicle ID No. SCFAD02A37GB07094;

11. Any and all right, title, and interest in the shares of the capital stock of Beacon Court Condominium and the proprietary lease of Unit No. 34C, located at 151 East 58th Street, New York, New York;

12. Any and all right, title, and interest in the real property and appurtenances known as 111 Dune Road, East Quogue, New York 11942;

13. Any and all right, title, and interest in the real property and appurtenances known as 109 Dune Road, East Quogue, New York 11942;

14. Any and all right, title, and interest in the real property and appurtenances known as 9 Clearview Drive, Sag Harbor, New York 11963;

15. Any and all right, title, and interest in the real property and appurtenances known as Temenos Development, Unit #1-H31, Anguilla, British West Indies;

16. Any and all right, title, and interest in the real property

and appurtenances known as Temenos Development, Unit #2-G32, Anguilla, British West Indies;

17. Any and all funds in Account No. 570-48022-176 AAA held at Morgan Stanley in the name of Marc S. Dreier, subject to the Receiver's authority to write checks and direct wire transfers;

18. Any and all funds in Account No. 2000029760358 held at Wachovia Bank in the name of MEA Properties LLC;

19. Any and all funds in Account No. 1010081258695 held at Wachovia Bank in the name of Marc S. Dreier;

20. Any and all funds in Account No. 036502230065 held at JP Morgan Chase in the name of Four Winds Holdings;

21. Any and all funds in Account No. 112735798 held at City National Bank in the name of Marc S. Dreier;

22. Acrylic on canvas by Ghada Amer, "Black Kiss" (2007);

23. Three dimensional archival print by John Baldessari, "Arms and Legs" (2008);

24. Lithographic screenprint by John Baldessari, "Two Bowlers (with Questioning Person)" (1994);

25. Screenprint by John Baldessari, "Person with Guitar (Red)" (2005);

26. Screenprint by John Baldessari, "Two Opponents (Blue & Yellow)" (2004);

27. Mixographia relief print by John Baldessari, "Stonehenge (With Two Persons) Yellow" (2005);

28. Mixographia relief print by John Baldessari, "Stonehenge (With Two Persons) Blue" (2005);

29. Photogravure by John Baldessari, "Paradise" (1989-90);

30. Screenprint by John Baldessari, "Noses & Ears Etc.; The Gemini Series" (2006);

31. Lithograph by Vija Celmins, "Untitled (Ocean)" (1972);

32. Screenprint by Vija Celmins, "Ocean with Cross #1" (2005);

33.   Oil on paper by Robert Greene, "Syd" (2006);

34.   Enamel on steel by Keith Haring, "Untitled" (1982);

35.   Household gloss on canvas by Damien Hirst, "2-(P-CHLOROPHENOXY)-2-METHYLPRIOPIONIC ACID (multicolored spots)" (1998);

36.   Household gloss on canvas by Damien Hirst, "Elaidic Anhydride (hot pinks spot painting)" (2007);

37.   Silkscreen print by Damien Hirst, "Santiago de Compostela" (2007);

38.   Silkscreen print by Damien Hirst, "Duomo" (2007);

39.   Silkscreen print by Damien Hirst, "St. Peter's" (2007);

40.   Lithograph by David Hockney, "Celia Inquiring" (1979);

41.   Lithograph and etching by David Hockney, "White Porcelain" (1985);

42.   Etching and aquatint by David Hockney, "Chair with Book on Red Carpet" (1998);

43.   Lithograph and etching by David Hockney, "Picture of Two Chairs, from Moving Focus Series" (1985-86);

44.   Lithograph by David Hockney, "The Wave, A Lithograph" (1990);

45.   Polychrome aluminum by Robert Indiana, "Love" (1966/1999);

46.   Etching by Jasper Johns, "Within" (2007);

47.   Oil on canvas by Alex Katz, "Red Tulips" (1967);

48.   Painting by Alex Katz, "Blue Umbrella" (1979-80);

49.   Screenprint by Roy Lichtenstein, "Reverie (C. 38)" (1965);

50.   Oil and magna on canvas by Roy Lichtenstein, "First Painting with Bottle" (1975);

51.   Offset lithograph by Roy Lichtenstein, "Crying Girl" (1963);

3

52. Acrylic and graphite on canvas by Agnes Martin, "Loving Love" (2000);

53. Watercolor by Kim McCarthy, "Untitled (Yellow Girl 3)" (2006);

54. Watercolor by Kim McCarthy, "Untitled (Yellow Boy)" (2006);

55. Cibachrome print by Elisabeth Montagnier, "Les Roseaux" (unknown);

56. Color photographs by Richard Prince, "Untitled (Four Women)" (1980);

57. Ink and watercolor on canvas by David Rathman, "Untitled (13)" (2007);

58. Oil on canvas by Mark Rothko, "Untitled" (1957-63);

59. Gelatin silver print by Julius Shulman, "Case Study House #22 (2 Girls) (Pierre Koenig, architect, 1959)" (1960);

60. Silkscreen ink and acrylic on canvas by Andy Warhol, "Jackie (Blue Jackie, 3 quarter view)" (1964);

61. Silkscreen ink and acrylic on canvas by Andy Warhol, "Jackie (White Jackie)" (1964);

62. Silkscreen ink and acrylic on canvas by Andy Warhol, "Jackie (Profile looking down)" (1964);

63. Silkscreen ink and acrylic on canvas by Andy Warhol, "Jackie (smiling Jackie w/JFK)" (1964);

64. Screenprint by Andy Warhol, "Space Fruit: Still-Lifes (Cantaloupes)" (1979);

65. Screenprint by Andy Warhol, "Martha Graham: Letter to the World (The Kick)" (1986);

66. Silkscreen ink and synthetic polymer paints on canvas by Andy Warhol, "John Lennon" (1985-86);

67. Silkscreen ink and synthetic polymer paints on canvas by Andy Warhol, "Rudolph Nureyev" (c. 1975);

68. Screenprint on canvas by Andy Warhol, "Muhammad Ali (downcast head)" (1978);

4

69.  42" plasma screen, custom speakers, and HD media player by Robert Wilson, "Salma Hayek" (2006);

70.  Digital C print by Thomas Wrede, "Beach Walkers" (2004);

71.  Digital C print by Thomas Wrede, "Mud Flat Wanderers" (2005);

72.  Digital chromogenic print by Thomas Wrede, "Midsummer Night at Sea" (2004);

73.  Digital chromogenic print by Thomas Wrede, "Beach Tents" (2004);

74.  Digital chromogenic print by Thomas Wrede, "Tidelands with Playful Dogs" (2004);

75.  Digital chromogenic print by Thomas Wrede, "Meadow" (2005);

76.  Digital chromogenic print by Thomas Wrede, "Under A Cloud" (2004);

77.  Digital chromogenic print by Thomas Wrede, "Ashore" (2002);

78.  Print by Pablo Picasso, "Portrait of a girl" (unknown);

79.  Handblown glass by Dale Chihuly, "Persian Wall Installation" (2008);

80.  Handblown glass by Dale Chihuly, "Gilded Melon Ikebana with Green and Dark Pink Stems" (2001);

81.  Handblown glass by Dale Chihuly, "Patent Yellow Macchia with Cherry Red Lip Wrap" (2002);

82.  Handblown glass by Dale Chihuly, "Mille Flor IV, Section K" (2004);

83.  Aquatint by Henri Matisse, "Grand Masque" (1948);

84.  Aquatint by Henri Matisse, "Nadia au profil aigu" (1948);

85.  Aquatint by Henri Matisse, "Nadia aux cheveux lisses" (1948);

86.  Bronze sculpture by Tom Otterness, "Princess with Magic Fish" (2003);

87. Bronze sculpture by Tom Otterness, "Big Thief" (2001);

88. Bronze sculpture by Tom Otterness, "Cone Figure" (2001);

89. Print by Eric Perez, [unknown title] (unknown);

90. Bronze sculpture by JR Summers, [unknown title] (unknown);

91. Screenprint with mounted collage element by Donald Baechler, "Brown Hat" (1993);

92. Screenprint with mounted collage element by Donald Baechler, "Arithmetic Head" (1993);

93. Stenciled handmade paper by Donald Baechler, "York House Suite (6)" (2000);

94. Stenciled handmade paper by Donald Baechler, "York House Suite (2)" (2000);

95. Lithograph with hand painting by Jim Dine, "Very Life In Japan" (2004);

96. Set of five color linocuts by Sol Lewitt, "Isometric Figures (1-5)" (2002);

97. Seven-color silkscreen by Ryan McGuiness, "Untitled (Peripheral Drift Illusion)" (2007);

98. Silkscreen and platinum leaf on paper by Takashi Murakami, "Flower" (2006);

99. Color lithograph by Don Nice, "American Still Life I" (1980);

100. Color lithograph by Don Nice, "American Still Life II" (1980);

101. Screenprint by Dan Walsh, "Vehicle I" (2007);

102. Screenprint by Dan Walsh, "Vehicle II" (2007);

103. Gouache on paper by Charles Arnoldi, "Untitled (07.126)" (2007);

104. Gouache on paper by Charles Arnoldi, "Untitled (07.127)" (2007);

105. Gouache on paper by Charles Arnoldi, "Untitled (07.128)" (2007);

106. Acrylic on canvas by Charles Arnoldi, "In the Saddle" (2007);

107. Epson print by Rick Ehrlich, "HR1" (2005);

108. Epson print by Rick Ehrlich, "HR2" (2005);

109. Epson print by Rick Ehrlich, "HR10" (2005);

110. Epson print by Rick Ehrlich, "HR16" (2005);

111. Epson print by Rick Ehrlich, "Graffiti (KUMA)" (2005);

112. Epson print by Rick Ehrlich, "Life Guard Tower #2" (2006);

113. Epson print by Rick Ehrlich, "Life Guard Tower #7" (2006);

114. Epson print by Rick Ehrlich, "Surfer #1" (2006);

115. Epson print by Rick Ehrlich, "Surfer #4" (2006);

116. Color aquatint etching by Kota Ezawa, "Kota" (2006);

117. Three aquatints by Dan Flavin, "Untitled (Triptych)" (1996-98);

118. Pigmented ink with photogravure by Robert Rauschenberg, "Lotus IV" (2008);

119. Pure pigment on archival paper by Michal Rovner, "Notes 8" (2002);

120. Acrylic on linen by Glen Rubsamen, "What Used to Be Called 'Oceanic Feeling'" (2006);

121. Acrylic on linen by Glen Rubsamen, "A Too-Clear Vision of Good and a Too-Sure Hatred of Evil" (2007);

122. Set of three color soft ground etchings by Ed Ruscha, "L.A.S.F. #1, #2, #3" (2003);

123. Series of four silver-gelatin prints by Ed Ruscha, "Rooftops" (1961/2004);

124. Colored ink on paper by Chris Taggart, "Self-Portrait as (a

Ghost)" (2005);

125. Acrylic on canvas by Brad Spence, "Literature" (2007);

126. Acrylic on canvas by Brad Spence, "Gaggle" (2007);

127. Cibachrome print by Wolfgang Tillmans, "Aufsicht (LA)" (2004);

128. Color direct gravure by Wayne Thiebaud, "Cakes and Pies" (2006);

129. Color direct gravure by Wayne Thiebaud, "Cupcakes and Donuts" (2006);

130. Cibachrome print by Doug Aitken, "Pure Channel" (2005);

131. Acrylic and pastel on paper by Peter Alexander, "Study for Gas" (1989);

132. Digital lambda print by Irit Batsry, "Key Light" (2006);

133. Alkyd on canvas by Marco Cassentini, "Every Afternoon 658" (2006);

134. Alkyd on canvas by Marco Cassentini, "Every Afternoon 659" (2006);

135. Alkyd on canvas by Marco Cassentini, "Every Afternoon 660" (2006);

136. Inkjet on watercolor paper by Benny Chan, "114301 (Interior of baggage claim, JFK)" (2006);

137. Inkjet on watercolor paper by Benny Chan, "114302 (Airplane, JFK)" (2006);

138. Inkjet on watercolor paper by Benny Chan, "900161 (Fly loft behind stage)" (2007);

139. Oil on canvas by Larry Cohen, "View from the top of the California Incline" (2006);

140. Cibachrome print by Marcus Doyle, "Radisson 2 (No Diving)" (2002);

141. Cibachrome print by Marcus Doyle, "Hollywood, Los Angeles, CA" (2005);

142. Cibachrome print by Marcus Doyle, "Radisson 1 (Potted Bush)" (2002);

143. Cibachrome print by Marcus Doyle, "Deli Liquor" (2005);

144. Cibachrome print by Marcus Doyle, "Ventura, CA Christmas Eve (Broccoli Field)" (2002);

145. Cibachrome print by Marcus Doyle, "Tire Tracks, Santa Monica, CA" (2005);

146. Cibachrome print by Marcus Doyle, "Urban Sport 3, Tennis Court" (2003);

147. Acrylic on canvas by Lorser Feitelson, "Untitled (February 28)" (1971);

148. Ilfochrome by Robert Flick, "At Cambria-A_01082401 (at Cambria Looking West)" (2001);

149. Ilfochrome by Robert Flick, "At Cambria-B_01082401 (at Cambria Looking West)" (2001);

150. Cibachrome print by Robert Flick, "LD SV970121 Almeda B, Los Angeles, CA" (1997);

151. Oil on paper by Robert Greene, "Nic" (2006);

152. Oil on paper by Robert Greene, "Lenore" (2006);

153. Oil on canvas by Jane Harris, "Glory Day" (2006);

154. Oil on canvas by Shirley Irons, "Conference Room 1" (2006);

155. Oil on canvas by Shirley Irons, "Interim, Pittsburgh" (2007);

156. Oil on canvas by Shirley Irons, "Corridor, Bellevue" (2007);

157. Oil on canvas by Shirley Irons, "Carousel" (2007);

158. Archival pigment print by Michael Light, "Highways 5, 10, 60 and 101 Looking West, LA River and Downtown Beyond 2.12.04" (2004);

159. Cibachrome print by David Maisel, "Terminal Mirage 24" (2005);

160. Mixed media on canvas by Donnie Molls, "Destined to Go Somewhere" (2007);

161. Oil on panel by Donnie Molls, "Sage Hotel #2" (2006);

162. Mixed media on panel by Donnie Molls, "Transmission" (2005);

163. Ink on plexiglass by Soojung Park, "Mela Slices (6 panels)" (2006);

164. Ink on plexiglass by Soojung Park, "Roughs, Shades, Peach" (2007);

165. Oil on canvas by Astrid Preston, "Brief Summer" (2006);

166. Oil on canvas by Astrid Preston, "Facing West" (2006);

167. Cibachrome print by James Welling, "IZGW" (2005);

168. Cibachrome print by James Welling, "ILLR" (2005);

169. Acrylic on paper by Patrick Wilson, "Halloween" (2006);

170. Acrylic on paper by Patrick Wilson, "Halloween III" (2006);

171. Acrylic on paper by Patrick Wilson, "The High Window (study)" (2006);

172. Acrylic on paper by Patrick Wilson, "Playback (study)" (2006);

173. 15,000 shares in Axiom Management Inc.;

174. Redeemable Warrant Notice to purchase 5 million shares of common stock prior to 12/21/10 at $.40 per share in International Power Grp LTD;

175. 80,000 shares (Series B Common Stock) in YS Interactive Corp.;

176. 60,000 shares in Avalon Capital Holdings; and

177. 9,294 shares in Nortel Networks Corp.

## EXHIBIT B

## SWORN DECLARATION OF DEFENDANT MARC S. DREIER

Marc Dreier, being duly sworn, pursuant to Title 28, United States Code, § 1746, declares the following:

1. In a sealed Complaint issued on December 4, 2008, I was charged with one count of securities fraud and one count of wire fraud. I have been incarcerated in the Metropolitan Correctional Center since December 7, 2008.

2. A bail hearing was held on December 11, 2008, before Magistrate Judge Douglas F. Eaton. My release on bail was denied, subject to further consideration based on additional information.

3. I am a U.S. citizen who is 58 years old and have resided my entire life in New York. I have practiced law in New York for the past 33 years. All of my business and professional life has been centered in New York.

4. My entire family – including my two children (ages 19 and 16), my two siblings and my mother – reside in the United States. I am divorced and share custody of my children with my ex-wife. My older child, Spencer, is a college student and had been residing full-time with me in Manhattan for the past six years. My daughter, Jackie, a high school student, has been residing with me approximately 40% of the time and the balance with her mother, who also resides in Manhattan.

5. I have no relatives living abroad. I have no business associates or friends living abroad, with the following few exceptions (paragraphs 6-9):

6. For the last several years, I have worked with Argentine residents Freddy Langsfeld and his wife Patricia Vaga (who is an attorney) in representing investors in Argentine bonds in a class action in federal court in New York. I have also invested with Mr. Langsfeld (approximately $200,000) in a potential biodiesel business in Argentina, which has never been launched. I have visited Argentina only once (more than three years ago) and have infrequent contact with these colleagues.

7. Contrary to the Government's assertion, I have not been to Turkey even once in the past several years (although I previously visited Turkey a few times on vacation). I have no close business associate in Turkey, nor any business associate there at all – only a friend, Erinch Ozada, who lives part-time in Turkey and part-time in New York. In the past I had co-invested with Mr. Ozada in a pleasure boat and in some vacation property – but I had no such investments or any other business with Mr. Ozada as of the time of my arrest.

8. Giovanni Rubboli, approximately 70 years of age, is a financial consultant who lives in Milan. I have done no business with Mr. Rubboli other than (i) representing Rubboli as a

client nearly 30 years ago, (ii) borrowing several hundred thousand dollars from Rubboli more than five years ago (for construction in my firm's law offices), which I have partially repaid, and (iii) allowing Rubboli the use of an office in my law office space in New York when Rubboli visits New York, for which I charge him no rent.  I have not been to Italy for at least five years, I conduct no business in Italy and I have no property or other assets in Italy.

9.   Mona Wardell, my former personal assistant in New York, now lives in Stockholm.  I do no business with Ms. Wardell, have never visited her abroad and have been in contact with her only once since February 2007.

10.  I have no business associates and no friends in St. Martin, Anguilla, Qatar, the United Arab Emirates, Spain or Canada.

11.  In the past year I visited St. Martin only to board a boat that was docked there.  At the Receiver's request, I have now consented to the transfer of that boat to Ft. Lauderdale, Florida, where it has been seized by the Receiver.

12.  In Anguilla, I have a share in a vacation property under construction (which, under the contract with the developer, cannot be occupied until its completion, now expected in November 2009).  I visited Anguilla during the past year (while on vacation in St. Martin) only to see the status of that property.

13.  I have travelled to Spain only once in the past year (and only one other time for a brief vacation several years earlier).  The trip to Spain this past year was to accompany a law partner to Barcelona to receive an honorary award.  I have no business and no associates in Spain.

14.  I visited the United Arab Emirates and Qatar for the first and only time this past November, when I met with several businesspeople, at their invitation, to discuss the possibility of opening a law office in the region and sharing investment opportunities. Those talks were in the most preliminary stage.  I have no property or other assets in those countries and have no business associates there; I know only the handful of people I met for the first time this past November.

15.  I travelled to Canada several times during the past year.  Each trip to Canada, except the most recent, was in connection with representing a client in Canada engaged in a proxy fight for a public company.  That representation concluded during this past summer, and I have had no contact with this client (whom I first met less than a year ago) since then. The only other occasion I have visited Canada during the past year was on the occasion when I was arrested on December 7, 2008.  I have no property or other assets in Canada and, other than as described above, have conducted no business in Canada.

16.  I currently have no money and no assets whatsoever, either in the United States or abroad.  The Government has frozen all bank and brokerage accounts that I previously controlled.  The Government has seized all property that I previously held.  My law firm

has been completely dismantled and put into bankruptcy. My license to practice law has been suspended by Order of the First Department.

17. I have no money abroad. I met with the Receiver, as early as December 17, 2008, and have met with him or his representatives several times since. In addition to providing the Receiver with a complete itemization of all funds and assets that I held directly or indirectly as of the time of my arrest, I have explained to the Receiver in great detail exactly what documents in the Receiver's possession show the disposition of all funds obtained from the transactions which are the subject of the Complaint, including, in particular, the bank statements which would disclose whether or not funds were transferred offshore. I gave the Receiver a detailed accounting of the disposition of those funds and answered every question the Receiver had in that regard. The only funds transferred overseas were (i) payments of principal and interest to foreign accounts designated by the hedge funds that had purchased certain of the allegedly fraudulent notes, and (ii) for a few works of art obtained from certain foreign art galleries, which pieces were shipped to New York and have since been confiscated by the Government.

18. Inasmuch as this same escrow account was also used for deposits from law firm clients in the ordinary course of law firm business, the bank statements also show (i) occasional transfers overseas in the ordinary course of business in connection with closings or other transactions for clients of the law firm, at the direction of these clients who had deposited funds into the account; and (ii) occasional transfers in relatively small amounts for foreign patents and trademark registrations for law firm clients.

19. The bank statements for the escrow account also show the domestic disposition of the $380 million allegedly obtained from the transactions which are the subject of the Complaint. Again, I reviewed the account statements with the Receiver and fully identified the disposition of the funds, showing that all the funds were either (i) wired to the accounts of hedge funds at their direction to make principal and interest payments on note purchases; (ii) transferred to other accounts for the law firm or its affiliates to cover millions of dollars in deficits incurred by the firms from operating expenses, capital expenditures, construction costs and security deposits; (iii) invested and, for the most part, lost in the stock market; or (iv) used for my acquisition of real property, artwork and other property, all of which have now been seized by the Government.

20. I have no criminal record. I graduated from Harvard Law School in 1975, attained partnership at two large New York law firms between 1983 and 1995, and founded a firm bearing my name in 1996 (which grew to more than 250 lawyers).

21. On the several occasions during the past several months when I was already out of the country, fully knowing that I was facing the prospect of prosecution, I nevertheless returned to the United States. In fact, I did this four times during the several weeks before my arrest in New York, each time foregoing any opportunity to avoid prosecution.

22. In late October or early November 2008, I was directly confronted with allegations of fraud by the principal of the real estate development company whose notes I am charged

with fraudulently issuing and by a principal of the accounting firm whose audit letters I am charged with falsifying. At that time a lawyer for the accounting firm, Thomas Manisero, told me on the phone (with principals of the real estate firm and accounting firm also on the line) that a representative of a hedge fund identified in the Complaint as Hedge Fund #1 had informed them of an alleged attempt to use false financial statements to sell a bogus note. Mr. Manisero stated that the matter was extremely serious and that the accounting firm was inclined to "turn the matter over to enforcement" if I could not conclusively demonstrate my innocence.

23. A series of phone calls followed over the next several weeks between me and Mr. Manisero, during which I endeavored to give an explanation. Each time, Mr. Manisero stated that he was dissatisfied with the explanation and that I was leaving him no choice but to report to the accounting firm that there was no innocent explanation for my conduct, thereby implicitly renewing Mr. Manisero's threat to report me to law enforcement.

24. Furthermore, in one of these phone calls, Mr. Manisero identified by name Hedge Fund #2 and asked me if I had engaged in any bogus transactions with that firm. I therefore knew perfectly well that this second hedge fund was also reporting to the real estate firm and the accounting firm that I had engaged in an alleged fraud. It was also very clear to me from my own phone calls with representatives of Hedge Fund #2 at about this time that Hedge Fund #2 was highly suspicious of me. On one occasion, a representative of Hedge Fund #2 informed me that he too had contacted the real estate firm directly (which was confirmed to me when I was copied on an email from the hedge fund to the real estate firm), thereby leaving no doubt in my mind that at least two hedge funds had addressed the transactions directly with the real estate firm and the accounting firm.

25. During the several weeks that these calls occurred, when I knew full well that I was facing the prospect of criminal charges, I was in foreign countries no less than four times. Nevertheless, realizing my exposure, I still chose to return to the United States each time. I did so from St. Martin, from the United Arab Emirates, from Qatar and from Canada.

26. I had at least one phone calls with Mr. Manisero while I was in the United Arab Emirates and on my way to Qatar (in late November), and I knew from that phone call that I had failed to persuade Mr. Manisero to drop the matter, yet I still returned to the United States. I also received an email from Mr. Manisero while I was in Canada during the first week of December 2008, which suggested that Mr. Manisero would be bringing the matter to the authorities, but I nevertheless returned to the United States. In fact, I had a private plane waiting for me at the airport in Toronto on December 2, 2008, which could have taken me to any destination, but instead of fleeing, I remained in Toronto to face questions from the Ontario Teachers Pension Fund even after representatives of the Fund told me on the phone they believed I had engaged in impersonation and fraud. Finally, after I was arrested in Toronto, I agreed to return to the United States rather than remain in Toronto or flee from Toronto – even after I knew, from conversations with my attorney, that I would be arrested upon my arrival in New York.

I affirm under the penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
       January 14, 2009

                                 _____
                                 Marc S. Dreier