UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA       :

     -v-              :

MARC DREIER,

            Defendant.

- - - - - - - - - - - - - - - -x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___JAN 2 9 2009___

**INDICTMENT**

09 Cr.

**09 CRIM 085**

## COUNT ONE

**(Conspiracy To Commit Securities Fraud and Wire Fraud)**

The Grand Jury charges:

### RELEVANT PERSONS AND ENTITIES

1.  At various times relevant to this Indictment, Dreier LLP was a law firm of more than 250 attorneys with its principal office in New York, New York and additional offices in Los Angeles and Santa Monica, California, Albany, New York, Stamford, Connecticut, and Pittsburgh, Pennsylvania.

2.  At all times relevant to this Indictment, MARC DREIER, the defendant, was the founder and managing partner of Dreier LLP.

### THE SCHEME TO DEFRAUD

3.  From in or about 2004 through in or about December 2008, MARC DREIER, the defendant, and his co-conspirators engaged in a scheme to sell fictitious securities in the form of promissory notes purportedly issued by entities located in the United States and Canada.

4.   Beginning in or about 2004, MARC DREIER, the defendant, falsely represented to various hedge funds and investment funds (the "Funds") that he had authority to sell promissory notes (the "False Developer Notes") issued by a real estate development company headquartered in New York, New York (the "Developer").   DREIER further represented to the Funds that the proceeds of the sale of the False Developer Notes would be used to finance investments in real estate projects located in the United States and abroad.   During the course of the scheme, DREIER represented to the Funds that (a) the interest rate to be paid on the False Developer Notes varied between approximately 8 percent and 12 percent, and (b) the notes generally had a term ranging from approximately one to two years.   DREIER also usually offered the Funds holding the notes the opportunity to extend the notes for an additional period of time at the end of their term.

5.   In some instances, MARC DREIER, the defendant, offered to sell the Funds what purported to be newly issued False Developer Notes, and in other instances DREIER offered to sell what purported to be False Developer Notes held by other investment funds that DREIER claimed had previously purchased them from the Developer.

6.   At all times relevant to this Indictment and in furtherance of the scheme, in order to convince the Funds that both their initial purchase and any subsequent extensions of the

2

False Developer Notes were legitimate, MARC DREIER, the
defendant, supplied the Funds with fake financial statements that
purported to be issued by the Developer and its related entities.
In many instances, DREIER also claimed that the fake financial
statements were audited by an accounting firm located in New
York, New York (the "Accounting Firm").  For example, DREIER
provided the Funds with forged letters purportedly signed by a
partner at the Accounting Firm stating that the Accounting Firm
had audited the fake financial statements provided by DREIER.

     7.  At times, the Funds that purchased the False
Developer Notes sought, as part of their due diligence, to speak
to a representative of the Developer or others about the False
Developer Notes, the Developer's business or the financial
statements.  In response, and in furtherance of the scheme, MARC
DREIER, the defendant, arranged for these Funds to have meetings
or telephone calls with individuals who falsely claimed to be,
and impersonated, representatives of the Developer or others,
including the Developer's Chief Executive Officer ("CEO") and its
controller.  Finally, as part of these sales, DREIER supplied
False Developer Notes and other documents purportedly signed by
representatives of the Developer to purchasers of the notes.

     8.  In addition, in furtherance of the scheme, starting
at least in or about 2008, MARC DREIER, the defendant, began to
sell fictitious promissory notes (the "Fake Pension Plan Notes")

3

purportedly issued by a pension plan located in Canada (the "Pension Plan").  The Fake Pension Plan Notes also purported to have terms of approximately one to two years, to pay interest of approximately 10 percent, and to be held by an investment fund that had previously received them from the Pension Plan.  DREIER falsely represented to various Funds that the Fake Pension Plan Notes were guaranteed by another company located in Canada (the "Canadian Company").

9.  In or about 2008, MARC DREIER, the defendant, also offered for sale notes in which the roles of the Canadian Company and the Pension Plan were reversed.  In these instances, DREIER claimed that the Canadian Company was the issuer of the notes and that the Pension Plan guaranteed the notes (the "Fake Canadian Company Notes").

10.  As with the sale of the Fake Developer Notes, when Funds that were purchasing the Fake Pension Plan Notes and Fake Canadian Company Notes sought, as part of their due diligence, to speak to a representative of the Pension Plan, the Canadian Company or other entities, MARC DREIER, the defendant, arranged meetings or telephone calls with individuals who falsely claimed to be, and impersonated, representatives of the Pension Plan or other entities.  As part of these sales, DREIER supplied fabricated and forged notes, assignments, and guarantees

purportedly signed by representatives of the Pension Plan and the Canadian Company.

11.   Between in or about 2004 and in or about December 2008, MARC DREIER, the defendant, sold hundreds of millions of dollars worth of Fake Developer Notes and Fake Pension Plan Notes in the manner described in paragraphs 3 through 10 above.   In truth and in fact, as DREIER well knew, these promissory notes were entirely fictitious and had not been issued by the entities supposedly issuing them.   Moreover, documents DREIER supplied, including the promissory notes themselves, were forged.   In addition, as DREIER well knew, the financial statements of the Developer and the accompanying letters of the Accounting Firm that DREIER supplied were fabricated and forged.

12.   Moreover, with respect to the meetings and phone calls that MARC DREIER, the defendant, arranged between the Funds and representatives of the issuers and holders of the Fake Developer Notes, Fake Pension Plan Notes, and Fake Canadian Company Notes, either DREIER himself, or co-conspirators acting at his direction, impersonated the representatives of those entities.   DREIER arranged phone calls and in-person meetings at which either he or his co-conspirators claimed to be representatives of those entities when in fact they were not.   In order to carry out these impersonations as part of the fraudulent scheme, DREIER obtained numerous cellphones, designated various

phone lines at Dreier LLP, and set up various fake email addresses.  DREIER told the purchasers of the fictitious notes to contact the issuers or holders of the notes at those phone numbers and fake email addresses.  On at least one occasion in or about October 2008, to enable a co-conspirator to impersonate a representative of the Developer as part of and in furtherance of the fraudulent scheme, DREIER gained unauthorized access to the offices of the Developer.  In or about December 2008, DREIER gained entry into the Pension Plan offices in Canada in order to impersonate a representative of the Pension Plan.

13.  MARC DREIER, the defendant, used the proceeds of the sale of these notes to, among other things, purchase personal assets for himself, including numerous homes, a yacht, several vehicles, and expensive art work, fund the operations of his law firm, pay interest and principal to previous purchasers of the notes, and pay his co-conspirators.  In addition, during the course of the fraudulent scheme, in order to fund the scheme and further support his lavish lifestyle, DREIER misappropriated funds from clients of Dreier LLP, including, for example, money placed into an escrow account on behalf of a Dreier LLP client and money obtained in the settlement of a client lawsuit.  When the fraud was publicly exposed in December 2008, the out-of-pocket loss sustained by the Funds that purchased fictitious

promissory notes from DREIER and by clients whose funds were misappropriated by DREIER exceeded $400 million.

## THE CONSPIRACY

14.   From in or about 2004 through in or about December 2008, in the Southern District of New York and elsewhere, MARC DREIER, the defendant, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, to commit:  (a) fraud in connection with the purchase and sale of securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5; and (b) wire fraud, in violation of Title 18, United States Code, Section 1343.

## Objects Of The Conspiracy

## Securities Fraud

15.   It was a part and an object of the conspiracy that MARC DREIER, the defendant, and others known and unknown, unlawfully, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of promissory notes purportedly issued by the Developer, the Pension Plan and the Canadian Company, manipulative and deceptive devices and contrivances in violation of Title 17, Code of

7

Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes and artifices to defraud; (b) making and causing others to make untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon purchasers and sellers of the securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

### Wire Fraud

16.   It was further a part and an object of the conspiracy that MARC DREIER, the defendant, and others known and unknown, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

## Means And Methods Of The Conspiracy

17.   Among the means and methods by which MARC DREIER, the defendant, and his co-conspirators would and did carry out the conspiracy were the following:

a.   DREIER sold fictitious promissory notes purportedly issued by the Developer and the Pension Plan.

b.   DREIER supplied fabricated financial statements to purchasers of the fictitious promissory notes.

c.   DREIER supplied forged notes and other documents to purchasers of the fictitious promissory notes.

d.   DREIER and his co-conspirators engaged in impersonations of the supposed issuers and holders of the promissory notes, including during interstate telephone calls, in order to convince purchasers that the notes were real.

e.   DREIER and his co-conspirators used facilities of interstate and foreign commerce in furtherance of the objects of the conspiracy.

## Overt Acts

18.   In furtherance of the conspiracy and to effect its illegal objects, MARC DREIER, the defendant, and his co-conspirators committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.   In or about November 2004, DREIER sold a promissory note purportedly issued by the Developer to a Fund.

9

b.   In or about December 2005, DREIER sold a promissory note purportedly issued by the Developer for approximately $10 million.

c.   In or about December 2006, DREIER extended the term and increased the amount of a promissory note purportedly issued by the Developer to $60 million.

d.   In or about November 2007, DREIER extended the term of a $5 million promissory note purportedly issued by the Developer.

e.   On or about July 2, 2008, an individual located in Canada acting at DREIER's direction impersonated a representative of the Canadian Pension Plan on a telephone call with a Fund representative located in New York, New York.

f.   In or about July 2008, DREIER sold two promissory notes with a value totaling approximately $52 million purportedly issued by the Pension Plan.

g.   In or about early October 2008, a co-conspirator not named as a defendant herein ("CC-1") contacted the founder of a hedge fund about promissory notes that DREIER sought to sell.

h.   On or about October 15, 2008, DREIER and CC-1 visited the offices of the Developer in New York, New York.

i.   On or about October 23, 2008, while in Connecticut, DREIER and CC-1 participated in a conference call

10

with individuals located in New York, New York concerning
fictitious promissory notes.

j.   On or about October 29, 2008, DREIER caused an
email concerning fictitious promissory notes to be sent on a fake
email address between New York, New York and Connecticut.

k.   On or about November 10, 2008, DREIER had a
telephone conversation while he was in the United Arab Emirates
with a client in New York, New York concerning that client's
settlement funds.

l.   On or about December 2, 2008, DREIER
impersonated a representative of the Pension Plan.

m.   On or about December 4, 2008, DREIER called
New York, New York from Canada and directed the transfer of $10
million from a Dreier LLP Attorney Trust account to a personal
account he controlled.

(Title 18, United States Code, Section 371.)

## COUNT TWO

### (Securities Fraud)

The Grand Jury further charges:

19.   The allegations contained in paragraphs 1 through
13 and paragraphs 17 and 18 of this Indictment are repeated and
realleged as if fully set forth herein.

20.   From in or about 2004 up to and including in or
about December 2008, in the Southern District of New York and

elsewhere, MARC DREIER, the defendant, unlawfully, willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, in connection with the purchase and sale of securities, used and employed manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon purchasers of promissory notes purportedly issued by the Developer, the Pension Plan and the Canadian Company.

     (Title 15, United States Code, Sections 78j(b) and 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5;
Title 18, United States Code, Section 2.)

## COUNTS THREE THROUGH SEVEN

### (Wire Fraud)

     The Grand Jury further charges:

     21.  The allegations contained in paragraphs 1 through 13 and paragraphs 17 and 18 of this Indictment are repeated and realleged as if fully set forth herein.

22.   On or about the dates set forth below, in the Southern District of New York and elsewhere, MARC DREIER, the defendant, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, to wit, the fraudulent scheme described in Count One, did transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, the following signs, signals, and sounds for the purpose of executing such scheme and artifice:

| COUNT | APPROXIMATE DATE | WIRE COMMUNICATION |
|-------|------------------|--------------------|
| 3 | July 2, 2008 | A telephone call between Canada and New York, New York concerning fictitious promissory notes |
| 4 | October 23, 2008 | A telephone call between New York, New York and Connecticut concerning fictitious promissory notes |
| 5 | October 29, 2008 | An email between New York, New York and Connecticut concerning fictitious promissory notes |
| 6 | November 10, 2008 | A telephone call between the United Arab Emirates and New York, New York concerning the settlement funds of one of DREIER'S clients |
| 7 | December 4, 2008 | A telephone call between Canada and New York, New York concerning the transfer of $10 million from a Dreier LLP Attorney Trust account to a personal account of DREIER |

(Title 18, United States Code, Sections 1343 and 2.)

13

**FORFEITURE ALLEGATION**

23.   As a result of committing one or more of the foregoing securities fraud offenses, in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2, as alleged in Counts One and Two of this Indictment, and wire fraud offenses, in violation of Title 18, United States Code, Sections 1343 and 2, as alleged in Counts Three through Seven of this Indictment, MARC DREIER, the defendant, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the fraud offenses, including but not limited to the following:

a.   At least $400 million in United States currency, in that such sum in aggregate is property representing the amount of proceeds obtained as a result of the charged securities and wire fraud offenses, including but not limited to:

> 1.   2005 Heesen Motor Yacht "Seascape," Registration No. 737657, located at Pier 66, Fort Lauderdale, Florida;
>
> 2.   2008 Novurunia Equator 530 Yacht Tender;
>
> 3.   2008 Blue Yamaha FX1100-G Waverunner, ID No. F1X-829554;

4.   2008 Blue Yamaha SJ700 Waverunner, ID No. F2F-500725;

5.   2002 Yamaha FX140 Waverunner, Registration No. NY2645UY;

6.   2004 Yamaha FX160HO Waverunner, Registration No. NY5285MB;

7.   2000 Mercedes Benz S500 Sedan, Vehicle ID No. WDBNG75J6YA094319;

8.   1997 Mercedes Benz SL500 Roadster, Vehicle ID No. WDBFA67F6VF147477;

9.   2006 BMW 650i Convertible, Vehicle ID No. WBAEK13406CN76888;

10.  2007 Aston Martin DB9 Volante, Vehicle ID No. SCFAD02A37GB07094;

11.  Any and all right, title, and interest in the shares of the capital stock of Beacon Court Condominium and the proprietary lease of Unit No. 34C, located at 151 East 58th Street, New York, New York;

12.  Any and all right, title, and interest in the real property and appurtenances known as 111 Dune Road, East Quogue, New York 11942;

13.  Any and all right, title, and interest in the real property and appurtenances known as 109 Dune Road, East Quogue, New York 11942;

14.  Any and all right, title, and interest in the real property and appurtenances known as 27 Meadow Lane, West Hampton, New York 11977;

15.  Any and all right, title, and interest in the real property and appurtenances known as Temenos Development, Unit #1-H31, Anguilla, British West Indies;

16.  Any and all right, title, and interest in the real property and appurtenances known as Temenos Development, Unit #2-G32, Anguilla, British West Indies;

15

17. Any and all funds in Account No. 570-48022-176 AAA held at Morgan Stanley in the name of Marc S. Dreier;

18. Any and all funds in Account No. 2000029760358 held at Wachovia Bank in the name of MEA Properties LLC;

19. Any and all funds in Account No. 1010081258695 held at Wachovia Bank in the name of Marc S. Dreier;

20. Any and all funds in Account No. 036502230065 held at JP Morgan Chase in the name of Four Winds Holdings;

21. Any and all funds in Account No. 112735798 held at City National Bank in the name of Marc S. Dreier;

22. Acrylic on canvas by Ghada Amer, "Black Kiss" (2007);

23. Three dimensional archival print by John Baldessari, "Arms and Legs" (2008);

24. Lithographic screenprint by John Baldessari, "Two Bowlers (with Questioning Person)" (1994);

25. Screenprint by John Baldessari, "Person with Guitar (Red)" (2005);

26. Screenprint by John Baldessari, "Two Opponents (Blue & Yellow)" (2004);

27. Mixographia relief print by John Baldessari, "Stonehenge (With Two Persons) Yellow" (2005);

28. Mixographia relief print by John Baldessari, "Stonehenge (With Two Persons) Blue" (2005);

29. Photogravure by John Baldessari, "Paradise" (1989-90);

30. Screenprint by John Baldessari, "Noses & Ears Etc.; The Gemini Series" (2006);

31. Lithograph by Vija Celmins, "Untitled (Ocean)"

(1972);

32. Screenprint by Vija Celmins, "Ocean with Cross #1" (2005);

33. Oil on paper by Robert Greene, "Syd" (2006);

34. Enamel on steel by Keith Haring, "Untitled" (1982);

35. Household gloss on canvas by Damien Hirst, "2-(P-CHLOROPHENOXY)-2-METHYLPRIOPIONIC ACID (multicolored spots)" (1998);

36. Household gloss on canvas by Damien Hirst, "Elaidic Anhydride (hot pinks spot painting)" (2007);

37. Silkscreen print by Damien Hirst, "Santiago de Compostela" (2007);

38. Silkscreen print by Damien Hirst, "Duomo" (2007);

39. Silkscreen print by Damien Hirst, "St. Peter's" (2007);

40. Lithograph by David Hockney, "Celia Inquiring" (1979);

41. Lithograph and etching by David Hockney, "White Porcelain" (1985);

42. Etching and aquatint by David Hockney, "Chair with Book on Red Carpet" (1998);

43. Lithograph and etching by David Hockney, "Picture of Two Chairs, from Moving Focus Series" (1985-86);

44. Lithograph by David Hockney, "The Wave, A Lithograph" (1990);

45. Polychrome aluminum by Robert Indiana, "Love" (1966/1999);

46. Etching by Jasper Johns, "Within" (2007);

47. Oil on canvas by Alex Katz, "Red Tulips" (1967);

48.   Painting by Alex Katz, "Blue Umbrella" (1979-80);

49.   Screenprint by Roy Lichtenstein, "Reverie (C. 38)" (1965);

50.   Oil and magna on canvas by Roy Lichtenstein, "First Painting with Bottle" (1975);

51.   Offset lithograph by Roy Lichtenstein, "Crying Girl" (1963);

52.   Acrylic and graphite on canvas by Agnes Martin, "Loving Love" (2000);

53.   Watercolor by Kim McCarthy, "Untitled (Yellow Girl 3)" (2006);

54.   Watercolor by Kim McCarthy, "Untitled (Yellow Boy)" (2006);

55.   Cibachrome print by Elisabeth Montagnier, "Les Roseaux" (unknown);

56.   Color photographs by Richard Prince, "Untitled (Four Women)" (1980);

57.   Ink and watercolor on canvas by David Rathman, "Untitled (13)" (2007);

58.   Oil on canvas by Mark Rothko, "Untitled" (1957-63);

59.   Gelatin silver print by Julius Shulman, "Case Study House #22 (2 Girls) (Pierre Koenig, architect, 1959)" (1960);

60.   Silkscreen ink and acrylic on canvas by Andy Warhol, "Jackie (Blue Jackie, 3 quarter view)" (1964);

61.   Silkscreen ink and acrylic on canvas by Andy Warhol, "Jackie (White Jackie)" (1964);

62.   Silkscreen ink and acrylic on canvas by Andy Warhol, "Jackie (Profile looking down)" (1964);

63.  Silkscreen ink and acrylic on canvas by Andy
     Warhol, "Jackie (smiling Jackie w/JFK)" (1964);

64.  Screenprint by Andy Warhol, "Space Fruit: Still-
     Lifes (Cantaloupes)" (1979);

65.  Screenprint by Andy Warhol, "Martha Graham: Letter
     to the World (The Kick)" (1986);

66.  Silkscreen ink and synthetic polymer paints on
     canvas by Andy Warhol, "John Lennon" (1985-86);

67.  Silkscreen ink and synthetic polymer paints on
     canvas by Andy Warhol, "Rudolph Nureyev" (c.
     1975);

68.  Screenprint on canvas by Andy Warhol, "Muhammad
     Ali (downcast head)" (1978);

69.  42" plasma screen, custom speakers, and HD media
     player by Robert Wilson, "Salma Hayek" (2006);

70.  Digital C print by Thomas Wrede, "Beach Walkers"
     (2004);

71.  Digital C print by Thomas Wrede, "Mud Flat
     Wanderers" (2005);

72.  Digital chromogenic print by Thomas Wrede,
     "Midsummer Night at Sea" (2004);

73.  Digital chromogenic print by Thomas Wrede, "Beach
     Tents" (2004);

74.  Digital chromogenic print by Thomas Wrede,
     "Tidelands with Playful Dogs" (2004);

75.  Digital chromogenic print by Thomas Wrede,
     "Meadow" (2005);

76.  Digital chromogenic print by Thomas Wrede, "Under
     A Cloud" (2004);

77.  Digital chromogenic print by Thomas Wrede,
     "Ashore" (2002);

78.  Print by Pablo Picasso, "Portrait of a girl"
     (unknown);

19

79. Handblown glass by Dale Chihuly, "Persian Wall Installation" (2008);

80. Handblown glass by Dale Chihuly, "Gilded Melon Ikebana with Green and Dark Pink Stems" (2001);

81. Handblown glass by Dale Chihuly, "Patent Yellow Macchia with Cherry Red Lip Wrap" (2002);

82. Handblown glass by Dale Chihuly, "Mille Flor IV, Section K" (2004);

83. Aquatint by Henri Matisse, "Grand Masque" (1948);

84. Aquatint by Henri Matisse, "Nadia au profil aigu" (1948);

85. Aquatint by Henri Matisse, "Nadia aux cheveux lisses" (1948);

86. Bronze sculpture by Tom Otterness, "Princess with Magic Fish" (2003);

87. Bronze sculpture by Tom Otterness, "Big Thief" (2001);

88. Bronze sculpture by Tom Otterness, "Cone Figure" (2001);

89. Print by Eric Perez, [unknown title] (unknown);

90. Bronze sculpture by JR Summers, [unknown title] (unknown);

91. Screenprint with mounted collage element by Donald Baechler, "Brown Hat" (1993);

92. Screenprint with mounted collage element by Donald Baechler, "Arithmetic Head" (1993);

93. Stenciled handmade paper by Donald Baechler, "York House Suite (6)" (2000);

94. Stenciled handmade paper by Donald Baechler, "York House Suite (2)" (2000);

95. Lithograph with hand painting by Jim Dine, "Very Life In Japan" (2004);

96. Set of five color linocuts by Sol Lewitt, "Isometric Figures (1-5)" (2002);

97. Seven-color silkscreen by Ryan McGuiness, "Untitled (Peripheral Drift Illusion)" (2007);

98. Silkscreen and platinum leaf on paper by Takashi Murakami, "Flower" (2006);

99. Color lithograph by Don Nice, "American Still Life I" (1980);

100. Color lithograph by Don Nice, "American Still Life II" (1980);

101. Screenprint by Dan Walsh, "Vehicle I" (2007);

102. Screenprint by Dan Walsh, "Vehicle II" (2007);

103. Gouache on paper by Charles Arnoldi, "Untitled (07.126)" (2007);

104. Gouache on paper by Charles Arnoldi, "Untitled (07.127)" (2007);

105. Gouache on paper by Charles Arnoldi, "Untitled (07.128)" (2007);

106. Acrylic on canvas by Charles Arnoldi, "In the Saddle" (2007);

107. Epson print by Rick Ehrlich, "HR1" (2005);

108. Epson print by Rick Ehrlich, "HR2" (2005);

109. Epson print by Rick Ehrlich, "HR10" (2005);

110. Epson print by Rick Ehrlich, "HR16" (2005);

111. Epson print by Rick Ehrlich, "Graffiti (KUMA)" (2005);

112. Epson print by Rick Ehrlich, "Life Guard Tower #2" (2006);

21

113. Epson print by Rick Ehrlich, "Life Guard Tower #7" (2006);

114. Epson print by Rick Ehrlich, "Surfer #1" (2006);

115. Epson print by Rick Ehrlich, "Surfer #4" (2006);

116. Color aquatint etching by Kota Ezawa, "Kota" (2006);

117. Three aquatints by Dan Flavin, "Untitled (Triptych)" (1996-98);

118. Pigmented ink with photogravure by Robert Rauschenberg, "Lotus IV" (2008);

119. Pure pigment on archival paper by Michal Rovner, "Notes 8" (2002);

120. Acrylic on linen by Glen Rubsamen, "What Used to Be Called 'Oceanic Feeling'" (2006);

121. Acrylic on linen by Glen Rubsamen, "A Too-Clear Vision of Good and a Too-Sure Hatred of Evil" (2007);

122. Set of three color soft ground etchings by Ed Ruscha, "L.A.S.F. #1, #2, #3" (2003);

123. Series of four silver-gelatin prints by Ed Ruscha, "Rooftops" (1961/2004);

124. Colored ink on paper by Chris Taggart, "Self-Portrait as (a Ghost)" (2005);

125. Acrylic on canvas by Brad Spence, "Literature" (2007);

126. Acrylic on canvas by Brad Spence, "Gaggle" (2007);

127. Cibachrome print by Wolfgang Tillmans, "Aufsicht (LA)" (2004);

128. Color direct gravure by Wayne Thiebaud, "Cakes and Pies" (2006);

129. Color direct gravure by Wayne Thiebaud, "Cupcakes and Donuts" (2006);

130. Cibachrome print by Doug Aitken, "Pure Channel" (2005);

131. Acrylic and pastel on paper by Peter Alexander, "Study for Gas" (1989);

132. Digital lambda print by Irit Batsry, "Key Light" (2006);

133. Alkyd on canvas by Marco Cassentini, "Every Afternoon 658" (2006);

134. Alkyd on canvas by Marco Cassentini, "Every Afternoon 659" (2006);

135. Alkyd on canvas by Marco Cassentini, "Every Afternoon 660" (2006);

136. Inkjet on watercolor paper by Benny Chan, "114301 (Interior of baggage claim, JFK)" (2006);

137. Inkjet on watercolor paper by Benny Chan, "114302 (Airplane, JFK)" (2006);

138. Inkjet on watercolor paper by Benny Chan, "900161 (Fly loft behind stage)" (2007);

139. Oil on canvas by Larry Cohen, "View from the top of the California Incline" (2006);

140. Cibachrome print by Marcus Doyle, "Radisson 2 (No Diving)" (2002);

141. Cibachrome print by Marcus Doyle, "Hollywood, Los Angeles, CA" (2005);

142. Cibachrome print by Marcus Doyle, "Radisson 1 (Potted Bush)" (2002);

143. Cibachrome print by Marcus Doyle, "Deli Liquor" (2005);

144. Cibachrome print by Marcus Doyle, "Ventura, CA Christmas Eve (Broccoli Field)" (2002);

145. Cibachrome print by Marcus Doyle, "Tire Tracks, Santa Monica, CA" (2005);

146. Cibachrome print by Marcus Doyle, "Urban Sport 3, Tennis Court" (2003);

147. Acrylic on canvas by Lorser Feitelson, "Untitled (February 28)" (1971);

148. Ilfochrome by Robert Flick, "At Cambria-A_01082401 (at Cambria Looking West)" (2001);

149. Ilfochrome by Robert Flick, "At Cambria-B_01082401 (at Cambria Looking West)" (2001);

150. Cibachrome print by Robert Flick, "LD SV970121 Almeda B, Los Angeles, CA" (1997);

151. Oil on paper by Robert Greene, "Nic" (2006);

152. Oil on paper by Robert Greene, "Lenore" (2006);

153. Oil on canvas by Jane Harris, "Glory Day" (2006);

154. Oil on canvas by Shirley Irons, "Conference Room 1" (2006);

155. Oil on canvas by Shirley Irons, "Interim, Pittsburgh" (2007);

156. Oil on canvas by Shirley Irons, "Corridor, Bellevue" (2007);

157. Oil on canvas by Shirley Irons, "Carousel" (2007);

158. Archival pigment print by Michael Light, "Highways 5, 10, 60 and 101 Looking West, LA River and Downtown Beyond 2.12.04" (2004);

159. Cibachrome print by David Maisel, "Terminal Mirage 24" (2005);

160. Mixed media on canvas by Donnie Molls, "Destined to Go Somewhere" (2007);

161. Oil on panel by Donnie Molls, "Sage Hotel #2" (2006);

162. Mixed media on panel by Donnie Molls, "Transmission" (2005);

24

163. Ink on plexiglass by Soojung Park, "Mela Slices (6 panels)" (2006);

164. Ink on plexiglass by Soojung Park, "Roughs, Shades, Peach" (2007);

165. Oil on canvas by Astrid Preston, "Brief Summer" (2006);

166. Oil on canvas by Astrid Preston, "Facing West" (2006);

167. Cibachrome print by James Welling, "IZGW" (2005);

168. Cibachrome print by James Welling, "ILLR" (2005);

169. Acrylic on paper by Patrick Wilson, "Halloween" (2006);

170. Acrylic on paper by Patrick Wilson, "Halloween III" (2006);

171. Acrylic on paper by Patrick Wilson, "The High Window (study)" (2006);

172. Acrylic on paper by Patrick Wilson, "Playback (study)" (2006);

173. 15,000 shares in Axiom Management Inc.;

174. Redeemable Warrant Notice to purchase 5 million shares of common stock prior to 12/21/10 at $.40 per share in International Power Grp LTD;

175. 80,000 shares (Series B Common Stock) in YS Interactive Corp.;

176. 60,000 shares in Avalon Capital Holdings;

177. 9,294 shares in Nortel Networks Corp.;

178. Any and all funds in Account No. 36502055966 held at JP Morgan Chase in the name of Dreier LLP;

179. Any and all funds in Account No. 36606819465 held at JP Morgan Chase in the name of Dreier LLP;

180. Any and all funds in Account No. 91391480465 held at JP Morgan Chase in the name of Dreier LLP; and

181. Any and all funds in Account No. 2000038437753 held at Wachovia Bank in the name of Dreier LLP Master Escrow 2.

### Substitute Asset Provision

24.  If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(i) cannot be located upon the exercise of due diligence;

(ii) has been transferred or sold to, or deposited with, a third person;

(iii) has been placed beyond the jurisdiction of the Court;

(iv) has been substantially diminished in value; or

(v) has been commingled with other property which cannot be subdivided without difficulty; it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; Title 18, United States Code, Sections 1343 and 2; and Title 21, United States Code, Section 853(p).)

FOREPERSON

LEV L. DASSIN
Acting United States
Attorney

26

Form No. USA-33s-274 (Ed. 9-25-58)

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

**UNITED STATES OF AMERICA**

- v -

**MARC DREIER,**

**Defendant.**

## INDICTMENT

09 Cr.

(Title 18, United States Code,
Sections 371, 1343 and 2; Title 15, United States Code
Sections 78j(b), 78ff, Title 17, Code of Federal Regulations,
Section 240.10b-5)

LEV L. DASSIN
Acting United States Attorney.

**A TRUE BILL**

Foreperson.

*INDICTMENT FILED.*
*CASE ASSIGNED TO USDJ*
*RAKOFF.*
*FOX, M.J.*

01/29/09