UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
UNITED STATES OF AMERICA

            -against-                        No. 09 CR 85 (JSR)

MARC DREIER,

                   *Defendant.*

-----------------------------------------------------------------X


## MEMORANDUM IN AID OF SENTENCING

      This Memorandum is respectfully submitted on behalf of Marc Dreier to assist the Court in determining an appropriate sentence.

      Marc Dreier understands that he committed extremely serious crimes, and he expects to receive a significant sentence.  He understands that he betrayed the trust placed in him by investors, clients, partners, employees, creditors, friends and family.  He understands that the victims of his crimes have suffered tremendous financial losses.  He is profoundly remorseful.

      Since his arrest, he has done whatever little he can to start to make amends for his crimes.  He has accepted full responsibility for his actions.  He has spent countless hours with the Court-appointed Receiver and bankruptcy Trustees, detailing the disposition of all the money he misappropriated.  He has done everything possible to identify, preserve and recover assets available for restitution.

      Dreier's punishment for his crimes has already begun.  He has been publicly disgraced and vilified.  His friends have abandoned him and his colleagues have shunned him.  He has had to witness the shame and suffering that his actions have brought upon his family.  He has lost his

law firm and every penny and possession that he ever had. And now he will lose his freedom as well, deservedly so.

In seeking some measure of leniency we appeal not to sympathy but to reason. We request a sentence that is both rational and proportionate. As colossal frauds capture national headlines, sentences for white collar offenders must not become disproportionately long. In many ways, the goals of sentencing as embodied in 18 U.S.C. § 3553(a) have suffered collateral damage in the war on white collar crime.

Marc Dreier is 59 years old. He asks for the opportunity to still have some meaningful life beyond incarceration. A sentence that allows for that makes sense, considering the facts of this case, the history and characteristics of the individual, and perhaps most importantly, the goals of federal sentencing.

### Defense Counsel's Sentencing Recommendation

At the outset, we respectfully submit for the Court's consideration a sentencing range with a rational basis under both the advisory Sentencing Guidelines and 18 U.S.C. § 3553(a). That range is 121-151 months.

This is a recommendation for a non-guidelines sentence. Yet, as explained below, it is a recommendation firmly rooted in the letter and spirit of the Guidelines, adjusting a single sentencing enhancement to bring it back within the range of reason and sound public policy. Further, it is a sentence "sufficient, but not greater than necessary" to fulfill the purposes of sentencing. See 18 U.S.C. § 3553(a).

# I.

## The Government's Guidelines Calculation

By letter dated May 11, 2009 (Exhibit A, "Gov't Pimentel Letter" at 3-4) the government

set forth the Guidelines calculation for this case:

| | |
|---|---|
| Base Offense Level (§ 2B1.1(a)(1)) | 7 |
| Loss of more than $400,000,000 (§ 2B1.1(b)(1)(P)) | +30 |
| Ten or more victims (§ 2B1.1(b)(1)(a)) | +2 |
| Involved sophisticated means (§ 2B1.1(b)(9)) | +2 |
| Defendant was an organizer or leader (§ 3B1.1(a)) | +4 |
| Defendant abused a position of trust (§ 3B1.3) | +2 |
| Acceptance of responsibility (§ 3E1.1(a) and (b)) | -3 |
| Adjusted Offense Level | 44 |

The Probation Department set forth an identical calculation in the PSR.  (Presentence

Investigation Report, dated June 18, 2009, revised July 6, 2009 ("PSR") at ¶¶ 45-57.)

The Guidelines for Dreier in this case, based on the government's calculation, are quite

literally "off the chart."  The sentencing table – designed to advise judges on sentencing for the

full spectrum of federal offenders – only reaches an offense level of 43.  Dreier, however, scores

an adjusted offense level of 44.

As stated by the government: "An offense level of 44 and a Criminal History Category of

I yields a sentencing range of life imprisonment."  (Gov't Pimentel Letter at 4; PSR at ¶ 106.)

Because Dreier "is not charged with any offense that carries a maximum term of life

imprisonment, the Guideline sentence is computed by adding the applicable statutory maximum

sentences on all counts of conviction, which results in a Guideline sentence of 145 years' imprisonment." (Gov't <u>Pimentel</u> Letter at 4; PSR at ¶ 106.)

Given Dreier's current age of 59, the Guidelines therefore suggest that the Court incarcerate him until age 204.

## II.

## <u>The Fundamental Flaw in the Guidelines</u>

As demonstrated by the government's Guidelines calculation, the offense level of 44 is driven almost entirely by the single enhancement for loss amount under Section 2B1.1(b)(1). Were it not for this 30-level enhancement, Marc Dreier's offense level would be 14, and his advisory Guidelines sentencing range would be 15-21 months. While an enhancement based on loss amount should clearly apply to fraud-based offenses – including the offense in this case – the escalating enhancement in the loss table at Section 2B1.1(b)(1) is both unreasonable and counter-productive. It is out of line with the enhancements elsewhere in Section 2B1.1 and in the Guidelines as a whole, and it effectively renders the Guidelines meaningless in white collar cases. <u>See</u> <u>United States v. Adelson</u>, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006), <u>aff'd</u>, 301 Fed. Appx. 93, at **1 (2d Cir. Dec. 9, 2008) (describing "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense."); <u>see also</u> <u>See</u> <u>United States v. Parris</u>, 573 F. Supp. 2d 744, 745, 754 (E.D.N.Y. 2008) (describing "the Sentencing Guidelines for white-collar crimes" as "a black stain on common sense" and sentencing defendant "to a term of incarceration of 60 months in the face of an advisory guidelines range of 360 to life.").

Attached to this Memorandum as Exhibit B is a chart listing the enhancements in Sections 2A ("Offenses Against the Person") and 2B ("Basic Economic Offenses") of the Guidelines – excluding the loss chart at Section 2B1.1(b)(1). As this survey demonstrates, no other enhancement in Section 2B of the Sentencing Guidelines – the section which applies to Dreier's offense – even approaches the 30 levels added under Section 2B1.1(b)(1). Nor does any enhancement under Section 2A, which deals with violent crime. <u>Indeed, there is no double-digit enhancement at all in Sections 2A or 2B</u>. The largest enhancements <u>anywhere</u> in the Guidelines appear to be:

| Enhancement | Points Added |
|---|---|
| Obstruction of justice related to terrorism (2J1.2(b)(1)(C)) | 12 |
| Felony involving or intending to promote terrorism (3A1.3(a)) | 12 |
| Willfully boarding an aircraft with a dangerous weapon or material without regard for the safety of human life (2K1.5(b)(1)) | 15 |
| Trafficking, receiving or possessing a portable rocket, missile, or launcher (2K2.1(b)(3)(A)) | 15 |
| Unlawfully entering or remaining in the United States after being convicted of certain major felonies (2L1.2(b)(1)(A)) | 16 |
| Bid-rigging or price-fixing, if the volume of commerce exceeds $1,500,000,000 (2R1.1(b)(2)(H)) | 16 |

Thus, other than the enhancement for loss amount under Section 2B1.1(b)(1), the largest enhancements in all of the Guidelines are 12-16 levels. A 30-level enhancement for fraud loss is therefore enormously disproportionate when considering the Guidelines as a whole. It simply cannot be a rational statement of sound public policy that the most serious aggravating factor in

all of federal criminal law – by almost double the amount of the next highest enhancement – is the amount of fraud loss in a white collar case. [1]

And, indeed, there is no indication that this enhancement is based in real-world policy, rather than reactionary politics.  The 30-level enhancement under Section 2B1.1(b)(1) was added in the 2003 Amendments to the Guidelines, in the wake of the corporate scandals at Enron, World Com, Tyco, and Global Crossing.  See USSG § 2B1.1 (Historical Notes) (2003 Amendments) (noting a previous maximum enhancement of 26 levels).  The 2003 Amendments "expand[ed] the loss table at § 2B1.1(b)(1) to punish adequately offenses that cause catastrophic losses of magnitudes previously unforeseen, such as the serious corporate scandals that gave rise to several portions of the [Sarbanes-Oxley] Act."  USSG § 2B1.1 (Historical Notes) (2003 Amendments) (Reason for Amendment).  These Amendments, while perhaps politically responsive, were not based on any empirical evidence that more severe sentences were actually needed:

> A general increase in federal economic crime sentences might have been justifiable on deterrence grounds if there were evidence that existing penalties were failing to deter potential offenders.  One indicator of insufficiently stringent penalties for a class of crimes would be an increase in the general incidence of such crimes.  However, the available statistics show exactly the opposite trend for economic offenses.

---

[1]      Certainly, comparing sentencing enhancements in a vacuum is an imperfect study, as it fails to consider the relationship between the enhancements in each section and the varying base offense levels for each underlying crime.  However, a comparison of only enhancements is nevertheless instructive: the Guidelines take into account the seriousness of an underlying offense by setting a base offense level; likewise, the Guidelines take into account the seriousness of a particular aggravating factor by applying a corresponding enhancement.

Moreover, taking into account the base offense level of Dreier's crime, before enhancements, only further demonstrates that the Section 2B1.1(b)(1) enhancement is disproportionate.  Here, the enhancement is more than 400% of the base offense level – a unique result under the Guidelines.

See Frank O. Bowman, III, Pour encourager les autres? The Curious History and Distressing Implications of the Criminal Provisions of the Sarbanes-Oxley Act and the Sentencing Guidelines Amendments That Followed, 1 Ohio St. J. Crim. Law 373, 419 (2003-2004) (collecting evidence).

In fact, this Court has noted the "considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders." See Adelson, 441 F. Supp. 2d at 514 (citing, among other sources, United States Sentencing Commission, Fifteen Years of Guidelines Sentencing 56 (2004), for the proposition "that the Sentencing Guidelines were written, in part, to 'ensure a short but definite period of confinement for a larger proportion of these 'white collar' cases, both to ensure proportionate punishment and to achieve deterrence'") (emphasis in original); see also Peter J. Henning, White Collar Crime Sentences After Booker: Was the Sentencing of Bernie Ebbers Too Harsh?, 37 McGeorge L. Rev. 757, 781 (2006) ("One significant goal of the Sentencing Guidelines was to create a system in which white collar offenders received 'short but definite periods of confinement' and moving away from sentences that did not include at least some term of imprisonment. They were largely successful in that regard …") (quoting Justice Stephen Breyer, The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest, 17 Hofstra L. Rev. 1, 22 (1988), where then-Judge Breyer stated that "the Commission believed that a short but definite period of confinement might deter future [white collar] crime more effectively than sentences with no confinement condition.").

In sum, the loss enhancement under § 2B1.1(b)(1) is simply not based on any empirical evidence showing that so severe an enhancement is warranted or, indeed, necessary. See United

States v. Cavera, 550 F.3d 180, 192 n.9 (2d Cir. 2008) (citing Kimbrough v. United States, 552 U.S. 85, 128 S.Ct. 558, 576 (2007)).

The Supreme Court's decision in Kimbrough v. United States, 128 S.Ct. at 574-75 provides a useful analogy here. In Kimbrough, the Court found that "[i]n formulating Guidelines ranges for crack cocaine offenses," the Sentencing Commission "did not take account of empirical data and national experience." Id. at 575. The Court noted that "the crack/powder disparity produces disproportionately harsh sanctions," and held accordingly that "it would not be an abuse of discretion for a district court to conclude when sentencing a particular defendant that the crack/powder disparity yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." Id. We submit that the same type of searching analysis of the Guidelines should be done here. There is every reason for the Court to vary from a strict application of the Guidelines when a certain enhancement (be it the Section 2B1.1(b)(1) enhancement or the crack/powder disparity) simply does not work.

We do not suggest, however, that because of this one ill-reasoned flaw the Court should disregard the Guidelines entirely in crafting a sentence in this case. In many cases, sentencing courts faced with a "Section 2B1.1(b)(1) dilemma" appear to simply disregard the Guidelines and instead move directly to a consideration of the Section 3553(a) factors. In this case, we submit that the Guidelines can still be instructive, if appropriately adjusted, as explained below.

### III.

### <u>The Court's Discretion to Depart From the Guidelines</u>

Following <u>United States v. Booker</u>, 543 U.S. 220, 226-27 (2005), district courts are no longer required to impose Guidelines-range sentences.  Rather, "<u>Booker</u> rendered the Guidelines 'effectively advisory,' and permitted sentencing courts to tailor the appropriate punishment to each offense in light of other concerns." <u>Cavera</u>, 550 F.3d at 187 (quoting <u>Booker</u>, 543 U.S. at 245).  Indeed, a sentencing court cannot even "presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors." <u>Cavera</u>, 550 F.3d at 189.

While the guidelines are only advisory, "[a] district court should normally begin all sentencing proceedings by calculating, with the assistance of the Presentence Report, the applicable Guidelines range." <u>Id.</u>  Even following <u>Booker</u> and its progeny, the Guidelines should still "provide the 'starting point and the initial benchmark' for sentencing." <u>Id.</u> (citing <u>Gall v. United States</u>, 552 U.S. 38, 128 S.Ct. 586, 596 (2007)).

In this case, however, as in so many white collar cases, a problem arises: it is impossible for a sentencing court to use the Guidelines – strictly applied – as a meaningful "starting point" or "initial benchmark."  <u>See</u> <u>Parris</u>, 573 F. Supp. 2d at 751 (in white collar case with similar Guidelines calculation, holding that "it is difficult for a sentencing judge to place much stock in a guidelines range that does not provide realistic guidance.").  This is because the Guidelines flatly advise a sentence of "life" based almost entirely on the loss chart in Section 2B1.1(b)(1).  In many white collar cases, as here, the Section 2B1.1(b)(1) enhancement so overwhelms all other guidelines factors that it renders the sentencing table irrelevant and forces sentencing courts to essentially "begin from scratch" in any sentencing proceeding where it applies.  <u>See</u> <u>United</u>

States v. Adelson, 441 F. Supp. 2d at 509 (S.D.N.Y. 2006) (stating, in white collar case, that where "the calculations under the guidelines have so run amok that they are patently absurd on their face, a Court is forced to place greater reliance on the more general considerations set forth in section 3553(a)"); see also Parris, 573 F. Supp. 2d at 751 ("My search for more relevant guidance, therefore, had to proceed in other directions, although I would have much preferred a sensible guidelines range to give me some semblance of real guidance.").

The resulting "Section 2B1.1(b)(1) dilemma" therefore contravenes Supreme Court and Second Circuit policy, which clearly recommends a thoughtful consideration of the Guidelines as a necessary first step in fashioning an appropriate individualized sentence.  See Cavera, 550 F.3d 180; see also Gall, 128 S.Ct. at 596 n.6 ("The fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process.").

In such circumstances, this Court can and should depart from the Guidelines to the extent necessary to fashion a reasoned and principled sentence.

## IV.

### Making the Guidelines Work

**A.**     **An Adjusted Offense Level**

In this case, the advisory Sentencing Guidelines can be adjusted so that they provide meaningful advice.  We respectfully submit that the most appropriate manner of solving the "Section 2B1.1(b)(1) dilemma" in this case is to apply a limited, proportional enhancement for fraud loss, an enhancement in line with the rest of the Guidelines and the goals of federal sentencing.  Our suggestion, based on a thorough survey of the Guidelines, is an enhancement of

18 levels instead of 30.  This would maintain the enhancement under Section 2B1.1(b)(1) as the largest enhancement anywhere in the Sentencing Guidelines (the next largest enhancement being 16 levels, as noted above), and would correspondingly respect the Sentencing Commission's focus on deterring white collar crime.  At the same time, it would bring Section 2B1.1(b)(1) back in line with the sense of proportionality and fundamental fairness expressed elsewhere in the Guidelines and in Section 3553(a).

We engage in this exercise in order to provide the Court with a well-reasoned sentencing recommendation.  We offer a concrete advisory Guidelines range in an effort to provide meaningful guidance in this proceeding, as the Court works to fashion a sentence that is "sufficient, but not greater than necessary."

In all too many cases, because of the "Section 2B1.1(b)(1) dilemma," attorneys for both defendants and the government are left floundering, hesitant to suggest an appropriate sentencing range, or forced to suggest a range of years without any principled foundation.  See Adelson, 441 F. Supp. 2d at 511 (recounting colloquy between the Court and the government, seeking concrete sentencing range government sought to impose).  A recommendation of "ten years" or "twelve years" or "fifteen years," without a rational basis for that number, we respectfully submit, would fail to reflect the goals of sentencing.  Those recommendations, expressed in general terms, are not "anchored" to any underlying rationale.

Here, we propose a rational Guidelines calculation:

| | |
|---|---|
| Base Offense Level (§ 2B1.1(a)(1)) | 7 |
| **Loss of more than $400,000,000[2] (§ 2B1.1(b)(1)(P), adjusted)** | **+18** |
| Ten or more victims (§ 2B1.1(b)(1)(a)) | +2 |
| Involved sophisticated means (§ 2B1.1(b)(9)) | +2 |
| Defendant was an organizer or leader (§ 3B1.1(a)) | +4 |
| Defendant abused a position of trust (§ 3B1.3) | +2 |
| Acceptance of responsibility (§ 3E1.1(a) and (b)) | -3 |
| Adjusted Offense Level | 32 |

Offense level 32, Criminal History Category I, provides a Guidelines sentencing range of 121-151 months. This is a sentencing range with a rational basis. It is a sentencing range firmly rooted in the Guidelines but not beholden to their strict application, in an instance where strict adherence would contravene any sense of fundamental fairness. We submit that such a sentence harmonizes the spirit of the Guidelines with the goals of sentencing.

This type of variance from a strict application of the guidelines is supported by case law. "[A] district court may vary from the Guidelines range based solely on a policy disagreement with the Guidelines, even where that disagreement applies to a wide class of offenders or offenses." Cavera, 550 F.3d at 191 (citing Kimbrough, 128 S.Ct. at 574-75). As described above, this is especially true in cases where a district court disagrees with a Guidelines provision

---

[2]    The Probation Department calculates that "the approximate balance owed to the victims who suffered monetary losses is $387,675,303." (PSR at ¶ 28.) As of February 17, 2009, the Receiver reported that "more than $100 million in assets" had been identified and safeguarded, to be made available through restitution. (Report of the Receiver, dated February 17, 2009, at 6.) In the following months, the Trustees, with Dreier's assistance, have continued to identify and recover assets that should be made available to victims. (PSR at ¶¶ 33-36.)

that was not "formulated based on special expertise, study, and national experience." Cavera,

550 F.3d at 192 n.9 (citing Kimbrough, 128 S.Ct. at 575).

As exhibited in this case, the Section 2B1.1(b)(1) enhancements simply do not work and

are not based on reliable empirical evidence; as a result the Court should adopt a rational

variance in order to keep the Sentencing Guidelines relevant.  An 18-level cap would accomplish

this goal.  Indeed, several sections of the Guidelines already explicitly state that the

enhancements to be applied to a base offense level should be "capped," presumably to avoid

disproportionate Guidelines ranges.  See, e.g., USSG §§ 2A2.2(b)(3) (cap at 10 for total

enhancements for aggravated assault); 2B1.1(b)(14)(C) (cap at 8 for total enhancements under

two subsections of 2B1.1); 2B3.1(b)(3) (cap at 11 for total enhancements for robbery, extortion

and blackmail); 2B3.2(b)(4) (cap at 11 for total enhancements for extortion by force).


**B.      Application of the 3553(a) Factors**

In addition to the advisory Sentencing Guidelines, a sentencing court must also consider

"the nature and circumstances of the offense and the history and characteristics of the defendant"

under 18 U.S.C. 3553(a).  See Cavera, 550 F.3d at 188.  "The sentencing judge is directed,

moreover, to consider: a) the need to reflect the seriousness of the offense, to promote respect for

the law, and to provide just punishment for that offense; b) the need to afford adequate

deterrence to criminal conduct; c) the need to protect the public from further crimes by the

defendant; and d) the need for rehabilitation." Id. (citing 18 U.S.C. § 3553(a)).

In this case, "the nature and circumstances of the offense" have been well-documented,

and will not be rehashed here.  See 18 U.S.C. § 3553(a)(1).  From the day he was arrested, Dreier

has made no effort to minimize his crimes, and no effort will be made here.[3]  We respectfully refer the Court to Dreier's accompanying letter where, in his own words, he provides additional background to the nature and circumstances of his offense.  (See Exhibit C, Letter of Marc Dreier, dated July 7, 2009.)

That said, we submit that the 3553(a) factors are consistent with defense counsel's recommended sentence.

### 1.    The History and Characteristics of the Defendant

For many years, Marc Dreier had led a productive and law-abiding life.  He graduated from Yale College and Harvard Law School, and then attained partnership at several major law firms.  He forged a reputation in New York as a capable and effective litigator.  In 1996, after 20 years of practice, he founded his own firm, Dreier LLP.  Through the firm he did extensive charity work; for example, every year he hosted a charity event to benefit abused and neglected children in the New York area and children suffering from AIDS in Africa.

Under the pressure of mounting debt and the disappointment of a failed marriage, he undertook an irrational course of action that would undo all that he had accomplished. Nevertheless, other of his actions, particularly since his arrest, warrant consideration.

---

[3]      We recognize that Dreier's crimes warrant particular condemnation because they tarnish the legal profession.  There can be no question that he violated the trust placed in him by virtue of his professional status.  However, it should be recognized that the Guidelines calculation in this case already takes into consideration this abuse of his position of trust, applying a corresponding enhancement.  See USSG § 3B1.3; (PSR at ¶ 51).  That enhancement is incorporated in the adjusted offense level proposed by defense counsel.

a.     **Dreier's Post-Arrest Conduct**

From the day he was arrested, Dreier has done everything possible to start to make amends for his crimes and mitigate their impact on his victims.  He never denied the charges against him.  To the contrary, he pleaded guilty well in advance of trial, preserving judicial resources and allowing the government to focus on the collection of available assets.  Further, and perhaps even more importantly, since his arrest, Dreier has done extensive work himself to minimize the damage to victims of his fraud.  First and foremost, Dreier has spent countless hours assisting the Court-appointed Receiver and bankruptcy Trustees to marshal and preserve assets that can be returned to victims in this case.  Because he was the sole equity partner of Dreier LLP and controlled all of the firm's finances, he was in a unique position – in the end, he was the only person qualified to intelligently discuss the firm's operation as well as its assets and liabilities.  Immediately upon his arrest, he used this position to minimize the damage his actions caused.  Indeed, he volunteered to do so; he began cooperating with these individuals long before the Court mandated his involvement as a condition of his release on bail.  Such assistance in the first days following his arrest, before assets could be dissipated by the actions of third parties or the passage of time, was particularly significant.  Correspondingly, it should be given significant consideration in Dreier's request for leniency.  See United States v. Bennett, 161 F.3d 171, 197 (3d Cir.1998) (noting that cooperation with bankruptcy Trustee "may constitute evidence of acceptance of responsibility").

Further, Dreier has continued participating in ongoing civil lawsuits in an effort to recover money to be returned to victims.  See United States v. Haversat, 22 F.3d 790, 795 (8th Cir. 1994) (noting that assistance in settling related civil lawsuit is relevant to acceptance of

responsibility and comparing such assistance to "voluntary assistance to authorities in the recovery of the fruits and instrumentalities of the offense").

Sheila Gowan, the Court-appointed bankruptcy Trustee for Dreier LLP, writes that at her request Dreier "provided detailed information and important insights" on a variety of subjects. (Exhibit G, Letter of Sheila Gowan, dated July 1, 2009; see also PSR at ¶ 34.)  She concludes:

> Mr. Dreier answered every question posed.  I believe that he was forthright and worked hard to recall information, sometimes suggesting ways that I might refresh his recollection or support his statements with documentary evidence from business files.  I have relied on his assistance, and he has helped maximize the efficiencies of my work.  By virtue of his assistance, I have spent fewer resources in attorney and financial advisor time than otherwise would be required to obtain the necessary information on behalf of the estate.

Salvator LaMonica, the Court-appointed Trustee in Dreier's personal bankruptcy case, reports that Dreier was "forthcoming" and "answered questions candidly," and that he was "readily available to assist with his investigation and recovery of assets."  (PSR at ¶ 35.)  Roberto Finzi, partner to the Court-appointed Receiver, confirmed that Dreier's "participation in their investigation allowed them to move forward quickly, therefore spending less time seeking answers from outside sources."  (PSR at ¶ 36.)

Dreier has also repeatedly taken steps to facilitate the liquidation of his assets, consenting to the sale of major properties in an effort to expedite the return of victims' money.  All of these actions should weigh in favor of leniency under Section 3553(a).

Under a strict application of the Guidelines, Dreier would, as a practical matter, receive no credit for pleading guilty, or for his efforts to accept responsibility and marshal funds for the victims of his offense.  A three-level reduction pursuant to § 3E1.1, as calculated by the government, would be meaningless; it reduces Dreier's offense level from 47 (life imprisonment) to 44 (life imprisonment).  The purpose of § 3E1.1 is to encourage defendants to plead guilty and

accept responsibility for their actions.  <u>See</u> USSG § 3E1.1 (Background).  A non-guidelines

sentence offering meaningful credit for actions like Dreier's would encourage white collar

defendants to act in a similar manner.  <u>See</u> <u>United States v. Milne</u>, 384 F. Supp. 2d 1309, 1312

(E.D. Wis. 2005) ("Where appropriate, courts may grant additional consideration to defendants

who demonstrate acceptance beyond that necessary to obtain a two or three level reduction under

§ 3E1.1.  This is so because such conduct bears directly on their character, and on how severe a

sentence is necessary to provide deterrence and punishment.  Further, courts should encourage

offenders to mitigate their misconduct voluntarily.") (internal citations omitted).

### b.    Dreier's Continued Devotion to His Children

Dreier has two children.  He has an extremely close relationship with both of them.

Spencer, 19 years old, has lived full-time with his father for most of the years since Dreier's

divorce in 2002.  Spencer plans to attend Vanderbilt University beginning this Fall.  Jackie, 17

years old, is a high school student who has divided her time between her parents.  Both children

have lived full-time with their father in the five months he has been under home confinement.

Dreier has used this time since his arrest to prepare his children for what lies ahead.  In a letter to

the Court, his son Spencer writes:

> During these months he has told us many times how we need to learn from what
> he did.  He has discussed with us the mistakes he made, why he made them and
> how important it is that we resist the types of bad decisions he made.  He has
> emphasized to us not just how important it is that we lead honest lives but how
> important it is to order our priorities in healthy and temperate ways so that we
> recognize what is really important in our lives and are not even tempted by bad
> choices.
>
> * * *
>
> I have always been very dependent on my father for his advice and support and
> his love.  Though he obviously was making some very poor choices for himself,
> at the same time, he was always giving me good and thoughtful advice.  He has
> always been there for me, always found time for me.  He is a father who has

always been openly affectionate with his children and cheerful and forgiving and encouraging, and I am not sure how to go on without him.[4]

If nothing else in Dreier's personal life warrants leniency at sentencing, surely the needs of his two children, who so deeply depend on him, should be given some consideration. See 18 U.S.C. § 3553(a)(1); (PSR at ¶¶ 71-72, 74). As stated earlier, Dreier stands before the Court asking only for the opportunity for a meaningful life beyond incarceration, and a chance to share that life with his children.

### 2.   Specific and General Deterrence

The proposed sentencing range would also satisfy the considerations of specific and general deterrence. See 18 U.S.C. § 3553(a)(2)(B) and (C). Certainly, the specific deterrence is clear. After serving his sentence Marc Dreier will never again be in a position to commit a similar crime. He has lost everything that he worked a lifetime to build. His reputation as an attorney has been destroyed; no matter what his sentence, he will clearly never practice law again. His criminal acts, which were only possible by trading on his reputation, could never be repeated. And, as the Receiver and both Trustees can attest, Dreier, financially, has nothing. He has been divested of every dollar and every piece of property that he ever owned.

Further, Dreier's age at the time of sentencing is significant when considering specific deterrence. Under the proposed sentence, he would not be released from incarceration until he is approximately 70 years old. This alone makes any prospect of recidivism highly unlikely. See United States v. Hodges, No. 07 Cr. 706, 2009 WL 36231, at *8 (E.D.N.Y. Feb. 12, 2009) (noting that "post-Booker, courts have observed that recidivism is markedly lower for older

---

[4]     Letters to the Court from Dreier's children, Spencer and Jackie, are attached to this Memorandum as Exhibits D and E, respectively. A letter from his mother is attached as Exhibit F.

defendants" and collecting cases); <u>United States v. Sanchez</u>, No. 99 Cr. 338, 2007 WL 60517, at
*4 (S.D.N.Y. Jan. 8, 2007) ("With regard to the necessity to protect society from future crimes of
the defendant, this Court and others have previously declined to impose lengthy Guidelines
sentences on older defendants in light of the Sentencing Commission's conclusion that
'[r]ecidivism rates decline relatively consistently as age increases.'") (citing U.S. Sentencing
Comm'n, <u>Measuring Recidivism: The Criminal History Computation Of The Federal Sentencing
Guidelines</u>, at 12 (2004) and collecting cases); <u>see also</u> <u>United States v. Hamilton</u>, No. 07 Cr.
2874, 2009 WL 995576, at *3 (April 14, 2009) (unpublished) (reversing and remanding for
resentencing because "the district court abused its discretion in not taking into account policy
considerations with regard to age recidivism not included in the Guidelines."); <u>Cavera</u>, 550 F.3d
at 219 n.4 (noting that "when the district court varied from the Guidelines because of defendant-
appellant's advanced age and the 'inverse relationship between age and recidivism,' the district
court cited numerous cases, many of which, in turn, relied upon a recidivism study of over 6,000
individuals that was conducted in 2004 by the Sentencing Commission.").

General deterrence is also satisfied by the proposed sentence. As discussed above, "there
is considerable evidence that even relatively short sentences can have a strong deterrent effect on
prospective 'white collar' offenders." <u>See</u> <u>Adelson</u>, 441 F. Supp. 2d at 514 (citing Richard
Frase, <u>Punishment Purposes</u>, 58 Stanford L. Rev. 67, 80 (2005), Elizabeth Szockyj, <u>Imprisoning
White Collar Criminals?</u>, 23 S. Ill. U. L.J. 485, 492 (1998)). In this case, a sentence within the
proposed range of 121-151 months (over ten years) should send an unmistakeable message to the
white collar community that conduct like Dreier's simply will not be tolerated. <u>See</u> 18 U.S.C. §
3553(a)(2)(B).

In all respects, therefore, we submit that this is a sentence "'sufficient, but not greater than necessary' to fulfill the purposes of sentencing." <u>See Cavera</u>, 550 F.3d at 189 (quoting 18 U.S.C. § 3553(a)).

**3.      <u>Consistency in Sentencing</u>**

The facts of every white collar case are different, of course, and the sentence that is appropriate in one may not be fitting in another.  However, some sense of consistency is to be sought.  <u>See Parris</u>, 573 F. Supp. 2d at 751-52 (quoting <u>United States v. Wills</u>, 476 F.3d 103, 109 (2007) for the proposition that: "Even fulfilling their primary purpose with an eye toward the particular circumstances before them, judges must be mindful of the general goal, however elusive, of national consistency."); <u>see also</u> 18 U.S.C. § 3553(a)(6).

To this end, the statistical comparison considered last year by Judge Block in <u>United States v. Parris</u> is instructive.  573 F. Supp. 2d at 752-54.  The information collected in <u>Parris</u> showed 18 financial fraud cases dating back to 2001 where the estimated loss amount exceeded $50 million.  In ten of those cases, the defendant received a sentence of less than 10 years.  In the eight cases where the sentence was 10 years or greater, the defendant pleaded guilty – as Dreier did here – in only two of them.  In those two cases, the sentences were 141 months (<u>United States v. Cotaggio</u>, E.D.N.Y. 2007, loss amount of $80 million) and 144 months (<u>United States v. Kumar</u>, E.D.N.Y. 2006, loss amount of $2.2 billion, recommended life sentence under the Guidelines).

Overall, 36 financial fraud cases were analyzed, and in not a single case did a defendant pleading guilty receive a sentence exceeding 145 months, regardless of the loss amount.[5]

Considering this information, we believe that a sentence in the range proposed by defense counsel – 121-151 months – is both reasonable and in line with the goals of Section 3553(a).

## CONCLUSION

For the reasons set forth above, we respectfully request that the Court impose a reasonable and principled sentence in this case, "sufficient, but not greater than necessary" to fulfill the purposes of sentencing.

Dated: New York, NY
      July 8, 2009

Respectfully submitted,

By:_____
      Gerald L. Shargel
      Ross M. Kramer
      LAW OFFICES OF GERALD SHARGEL
      570 Lexington Ave. 45th Floor
      New York, New York 10022
      (212) 446-2323
      *Attorneys for defendant Marc Dreier*

---

[5]     Without minimizing Dreier's crimes, his fraud was still quantitatively different from the "large-scale financial frauds" cited by the Probation Department. (PSR at p. 30.) In those cases, there were thousands of victims, and in most, billions of dollars in losses. In all but one, the sentence was also imposed post-trial.

It is impossible to ignore the sentence of 1,800 months recently handed out to Bernard Madoff. The facts of that case were unique. Respectfully, that sentence, which is far out of line with national standards and Circuit precedent, is likewise unique and unsuitable for comparison.