UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
: 
UNITED STATES OF AMERICA,                     :

    - v. -                                                       :           S1 09 Cr. 085 (JSR)

MARC DREIER,                                              :

                Defendant.                             :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S SENTENCING MEMORANDUM

                                                          LEV L. DASSIN
                                                          Acting United States Attorney for the
                                                          Southern District of New York

JONATHAN R. STREETER
Assistant United States Attorney

      - Of Counsel -

**TABLE OF CONTENTS**

Relevant Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.  The False Promissory Notes  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.  The Stolen Escrow Funds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    C.  The Scheme Unravels . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    D.  The Use of the Proceeds to Support Dreier's Lavish Lifestyle . . . . . . . . . . . . . . . . . . . . . 7

    E.  The Effects of Dreier's Offenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

I.  Applicable Law  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

II.  Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    A.  Application of Sentencing Guidelines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    B.  Application Of The Section 3553 Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        1.  The Nature and Circumstances of the Offense  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        2.  History and Characteristics of the Defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        3.  The Need To Afford Adequate Deterrence  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        4.  The Need To Avoid Unwarranted Sentence Disparities . . . . . . . . . . . . . . . . . . . . . . 16

    C.  Dreier's Sentence Should Not Be Reduced Because Of Any Assistance To The Court-Appointed Receiver And Trustees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                     :
UNITED STATES OF AMERICA,                            :
                                                     :
    - v. -                                           :    S1 09 Cr. 085 (JSR)
                                                     :
MARC DREIER,                                         :
                                                     :
            Defendant.                               :
                                                     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S SENTENCING MEMORANDUM

The Government respectfully submits this memorandum in connection with the sentencing of defendant Marc Dreier, scheduled for July 13, 2009, at 5:00 p.m.

As the Court observed at the conclusion of Dreier's guilty plea proceeding, the defendant "has shown that he is to be ranked with those who have committed some of the most egregious frauds in history . . . . He has disgraced the venerable profession of law." 5/11/09 Tr. at 71-72. Indeed, this defendant, an officer of the court, engaged in a more than $740 million series of frauds over a 7-year period largely to finance a personal life of extraordinary lavishness. With all of the advantages conferred by a comfortable upbringing, Harvard and Yale educations, and a solid start in the legal profession, Dreier could have pursued a rewarding and productive life as a lawyer, serving clients and the law, with compensation in the top few percent of the general population. Instead, Dreier decided to seek vast personal riches and prestige through a life of fraud and through dishonor to his profession. Having set himself this goal, there appears to have been little that Dreier would not do to achieve it. He impersonated clients – in person and on the phone – and recruited others to execute elaborate charades. He created phony client and accounting firm documents, which he distributed to his victims. He stole from clients. He

misappropriated funds from bankruptcy-court approved accounts and from client escrow accounts. He offered to pay off accounting firm professionals who confronted him with evidence of his fraud in late 2008. Even following his arrest, from a prison in Canada, he called his law firm and directed the transfer of millions of dollars from an escrow account to a personal account in his control. As a result of his conduct, he caused massive losses to the direct victims of his frauds, including clients and duped investors, and to indirect victims, including the employees of his law firm who found themselves jobless when his law firm collapsed in the wake of news of his frauds. And he did this all while holding himself out as a legitimate and prominent lawyer. This conduct, and the resulting harm, is especially deserving of a lengthy prison sentence.

## **RELEVANT FACTS**[1]

Dreier has been a lawyer and a member of the bar in New York State for more than 33 years. PSR ¶ 89. Approximately 12 years prior to his arrest, he founded Dreier LLP, a law firm located in New York and later expanded to include affiliated firms in New York, Los Angeles, and other cities. Dreier served as the managing partner and sole equity partner of theses firms. PSR ¶¶ 13, 91. By 2008, these firms employed a total of approximately 270 lawyers and 500 total employees.

Dreier's criminal conduct started at least as early as January 2002,[2] when he began

---

[1] The facts described in this section are based on the Presentence Report, the Report of the Receiver appointed in the parallel civil proceeding <u>Securities and Exchange Commission</u> v. <u>Marc S. Dreier</u>, 08 Civ. 10617 (MGC), victim impact letters sent to the Court, documents that the Government has produced to the defendant in discovery, and Government interviews of various witnesses.

[2] Dreier stated to the United States Probation Office that he commenced the instant offense in early 2004. PSR ¶¶ 40, 91. Documents obtained by the Government (and provided to

selling fraudulent promissory notes to individual investors, including individual clients of his law firm. PSR ¶¶ 14-15. He then expanded his criminal conduct in late 2002 to include stealing money from his clients. Dreier continued to execute these frauds until his arrest in late 2008.

### A.     The False Promissory Notes

At the inception of his scheme, Dreier sold notes that he claimed were issued by Dreier & Baritz LLP, the predecessor to Dreier LLP, and guaranteed by one of his clients, a real estate development company located in New York, New York (the "Developer"). Shortly thereafter, in late 2002, Dreier began selling notes to investors that he said were issued directly by the Developer. Dreier claimed that the Developer had authorized him to market these notes because of his close attorney-client relationship with the Developer. Of course, these claims were false; the Developer never issued or guaranteed these notes, but for nearly seven years Dreier collected hundreds of millions of dollars by selling them to unwitting investors.

During 2003, Dreier continued selling to various individual investors fraudulent promissory notes ranging in amounts from $250,000 to $3 million and purportedly issued by the Developer. In 2004, Dreier broadened his fraud to target various hedge funds, and during the remaining years of his schemes through his arrest, continued to sell the fictitious notes to both individuals and hedge funds. PSR ¶¶ 14-15. In some cases, Dreier collected as much as $100 million from a single sale. For each note, Dreier provided the purchaser with documents bearing the forged signature of the Developer's Chief Executive Officer (the "CEO"), financial statements that he claimed were the Developer's but that were in fact entirely fabricated, and letters that purported to be from the accounting firm that provided auditing services to the

---

the defense), as well as statements of witnesses demonstrate that, as described herein, Dreier's offense conduct began in early 2002.

Developer (the "Accounting Firm"). Those letters were on the letterhead of the Accounting Firm and bore what appeared to be signatures of partners at that Accounting Firm. In truth, Dreier had misappropriated the Accounting Firm's letterhead and forged the signatures of its partners. PSR ¶¶ 17-18.

In addition to selling notes that he claimed were newly issued by the Developer, Dreier also marketed notes that he claimed were held by hedge funds seeking to sell their previously purchased notes. In these instances, Dreier falsely claimed he was legal counsel not only to the Developer, but also to the supposed seller of the notes in the transaction. PSR ¶¶ 24-25.

In all of these criminal transactions, Dreier misused information and confidences obtained as a result of his close attorney-client relationship with the Developer, including information about its business affairs, finances and personnel. In some cases, Dreier also sold the notes to his clients, again exploiting the attorney-client relationship of trust. Continuing his long pattern, in 2008 Dreier began to offer notes he claimed were issued by a pension plan located in Canada (the "Pension Plan") and guaranteed by another company located in Canada (the "Canadian Company"), as well as notes purportedly issued by the Canadian Company and guaranteed by the Pension Plan. PSR ¶ 19-20. Both the Pension Plan and the Canadian Company were also clients of Dreier LLP, and all of the notes Dreier offered were fictitious and supported by forged documents.

During the course of his fraudulent scheme, Dreier impersonated, and recruited and directed at least five other individuals to impersonate, various people so as to trick prospective purchasers who sought, during due diligence, to speak to representatives of the purported issuers or sellers of the notes. From November 2002 until Dreier's arrest in December 2008, on at least

thirteen occasions in telephone calls and in-person meetings, Dreier either himself impersonated or directed others to impersonate the CEO of the Developer, the Chief Financial Officer of the Developer, an accountant at the Accounting Firm, representatives of various hedge funds, executives and lawyers at the Pension Plan, a person in the "credit department" of the Canadian Company, and the general counsel of a hedge fund.  In some instances, Dreier paid the impersonators as much as $100,000 per episode.  In addition, to assure the success of these impersonations, Dreier directed employees of his law firm to set up numerous fake e-mail addresses, record fictitious outgoing voice mail messages on designated phone lines at Dreier LLP, and obtain cell phones, including phones issued from Europe and Canada, for use during the impersonations.  Dreier also gained unauthorized access to the offices of the Developer, the Accounting Firm, and the Pension Plan to stage various impersonations in face-to-face meetings. PSR ¶ 18, 21, 23.

      **B.**     **The Stolen Escrow Funds**

In late 2002, shortly after Dreier began selling fictitious promissory notes, he also began misappropriating funds from his clients.  For example, in September 2002, Dreier falsely claimed to a client ("Client 1") for whom he had obtained a legal settlement that the opposing party had failed to make a $300,000 payment on that settlement.  In fact, the opposing party had sent those funds to Dreier, and he had converted them to his own use.  Over the next several years, Dreier used a total of more than $500,000 of Client 1's settlement funds for his own purposes while telling Client 1 that no payments had been made.  In January 2004, Dreier falsely claimed to Client 1 that the opposing party had finally begun making small monthly payments on the settlement, and Dreier in turn began making small monthly payments to Client 1.  To carry

out this fraud, Dreier cut and pasted the signatures of the opposing party and a notary public onto various documents that he falsely claimed were amended settlement agreements. As of today, even though Dreier collected the full settlement amount years ago, Client 1 still has not been paid approximately $94,000.

Dreier also defrauded other clients. During 2007 and 2008, Dreier repeatedly stole and partially replenished more than $54 million of one client's funds recovered during a bankruptcy proceeding. Dreier used those funds, which had been placed into a firm escrow account under his exclusive control, to pay back purchasers of some of the fictitious notes, fund the operations of his law firm, and support his lavish lifestyle. At the time of his arrest, approximately $38.6 million of those funds were missing from the firm escrow account. In addition, in October 2008, Dreier stole approximately $6.3 million in proceeds from yet another client's settlement. He lied to that client about the circumstances of the settlement, forged settlement documents, and converted the money to his own use. And, again in November 2008, Dreier stole approximately $1.65 million that a client had deposited into a firm escrow account to complete the purchase of a business.

### C.     The Scheme Unravels

In November 2008, Dreier's scheme began to unravel. Both the Developer and the Accounting Firm confronted him with forged documents that Dreier had created and distributed. The day after the Developer confronted him, Dreier transferred approximately $33 million in fraud proceeds from a law firm escrow account into a personal account he controlled relating to his properties in the Caribbean. Then, notwithstanding the Developer's discovery of fraudulent documents, Dreier attempted to sell fictitious Developer notes to individuals in Doha, Qatar, and

traveled to the Middle East in an attempt to close a deal. Also following the Accounting Firm's discovery of fraudulent documents, during telephone calls with a representative of the Accounting Firm that were recorded at the direction of the United States Attorney's Office, Dreier attempted to pay the Accounting Firm to "settle" the matter and keep the Accounting Firm from reporting him to the authorities.

Finally, in late November and early December 2008, Dreier attempted to sell to a U.S. based hedge fund a $44.7 million note purportedly issued by the Canadian Company and guaranteed by the Pension Plan. In an effort to sell the fictitious note, Dreier traveled to Canada, met with lawyers from the Pension Plan (which was a client of Dreier), and then impersonated one of those lawyers to a representative of the U.S. hedge fund. Hours later, Dreier was arrested by Canadian authorities. Two days later, while in a jail in Canada, Dreier, by phone, successfully directed the transfer of $10 million in fraud proceeds from a law firm escrow account into the account for his Caribbean properties.

Through his scheme, from 2002 through 2008, Dreier collected approximately $700 million from the sale of fictitious promissory notes to thirteen hedge funds and four individuals. PSR ¶¶ 22, 24. And, he stole more than $46 million in funds from at least four different clients. Dreier deposited the proceeds of both his promissory note fraud and his escrow account theft into the bank accounts of Dreier LLP, as to which he was the sole signatory.

### D.  The Use of Fraud Proceeds to Support Dreier's Lavish Lifestyle

Although he attempted to tout his charitable activities to Probation, in fact Dreier spent much of this money on himself: a yacht he purchased for more than $16 million; two beachfront Hamptons homes; expensive cars; a luxury apartment in Manhattan; property in Anguilla; a

7

beachfront apartment in Santa Monica; and countless artworks, some of which he purchased for more than $6 million each. See Exhibit A attached hereto (showing selected examples of assets Dreier obtained with fraud proceeds); PSR ¶ 26. In addition, Dreier spent some of the proceeds of his fraud throwing extravagant parties and going on expensive vacations. PSR ¶¶ 39-41.

### E.     The Effects of Dreier's Offenses

The impact of Dreier's crimes has been far-reaching. Numerous victims, including individuals, corporations and hedge funds, have collectively lost approximately $400 million. As the victim impact statements submitted to this Court make clear, in several cases, these losses have destroyed personal lives and business opportunities. For example, one group of victims placed their life savings into escrow at Dreier LLP in order to purchase a business; those funds are now lost. Another victim lost much of his livelihood as an entrepreneur, and still another has been forced to wind down its hedge fund business in part because of losses caused by Dreier. In addition, numerous small businesses have been severely disrupted by Dreier's theft of bankruptcy-court approved funds in escrow that were supposed to be distributed to those businesses. As one victim noted, Dreier used his "law license rather than a ski mask and a gun" to steal from his victims. PSR ¶ 31. Finally, when Dreier's crimes were exposed, his law firm quickly collapsed, leaving many clients without stable legal representation and hundreds of firm employees – secretaries, administrative staff and lawyers – without jobs. PSR ¶ 32.

On January 29, 2009, a seven-count indictment was filed against Dreier charging him with conspiracy to commit securities fraud and wire fraud, securities fraud, and five counts of wire fraud. On March 17, 2009, an eight-count superseding indictment was filed against Dreier charging those same offenses and adding a money laundering charge. On May 11, 2009, Dreier

8

pleaded guilty before this Court to the eight-count superseding indictment. PSR ¶ 11.

## DISCUSSION

**I.     APPLICABLE LAW**

The advisory Sentencing Guidelines promote the "basic aim" of Congress in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." *United States* v. *Booker*, 125 S. Ct. 738, 760 (2005). Thus, the Guidelines are more than "a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge." *United States* v. *Crosby*, 397 F.3d 103, 113 (2d Cir. 2005*)*. The applicable Sentencing Guidelines range "will be a benchmark or a point of reference or departure" when considering a particular sentence to impose. *United States* v. *Rubenstein*, 403 F.3d 93, 98-99 (2d Cir. 2005).

In furtherance of that goal, a sentencing court is required to "consider the Guidelines 'sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant,' the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims." *United States* v. *Booker*, 125 S. Ct. at 764 (citations omitted).

Along with the Guidelines, the other factors set forth in Section 3553(a) must be considered. Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two. That sub-paragraph sets forth the purposes as:

>   (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
>   (B) to afford adequate deterrence to criminal conduct;

>(C) to protect the public from further crimes of the defendant; and
>
>(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

Section 3553(a) further directs the Court – in determining the particular sentence to impose – to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a).

The Second Circuit has instructed that district courts should engage in a three-step sentencing procedure. *See United States* v. *Crosby*, 397 F.3d at 103. First, the Court must determine the applicable Sentencing Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." *Crosby*, 397 F.3d at 112. Second, the Court must consider whether a departure from that Guidelines range is appropriate. *Id*. Third, the Court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose. *Id.* at 113. In so doing, it is entirely proper for a judge to take into consideration his or her own sense of what is a fair and just sentence under all the circumstances. *United States* v. *Jones*, 460 F.3d 191, 195 (2d Cir. 2006).

## II.     ANALYSIS

As discussed below, the Government respectfully submits that application of the sentencing factors to Dreier's conduct calls for a Guidelines sentence of 145 years or, alternatively, a term of years that would both assure that Dreier will remain in prison for life and emphatically promote general deterrence.

### A.     Application of Sentencing Guidelines

Because each of the offenses of conviction is fraud-related and grouped, Section 2B1.1 of the Guidelines determines the applicable offense level.  Under Section 2B1.1, and including applicable Chapter Three adjustments, the defendant's offense level is calculated as follows: base offense level of 7 (2B1.1(a)(1)); 30 levels for a loss of more than $400 million (2B1.1(b)(1)(P)); 2 levels for ten or more victims (2B1.1(b)(2)(A)); 2 levels because the offense involved sophisticated means (2B1.1(b)(9)); 4 levels for his role as an organizer or leader (3B1.1(a)); 2 levels for Dreier's abuse of a position of trust (3B1.3); and a reduction of 3 levels for the acceptance of responsibility reflected by Dreier's plea of guilty (3E1.1).  PSR ¶¶ 43-57.

Accordingly, under the Guidelines, Dreier is in Criminal History Category I and has an adjusted offense level of 44.   The Guidelines therefore call for a sentence of life imprisonment. *See* U.S.S.G. § Ch. 5, Pt. A.  Because Dreier is not charged with any offense that carries a maximum term of life imprisonment, the Sentencing Guidelines call for the applicable statutory maximums on all counts of conviction to be added together, which results in a Guidelines sentence of 145 years' imprisonment.[3]  *See* U.S.S.G. § 5G1.2(d).

---

[3]    The Guidelines sentence is calculated as follows: 5 years on Count One (Conspiracy) and 20 years on each of Counts Two (Securities Fraud), Three through Seven (Wire Fraud), and Eight (Money Laundering).

Although no longer binding upon the Court, the Guidelines sentence in this case reflects the seriousness of the offenses of conviction and the particular aggravating factors relating to Dreier's conduct.

In his submission to the Probation Department concerning the Presentence Report, Dreier has not objected to any of the Guidelines calculations set forth above.

**B.     The Section 3553 Factors**

**1.     The Nature and Circumstances of the Offense**

As this Court noted at the conclusion of the plea in this case, Dreier "has shown that he is to be ranked with those who have committed some of the most egregious frauds in history." 5/11/09 Tr. at 71.  Dreier's crimes in this case involved wholesale abuses of trust and were exceptionally brazen, selfish, and extensive in their almost seven-year duration, the amount of money stolen, and the manner in which the offenses were committed.

Dreier abused his position of trust as a lawyer in almost every conceivable way.  First, he claimed that the notes he sold were issued by his clients.  To carry out his scheme, Dreier used those client relationships to convince his victims that the notes were legitimate.  He also used information he learned purely through those client relationships to lend credibility to the false documents that he supplied throughout the scheme, and he even impersonated his clients.  Second, Dreier sold fictitious notes to certain of his clients.  Third, Dreier used his legal clout – his stature as the founder and managing partner of a 270-lawyer law firm – to earn the trust of those whom he defrauded.  Finally, throughout the scheme, Dreier simply stole funds that were entrusted to him by his clients and repeatedly lied to his clients in order to conceal those thefts.

Dreier's crimes were also stunning because of the brazen manner in which he committed

12

them. Repeatedly, over an almost seven year period, Dreier himself, and others acting at his direction, performed elaborate impersonations in order to convince his victims that the fictitious notes were real. These impersonations were performed over the phone, in person (after Dreier gained unauthorized access to client offices), and through e-mail. He made extensive use of his law firm's resources and prestige to execute his frauds, including by directing employees to draft and type fraudulent documents, obtain cell phones, set up fake e-mail addresses, and designate phone lines. And he used his law firm's bank accounts to launder the proceeds of his fraud.

The extensive scope and duration of the fraud is also extraordinary. Dreier sold approximately 85 fake notes to at least thirteen hedge funds and four individuals, and he attempted to sell additional notes to yet more victims. Moreover, he stole funds from at least four of his clients, and he hijacked the identities of numerous additional firms in order to carry out his scheme. PSR ¶ 28. In all, he collected approximately $700 million from his note fraud victims and more than $46 million in stolen funds from his clients. As a result, the impact of Dreier's frauds is tremendous. His victims are currently out-of-pocket approximately $400 million, a substantial portion of which Dreier simply stole for his own personal benefit. Hundreds of employees of his law firms have lost their jobs; numerous victims either lost their livelihoods or saw their businesses severely disrupted by Dreier's crimes; and clients were left without stable legal representation.

### 2. History and Characteristics of the Defendant

Dreier's history and characteristics also strongly support a lengthy sentence in this case. Unlike many criminals who come before the Court who began life with almost nothing, Dreier began with and continued throughout his life to enjoy virtually every advantage. PSR ¶¶ 66-68,

87-88 (summarizing Dreier's comfortable upbringing and education at Yale College and Harvard Law School). Notwithstanding his advantages in life, he committed his crimes simply to satisfy his own greed and vanity. As Dreier explained to the Probation Department, he began his fraud because he "had been dissatisfied with his life . . . [and was] envious of those who had achieved greater success in life than he had at that time." PSR ¶ 40. He further admitted to the Probation Department that during the scheme, "while it was continual work to sustain the fraud, he was living the life he felt he deserved. He believed that he was entitled to be 'this' successful and now having these possessions and esteem from a successful law firm saved his life from mediocrity." PSR ¶ 41.

Those statements reveal the avarice and narcissism that drove this defendant. Prior to committing his crimes, Dreier was earning approximately $400,000 per year. PSR ¶ 91. He admits he was not satisfied with this ample compensation, PSR ¶ 40-41, and thus set about accumulating through fraud and theft massive wealth in a short period of time, purchasing countless expensive luxury assets, including the examples shown in exhibit A to this submission and those listed in paragraph 28 of the superseding indictment, throwing "lavish parties," and enjoying numerous vacations. PSR ¶ 39-41. In short, by his own admission, Dreier committed this crime in order to elevate his stature to that of the rich and famous, thereby avoiding the "mediocrity" of merely running his own law firm and earning "only" hundreds of thousands per year.

Dreier's conduct once he was confronted with his fraud is also revealing. For example, in early November 2008, when the Developer questioned Dreier about fraudulent documents he had issued, Dreier redoubled his efforts to sustain the fraud and reap its benefits. First, the day

after he was confronted, Dreier, obviously fearful that his criminal proceeds could be recovered from him, transferred $33 million in fraud proceeds from a law firm trust account into a personal account he kept for his Anguilla properties. Second, apparently in an attempt to obtain still more money, Dreier traveled half-way around the world, to Doha, Qatar, where in mid-November he attempted to sell yet more fictitious Developer notes. Third, Dreier continued to attempt to sell fake Pension Plan and Canadian Company notes, including during a trip to Canada in which he himself impersonated one of his clients in order to sell a $44.7 million note. Fourth, when confronted by the Accounting Firm about forged documents and fake financial statements, Dreier attempted to persuade the Accounting Firm not to report him to the authorities, by offering the Firm what amounted to a bribe cloaked as a "settlement" of the matter. Fifth, once Dreier was arrested and detained in Canada, he directed the transfer of $10 million in proceeds of his fraud from a law firm trust account into the above-referenced personal account for the Anguilla properties. And finally, once he was arrested in the United States, Dreier continued to use those around him for his own personal benefit. For example, he convinced his sister and elderly mother to give up some of their life savings to pay for armed guards so that he could remain out on bail. 5/11/09 Tr. at 63. Nevertheless, he told the Probation Department that he was "disappointed" in his siblings and that the same sister had been only "reasonably" supportive of him "throughout his legal troubles." PSR ¶ 67. Dreier's comments reflect his extreme selfishness.

      **3.**     **The Need To Afford Adequate Deterrence**

Under Section 3553(a), the need for the sentence to "afford adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(2)(B), must also be considered. Here, the Government

15

respectfully submits that a lengthy sentence is necessary to serve this purpose. There are thousands of lawyers in this and other jurisdictions, who are surrounded by the wealth and lifestyles of the clients they serve. Imposing a long term of imprisonment in this case will serve to deter other lawyers who are tempted to steal, cheat or otherwise dishonor their profession to achieve personal wealth.

### 4. The Need To Avoid Unwarranted Sentence Disparities

Under 18 U.S.C. § 3553(a)(7), the Court should consider the "need to avoid unwarranted sentencing disparities." We respectfully submit that, given Dreier's role as a lawyer and officer of the court, there are precious few defendants who compare with him and the scope of his offenses. Given his position and role, the scope and complexity of his schemes, the egregious manner in which he carried them out, and his personal use of much of the proceeds, a very substantial sentence would simply not implicate any "unwarranted" disparity.[4]

### C. Dreier's Sentence Should Not Be Reduced Because Of Any Assistance To The Court-Appointed Receiver And Trustees

Dreier's assistance to the court-appointed Receiver and two bankruptcy trustees is worthy of little, if any, consideration at his sentencing. First, Dreier did not identify previously unknown assets that the Receiver or trustees were not already in the process of recovering. Rather, he merely confirmed or facilitated that process for some assets. *See* PSR ¶ 36 (Receiver's counsel reported that "Dreier's assistance confirmed and explained information [the Receiver] already had and [Dreier's] participation in their investigation allowed them to move

---

[4] In any event, recent, long-lasting and substantial fraud cases prosecuted in this District – for example, Bernard Madoff (150 years), Bernard Ebbers (WorldCom; 25 years), John and Timothy Rigas (Adelphia; 12 and 17 years, respectively, on re-sentencing), Phillip Bennett (Refco; 16 years), and Samuel Israel (Bayou; 20 years) – support a lengthy sentence in this case.

16

forward quickly, therefore spending less time seeking answers from outside sources")[5]; PSR ¶ 35 (Dreier's personal bankruptcy Trustee "stated that Dreier did not provide them with the whereabouts of any unknown assets, but was able to shed light on assets that had already been identified"); PSR ¶ 34 (the Dreier LLP Trustee reported that Dreier "helped 'maximize the effectiveness' of [her] work [and] allowed her to spend 'fewer resources in attorney and financial advisor time'"); PSR Recommendation, pg. 29 ("While Dreier did not provide any additional information with regard to unknown assets, his information was used to speed-up the recovery process.").

Second, Dreier's assistance to the bankruptcy trustees has focused largely on the recovery of disputed fees and accounts receivable of his various law firms. PSR ¶¶ 34-35. Therefore, Dreier has essentially aided in the trustee's efforts to recover money formerly owed to him as the sole owner of those businesses. These recoveries, as well as the liquidation of his assets, will ultimately serve to reduce Dreier's substantial financial liabilities, either through a reduction in his restitution obligation or a reduction in his debts (some of which, because they are the result of fraud, may not be discharged in bankruptcy). Dreier's assistance to three court-appointed law firms working diligently (at no expense to Dreier) to reduce his liabilities and limit the damage of his crimes is hardly worthy of leniency, especially in light of Dreier's offense conduct. In short, he has helped the trustees and Receiver help him, and that kind of assistance simply does not merit a reduction in his sentence.

---

[5] The Receiver has reported to the Court that, in his view, Dreier was not always fully cooperative. Specifically, after Dreier's arrest, his son submitted documents that purported to transfer Dreier's two Hamptons beach properties to his son. The Receiver reported to the Court during a bail hearing on February 2, 2009, that he did not view as credible Dreier's explanation of the circumstances of this attempted transfer. 2/2/09 Tr. at 40-42.

17

Finally, the circumstances of Dreier's assistance, after he had been arrested, his life had completely unraveled, and both he and his business were forced into bankruptcy – when he had little choice in the matter – does not reveal any "history and characteristics" of this defendant that are probative at sentencing.

## CONCLUSION

As set forth above, the Government respectfully submits that a reasonable sentence in this case would be a the Guidelines sentence of 145 years or, alternatively, a term of years that would assure that Dreier will remain in prison for life and forcefully promote general deterrence.

Dated:  New York, New York
        July 8, 2009

                                               Respectfully submitted,

                                               LEV L. DASSIN
                                               Acting United States Attorney
                                               Southern District of New York

                                          By:   /s/ Jonathan R. Streeter
                                              JONATHAN R. STREETER
                                              Assistant United States Attorney
                                              (212) 637-2272