**quinn emanuel**

a Madison Avenue, 22nd Floor, New York, New York 10010 | tel (212) 849-7000 fax (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7160**

WRITER'S INTERNET ADDRESS
**kevinreed@quinnemanuel.com**

December 20, 2012

**Via Hand Delivery**
Honorable Jed S. Rakoff
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Re:   United States v. Marc Dreier, S1 09 Cr. 85 (JSR)

Dear Judge Rakoff:

Heathfield Capital Limited ("Heathfield") respectfully submits this post-hearing letter-brief in further support of the proposed stipulation between Heathfield and the Government resolving Heathfield's petition to enforce a first-priority, fully-perfected security interest in certain artwork the Government forfeited from Marc Dreier (the "Artwork").[1]  The proposed stipulation provides, in pertinent part, that the Artwork shall be released to Heathfield and that Heathfield shall then pay the Government the $1,650,000 fee that its predecessor committed to pay Dreier for the security interest.  The Court should "so order" the proposed stipulation because the Heathfield affiliate and predecessor that acquired the security interest from Dreier was "a bona fide purchaser for value . . . that was at the time of purchase reasonably without cause to believe that the [Artwork] was subject to forfeiture . . . ."  21 U.S.C. § 853(n)6)(B).

### Statement of Facts

Heathfield's verified petition and the testimony adduced at the November 30, 2012 hearing in this matter establish a set of straightforward and undisputed facts.

**quinn emanuel urquhart & sullivan, llp**

LOS ANGELES | 865 South Figueroa Street, 10th Floor, Los Angeles, California 90017-2543 | tel (213) 443-3000 fax (213) 443-3100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111-4788 | tel (415) 875-6600 fax (415) 875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, 5th Floor, Redwood Shores, California 94065-2139 | tel (650) 801-5000 fax (650) 801-5100
CHICAGO | 500 W. Madison Street, Suite 2450, Chicago, Illinois 60661-2510 | tel (312) 705-7400 fax (312) 705-7401
WASHINGTON, DC | 1299 Pennsylvania Avenue NW, Suite 825, Washington, District of Columbia 20004-2400 | tel (202) 538-8000 fax (202) 538-8100
LONDON | 16 Old Bailey, London EC4M 7EG, United Kingdom | tel +44(0) 20 7653 2000 fax +44(0) 20 7653 2100
TOKYO | NBF Hibiya Bldg., 25F, 1-1-7, Uchisaiwai-cho, Chiyoda-ku, Tokyo 100-0011, Japan | tel +81 3 5510 1711 fax +81 3 5510 1712
MANNHEIM | Mollstraße 42, 68165 Mannheim, Germany | tel +49(0) 621 43298 6000 fax +49(0) 621 43298 6100

In October 2008, Marc Dreier approached Heathfield's predecessors, affiliates of Elliott Management Corporation ("Elliott"), with what he represented as an opportunity to purchase promissory notes issued by a company within the Solow Realty organization (the "Issuer") at a substantial discount. (Tr. 6-7.)

The sellers of the notes, Dreier said, were several hedge funds that were facing liquidity problems (the "Sellers"). (Tr. 12.) Dreier was a successful and well-known attorney, with impeccable credentials. (Tr. 19.) The Solow Realty organization was a successful and well-known concern. (*Id.*) The capital markets were frozen solid in October 2008 due to the credit crisis, so it seemed entirely logical that a group of hedge funds would be looking to sell assets such as promissory notes at a discount to raise liquidity. (Tr. 17.) Elliott thus decided to pursue the opportunity.

The team Elliott assigned to perform due diligence on the transaction, led by Chuck MacDonald, focused on two main issues. First, the team sought to ascertain the financial condition of the Solow Realty organization, in order to gain comfort that the promissory notes would be paid. Second, the team sought to ascertain the financial condition of the Sellers, since Elliott did not want to expose itself to fraudulent-conveyance actions in the event one or more of the Sellers were insolvent. (Tr. 7.) A third issue Elliott focused on was the fact that Dreier was representing all of the Sellers, as well as Solow Realty, in the transaction. (Tr. 22.)

With respect to the first issue, Elliott's research gave rise to a concern that there were insufficient restrictions on the Issuer's ability to divest itself of assets. (Tr. 8.) This, in turn, raised a concern about the collectability of the promissory notes in the event of a default. In conversations with Marc Dreier and a person purporting to be Steve Cherniak, the CFO of Solow Realty, Elliott explored the possibility of binding the Issuer to certain restrictions on its ability to transfer assets, but that idea proved unworkable, seemingly due to the complexity of the Solow Realty organization. (Tr. 9.) Elliott proposed as a work-around that Gerald Solow, the head of the Solow Realty organization, personally guarantee the notes, as such a guarantee would avoid the need to rely on the solvency of the Issuer. Dreier, after initially expressing doubt that Mr. Solow would provide a personal guarantee, later reported to Heathfield that Mr. Solow was, in fact, willing to do that. Dreier explained that Solow was anxious to facilitate the sale of the notes to Elliott, because he did not want the notes to become the subject of a public auction and because he viewed Heathfield as likely to roll over the notes when they matured and, thereby, continue an important part of the Solow Realty organization's liquidity program. (Tr. 13, 42-44.)

With respect to the second issue, Elliott researched the sellers and spoke at length to a purported representative of at least one of them but was not able to develop sufficient information about the Sellers to assess their solvency. (Tr. 39.) Elliott requested financial information from the Sellers through Dreier, but Dreier reported that the Sellers were unwilling to disclose it. (Tr. 11-12.) As Chuck MacDonald testified, MacDonald understood the Sellers' desire not to show their financial information to a competing hedge fund, but their unwillingness left Elliott's concern about a possible fraudulent-conveyance action unaddressed. (*Id.*) Dreier stepped forward with a solution by personally vouching for the Sellers, which he purported to known for years by virtue

---

[1]   The Government has informed Heathfield that it continues to support entry of the proposed stipulation and order based on the evidence presented at the hearing

of having operated the Solow Realty notes program, and offering to pledge the Artwork as security. (Tr. 12-13, 44.) After first-hand inspections of the Artwork and the procurement of documents proving that Dreier owned it, Elliott agreed to Dreier's proposal. (Tr. 48-49.) The parties agreed that Dreier would receive $1.65 million for the security interest, which was to be paid upon the earliest of payment on the notes, payment on Solow's guarantee or delivery of the Artwork. *See* Heathfield Petition, Ex. B at 1.

Elliott also considered as part of its diligence process the fact that Dreier was representing multiple parties in the transaction. His multiple representations raised a concern in Chuck MacDonald's mind that Dreier might be laboring under a conflict that could impair the transaction or lead him to conceal negative information concerning one of the Sellers in his "zeal" to help Solow get the notes placed. (Tr. 36-37.) Dreier's multiple representations made more sense, however, when Elliott learned that Dreier had been the manager of the Solow notes program for years. (Tr. 16, 40-41.) In that context, it seemed reasonable that a group of note holders facing liquidity pressures during the credit crisis would approach Dreier for assistance with selling their notes, and that Dreier would undertake that role. (Tr. 20.) Elliott was also reassured on this point by a conversation with Fortress, a world-renowned publicly-traded hedge fund (and now a member of the Victim Group), which confirmed that Dreier had been managing the Solow notes program for years and that "they'd been in the notes for years and everything worked perfectly, and they've always been on time. There was never an issue. They were perfectly happy." (Tr. 16).

With the concerns raised through the due-diligence process all having been addressed, Chuck MacDonald made the decision that Elliott would purchase the notes. The transaction, which included both Solow's personal guarantee of the notes and a security agreement between Dreier and Elliott conveying a security interest in the Artwork, closed on October 24, 2008. A second purchase, of a note that Dreier had previously indicated might later come available, closed on November 6, 2008. Subsequently, in late November 2008, Dreier's by now well-chronicled fraud began to unravel when a member of the Elliott due-diligence team directly contacted an executive at Solow Realty and learned that Dreier had used imposter to play that person during his October 2008 negotiations with Elliott.[2] (Tr. 49-50.)

I.     **Elliott Did Not Have Reason To Believe The Artwork Was Subject To Forfeiture**

The facts set forth above make clear that when Elliott participated in the note-purchase transaction through which it acquired its security interest in the Artwork, Elliott was "reasonably without cause to believe that the [Artwork] was subject to forfeiture." 21 U.S.C. § 853(c). The transaction was offered by a prominent and successful New York attorney, who at the time had an unblemished reputation. The notes purportedly had been issued by a prominent New York

_____

[2]     The Victim Group suggests in its letter-brief (at p. 6) that Sundar Srinivasan, the Elliott employee whose contact with Solow Realty following the note purchase led to the unraveling of Dreier's fraud, made that subsequent contact on account of a lingering concern about the transaction. That is a distortion of the record. Lee Grinberg testified that Mr. Srinivasan expressed concern to him only after an email Mr. Srinivasan had sent to a Solow Realty executive bounced back as undeliverable. It was Elliott's immediate follow-up on those concerns that led to the fraud being exposed. (Tr. 50-51.)

3

company, and a person whom Elliott reasonably understood to be an officer of that Company confirmed to Elliott that the notes were genuine and up for sale. Given those facts, *none of which are disputed*, Elliott had no reason even to consider that Dreier was perpetrating a crime, much less a crime that would subject all of his assets to forfeiture.[3]  Tellingly, faced with those same circumstances, members of the Victim Group also bought notes from Dreier, never suspecting they were falling prey to a fraud.

The Victim Group identifies several supposed "red flags" that it maintains distinguish Elliott's situation from theirs and should have put Elliott on notice that a fraud was afoot. We address the supposed red flags individually below, but we note at the outset that they must be evaluated against the above-described background, in which Dreier was a well-respected attorney and the Company that purportedly issued the notes had confirmed their authenticity. Added to that, at least one of the Sellers had also, to Elliott's knowledge, confirmed that the notes were genuine and for sale, and Fortress, too, had vouched for the long-standing existence of the Solow Realty note program and expressed approval of Dreier's management of it. These events occurred, moreover, during October 2008, the height of the credit crisis, a time when it was not merely plausible, but highly likely, that a group of hedge funds would be facing a liquidity crisis and looking to dispose of assets like the notes to raise capital. The transaction that Dreier proposed thus had every indication of legitimacy. In contending that Elliott should have nonetheless perceived a risk that Dreier had fabricated the notes, used imposters to portray Solow Realty personnel, and invented the Sellers out of whole cloth, the Victim Group adopts an extreme position that relies on no small measure of self-serving hindsight. Indeed, even *with* the benefit of hindsight, the scheme Dreier perpetrated was so audacious that it remains hard to believe.

One of the purported red flags the Victim Group cites is Dreier's willingness to pledge his personal art collection to facilitate the sale of the Notes. The Victim Group contends that the unusual circumstance of an attorney pledging personal property for the benefit of a client should have alerted Elliott that something was amiss. Elliott, however, had a history of accepting unusual collateral to support transactions, such as a Manhattan townhouse and LaGuardia Airport landing slots. (Tr. 14.) Even if unusual, however, Dreier's pledge of the Artwork was not a "red flag" pointing at fraud when examined in the totality of the circumstances. *First*, Elliott understood that (i) Solow was a long-term client of Dreier, (ii) Dreier had for years been engaged by Solow Realty as the manager of its notes program (as reported not only by Dreier, but also by Fortress), and (iii) Gerald Solow wanted the distressed Sellers' notes placed with Elliott. These apparent facts made it appear that Dreier had a personal interest in facilitating the sale of the notes to Elliott, *i.e.*, to please an important client on an ongoing engagement. (Tr. 13.) *Second*, Dreier represented that he was familiar with the Sellers through the notes program and that they were solvent, and Dreier negotiated to receive a $1.65 million fee for granting a security interest in his art. These apparent facts suggested that Dreier viewed the grant of

---

[3]  That distinction is not without a difference. Even where a transferee should have suspected that a transferor was engaged in wrongdoing, the transferee is entitled to remission from forfeiture where it had no reason to suspect that the transferor's wrongdoing was of a type that would subject the transferred property to forfeiture. *See, e.g.*, *United States v. Reckmeyer*, 836 F.2d 200, 204-205 (4th Cir. 1987) (holding that a third-party who was aware that transferor was under investigation for tax violations was reasonably without cause to believe that transferor's property was subject to forfeiture on account of drug-related crimes).

security in the Artwork as a low-risk way to generate a substantial profit for himself. (Tr. 12-13). *Third,* at the time these events occurred in October 2008, the credit crisis was in full bloom and Wall Street was experiencing unprecedented events with regularity; in that environment the fact that Dreier proposed an unusual mechanism to facilitate a transaction was simply not suspicious.

The Victim Group cites as another red flag the fact that the Sellers refused to provide financial statements to Elliott. As noted above, however, Mr. MacDonald did not deem it suspicious that other hedge funds, which are typically very protective of their privacy, would not want to disclose their financial information to another hedge fund. (Tr. 11-12.) Given that plausible explanation for the Sellers' unwillingness to disclose their financial statements, plus the facts that the purported issuer of the notes and at least one of the Sellers had confirmed that the notes existed and were for sale, a highly-regarded attorney such as Dreier was brokering the sale, and the notes were owned by a hedge fund with the prominence of Fortress, Elliott never had a concern that the Sellers were fictitious, nor would have any reasonable person in Elliott's position. The sole concern that Elliott had with regard to the Sellers was that a Seller's insolvency would enable its creditors to claw back one or more of the notes in a fraudulent-conveyance action. Once Dreier ameliorated that concern by pledging the Artwork, Elliott had no reason to press further for the Seller's financial statements or to perform further diligence with respect to the Sellers. Thus, the fact that Elliott made no further inquiry into the Sellers resulted not from willful blindness, as the Victim Group contends, but from Elliott's reasonable perception that it had no business need to do so.

The last purported red flag cited by the Victim Group is Dreier's representation of both Solow Realty and the Sellers in the transaction. The Victim Group neglects to explain precisely why this should have made Elliott suspicious of a fraud, and Mr. MacDonald testified that the only concerns that Dreier's representations raised in his mind were that Dreier might be laboring under a conflict that could undermine the legal opinions his firm provided to support the transaction or that Dreier might fail to disclose negative information concerning one of the Sellers so as to avoid blowing up a deal his major client, Solow Realty, wanted to conclude. (Tr. 36-37). As explained above, moreover, the only concern that Mr. MacDonald had concerning the Sellers related to their solvency, and Dreier's pledge of the Artwork hedged that risk for Elliott. Additionally, as Mr. Grinberg summarized, the information Elliott was given by Dreier and Fortress provided a reasonable explanation for Dreier's multiple representations:

> [W]e understood or came to understand that Mr. Dreier had a
> breadth of relationships, and he was actually the person who
> introduced the note program to the note sellers, so . . . because of
> the breadth of his relationships . . . we felt ok that he was playing
> multiple roles, especially considering his long-standing
> relationship with Mr. Solow, as was identified in the press and
> other areas where we researched.

(Tr. 41.) Mr. MacDonald acknowledged that one member of his team, Mr. Srinivasan, remained uncomfortable with Dreier's dual role, but Mr. MacDonald made the judgment that Mr. Srinivasan's concerns were not a reason to back out of the transaction. Contrary to the Victim Group's contention, Mr. MacDonald did not ignore Mr. Srinivasan's views or fail to conduct

5

further diligence in response to them.  Based on the facts that he already knew, and the protections that Elliott had put in place, Mr. MacDonald reasonably believed that Elliott had properly accounted for and protected against the business risks (not fraud risks) that Dreier's multiple representations posed.[4]  (Tr. 22-23 ("It was not a question of following up.  This was . . . an issue that had existed throughout the entire due diligence process, something we had thought of before, and it still bothered [Srinivasan], but I was comfortable with the outcome . . . .").)

Finally, the above-described facts and circumstances of this case makes it readily distinguishable from the cases the Victim Group cites in support of their position.

In *In re Moffitt, Zwerling & Kemler, P.C.*, 846 F. Supp. 463 (E.D. Va. 1994), a law firm was found to have been without reasonable cause to believe that a $100,000 fee it had received from a client indicted for drug dealing was not subject to forfeiture.  The fee was paid to the law firm in cash, in small bills, and delivered in a Ritz cracker box; the client had advised the firm that he had used his business to facilitate his drug trafficking and the government had seized virtually everything he owned; and the law firm, in spite of these facts, never asked the client about the source of the fee money.  *Id. at 472-73*.  *In re Moffitt* thus presents perhaps the prototypical example of a third-party that lacked reasonable cause to believe that property was not subject to forfeiture, and it is self-evidently unlike this case.

*In United States v. BCCI Holdings (Luxembourg), S.A.*, 961 F. Supp. 287 (D.D.C. 1997), the Court found that American Express Bank was not without reasonable cause to believe that funds it held in accounts maintained by BCCI were subject to forfeiture (and thus available for set off by American Express Bank), because of the "extensive public record of BCCI's misconduct." *Id.* at 296.  The Court quoted from dozens of press articles published in the several months preceding American Express Bank's attempted set-off that chronicled BCCI's misdeeds.  *Id.* at 296-301.  This case, too, is thus self-evidently different than the present case, in which Dreier's fraud was revealed only after Elliott had purchased the notes and a security interest in the Artwork from him.

The last case cited by the Victim Group, *United States v. Cuartas*, 155 F. Supp.2d 1338 (S.D. Fla. 2001), involved a Columbian businessman, who purchased United States dollars by writing checks denominated in Columbian pesos to strangers identified for him by his Columbian banker *after* the dollars had been deposited into his account.  When some of the dollars the businessman purchased in this fashion were forfeited as drug proceeds, the businessman sought to recover them based on a contention the he was reasonably without cause to know of the funds' tainted origin.  The Court rejected that claim, finding that the businessman had been willfully blind to the suspicious aspects of the transactions, which included "purchases of currency at better exchange rates not available through established banks or other legitimate currency exchangers," the deposit of dollars into the businessman's account *prior* to his having paid for them, and the complete absence of paperwork or exchange of financial documents.  *Id.* at 1343.  Nothing remotely like these suspicious circumstances was present in this case.

---

[4]  The Victim Group criticizes Elliott for failing to call Mr. Srinivasan at the November 30, 2012 hearing, but they neglect to mention that they declined the Court's invitation at the conclusion of the hearing to summon him as a witness.

## II. Elliott's Purchase Of The Security Interest Was Not A Fraudulent Conveyance

At the conclusion of the hearing on November 30, 2012, the Court invited the Victim Group to put in a letter brief "on anything they want to say *as a result of this hearing.*" (Tr. 51 (emphasis added).)  In addition to addressing matters raised at the hearing, however, the Victim Group devotes nearly half of its letter brief to rehashing the argument it made in its prehearing briefs that Heathfield's security interest should be set aside as either a constructive or actual fraudulent conveyance.  The argument is no more persuasive now than it was then.  Heathfield incorporates by reference the arguments on these issues set forth in its previously filed memoranda and reiterates only the most directly responsive points below.

The Victim Group's claim that Heathfield's security interest should be set aside as a fraudulent conveyance under New York law founders upon Section 278 of the New York Debtor and Creditor Law.  Section 278 provides that "[w]here a conveyance or obligation is fraudulent as to a creditor, such creditor, when his claim has matured, may, as against any person *except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase, or one who has derived title immediately . . . from such purchaser* . . . [h]ave the conveyance set aside or obligation annulled  to the extent necessary to satisfy his claim . . . ." N.Y. Debt. & Cred. Law § 278 (emphasis added).  "Courts have recognized this special protective carve-out for innocent purchasers for value under the New York statute." *Chemtex, LLC v. St. Anthony Enters., Inc.*, 490 F.Supp.2d 536, 544 (S.D.N.Y. 2007); *see also HBE Leasing Corp. v. Frank*, 48 F.3d 623, 636 (2d Cir. 1995) (noting the statute's "policy of protecting innocent creditors or purchasers for value who have received the debtor's property without awareness of any fraudulent scheme"); *Jacobs v. Jacobowitz (In re Jacobs)*, 394 B.R. 646, 659 (Bankr. S.D.N.Y. 2008) (explaining that "New York's Debtor and Creditor Law offers protection to an innocent purchaser for value"[5]).  Indeed, courts have recognized that the DCL "offers complete protection to an innocent purchaser for value regardless of the intent of the debtor." *Chemtex*, 490 F. Supp.2d at 544.

Even if Dreier's transfer of the security interest in his Artwork could somehow be deemed a fraudulent conveyance (and for the reasons set forth in Heathfield's previously submitted memoranda it cannot), Heathfield falls within the safe harbor of Section 278 because it acquired its security interest from Elliott, which acquired it from Dreier for fair consideration and without knowledge of Dreier's fraud.

The discussion in Point I above demonstrates that Elliott acquired the security interest without knowledge of Dreier's fraud.  As to fair consideration, Section 272 of the N.Y. DCL provides that "[f]air consideration is given for property, or obligation, a. [w]hen in exchange for such property or obligation as a fair equivalent therefore, and in good faith, property is conveyed or an antecedent debt satisfied, or b. [w]hen such property or obligation is received in good faith to secure a present advance or antecedent debt in an amount not disproportionately small as compared with the value of the property or obligation obtained." N.Y. Debt & Cred. Law § 272.  The Second Circuit has more succinctly stated that fair consideration is provided when "the value of the benefit received by the debtor approximates the value of the property or obligation he has given up." *Rubin v. Mfrs. Hanover Trust Co.*, 661 F.2d 979, 992 (2d Cir. 1981).

7

Here, there is no dispute that the value of the property Elliott gave to Dreier - more than $100 million - did not merely approximate but vastly *exceeded* the value of the Artwork Dreier conveyed to Elliott through the security interest.  Seeking to avoid the import of this fact, the Victim Group urges that the Court should ignore the economic reality of Elliott's transaction with Dreier and, for purposes of assessing whether the security interest was a fraudulent conveyance, disregard the $100 million that Elliott conveyed to Dreier as the purchase money for the fictitious notes.  The Court, according the Victim Group, should pretend that the only thing Dreier received from Elliott was its promise to pay him $1.65 million in exchange for the security interest.

This suggestion finds support in neither logic nor law.  The purpose of the fraudulent conveyance doctrine is to avoid transfers that unfairly disadvantage an insolvent debtor's creditors by removing assets from the debtor's estate for less than fair consideration and thereby reducing the amount of assets creditors can turn to for recovery.  *See Rubin,* 661 F.2d at 991 ("The reason for [the fair-consideration] requirement is obvious: if the debtor receives property or discharges or secures an antecedent debt that is substantially equivalent in value to the property given or obligation incurred by him in exchange, then the transaction has not significantly affected his estate and his creditors have no cause to complain."); 5 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 548.01 (16th ed. 2009) ("Broadly speaking, fraudulent transfer law allows creditors to avoid transactions which unfairly or improperly deplete a debtor's assets or that unfairly or improperly dilute the claims against those assets.").  In this case, Dreier's estate and its creditors were hardly made worse off by his transaction with Elliott.  To the contrary, the estate realized a *profit* of roughly $65 million dollars by effectively selling Elliott Artwork worth approximately $35 million in exchange for a cash payment of more than $100 million that everyone agrees went from Elliott to Dreier.  Invocation of fraudulent conveyance law in such circumstances makes no sense.

The sole case the Victim Group cites to support its argument that the Court should disregard economic reality, *U.S. v. Lavin,* 942 F.2d 177 (3d Cir. 1991), is inapposite.  In *Lavin,* the party seeking remission from forfeiture was a victim of embezzlement who had not engaged in any form of commercial transaction with the criminal defendant.  The Court ruled that the purpose of the bona-fide purchaser exception codified in 21 U.S.C. § 853(n)(6)(B), which it described as "to promote finality in commercial transactions and thus to encourage purchases and foster commerce," would not be furthered by granting relief to a party who had not engaged in a commercial transaction - or, indeed, any transaction - but was merely a victim of theft.  *Lavin,* 942 F.2d at 186.  Here, however, the Elliott Entities *did* engage in a series of commercial transactions with Dreier.  They believed they were paying Dreier, as the agent of his clients, $100 million to purchase certain promissory notes, and they committed to pay Dreier, in his own capacity, $1.65 million for a security interest to guarantee those notes.  Purchases of promissory notes and security interests are quintessentially commercial transactions as to which parties' reasonable expectations must be protected for commerce to flourish.  Granting relief to Heathfield by giving effect to the Security Interest that its predecessors purchased in good faith (and for value) would thus serve the statutory purpose of Section 853(n)(6)(B).

Finally, even if one were to accept to the Victim Group's invitation to ignore the economic reality of the transaction and consider only the $1.65 million that Elliott committed to pay, that

8

would not change the result. The Victim Group's argument that Heathfield's "promise to pay $1.65 million was disproportionately small in comparison to the value of the *Artwork* and therefore cannot constitute fair consideration," Letter, Dec. 10, 2012, at 8 (emphasis added), is based on a flawed premise:  Heathfield did not promise to pay $1.65 million for *the Artwork*; Heathfield promised to pay $1.65 million for a *security interest* in the Artwork, which amounted to a promise from Dreier to deliver the Artwork if and only if two contingencies occurred (*i.e.* the Issuer's failure to pay on the notes and Gerald Solow's failure to pay on his guarantee).[6] The face value of the Artwork is obviously not the proper measure of value for this third level of security that was unlikely ever to be called upon because it sat behind promissory notes issued by a substantial real-estate company and the personal guarantee of its wealthy principal. "It is well established . . . that a contingent liability cannot be valued at its potential face amount; rather, 'it is necessary to discount it by the probability that the contingency will occur and the liability become real.'" *In re Chase & Sanborn Corp.*, 904 F.2d 588, 595 (11th Cir. 1990) (upholding a finding that a payment of $369,288 was reasonably equivalent value for a guaranty of a $22 million loan) (quoting *Matter of Xonics Photochemical, Inc.*, 841 F.2d 198, 200 (7th Cir. 1988)).

None of the cases the Victim Group cites for their argument that the price Elliott paid for its security interest was insufficient involved a contingent liability. They all involved an unequal exchange of property of fixed value, and for that reason are inapposite. *See HBE Leasing Corp. v. Frank*, 61 F.3d 1054 (2d Cir. 1995) (notes worth hundreds of thousands of dollars conveyed to satisfy antecedent debt of $75,000); *Teitelbaum v. Voss (In re Tuller's Inc.)*, 480 F.2d 49 (2d Cir. 1973) ($60,000 in notes conveyed in exchange for promise to pay $3,000 debt); *BSL Dev. Corp. v. Aquaboque Cove Partners, Inc.*, 212 A.D.2d 694 (2d Dep't 1995) ($8 million mortgage exchanged in satisfaction of $1 million antecedent debt).

Finally, it is no answer for the Victim Group to argue that the contingencies on Dreier's obligation to deliver the Artwork were illusory because Dreier knew that the notes and Solow guarantee were fictitious. If the Victim Group wants to have this matter adjudicated based on the false assumption that Dreier received only $1.65 million from Elliott, it must also accept the false assumption that the obligations secured by the security interest were real. On the other hand, if the Victim Group wants to have this matter decided based on the world as it truly was, it must acknowledge not only that Dreier fabricated the notes and Solow guarantee, but also that Dreier received more than $100 million from Elliott, not merely $1.65 million. Fairness requires that the Victim Group not be allowed to create a hybrid of the false and real worlds in order to generate the result it desires here.

---

[6] By contrast, Elliot's promise to pay Dreier $1.65 million for the security interest was not contingent. As explained in Heathfield's December 12, 2011 memorandum, at pp. 7-8, the terms of the parties' security agreement left no doubt that the $1.65 million would be paid; the only open question was when it would be paid. As further explained in Heathfields's memorandum, at pp. 6-7, such a non-contingent promise constitutes consideration sufficient to support a security interest. The Victim Group's observation that the $1.65 million has not yet been paid is, therefore, irrelevant. Heathfield, moreover, has reaffirmed its obligation to pay the $1.65 million in its proposed stipulation with the Government.

9

## Conclusion

For the reasons set forth above and in Heathfield's prior memoranda, the Court should "so order" the proposed stipulation between Heathfield and the Government.

Respectfully submitted,

Kevin S. Reed

cc:    David B. Hennes, Esq.
       T. Barry Kingham, Esq.
       Janice Mac Avoy, Esq.
       AUSA Jeffrey Alberts