# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Douglas A. Kelley, in his capacity as the court-appointed Receiver of Thomas Joseph Petters; Petters Company Inc., aka PCI; Petters Group Worldwide, LLC; Deanna Coleman aka Deanna Munson; Robert White; James Wehmhoff; Larry Reynolds, and/or dba Nationwide International Resources aka NIR; Michael Catain, and/or dba Enchanted Family Buying Company,

Court File No. _____

**JURY TRIAL DEMANDED**

Plaintiff,

**COMPLAINT**

vs.

Paul Traub,

Defendant.

---

Douglas A. Kelley (the "Plaintiff" or "Receiver"), in his capacity as the court-appointed Receiver of the above captioned individuals and entities, by and through his legal counsel, Fruth, Jamison & Elsass, PLLC, brings this Complaint against Defendant Paul Traub ("Defendant" or "Traub"), to recover $803,966.00 transferred to Defendant by Thomas J. Petters ("Petters") in the form of cash and an equity interest in EBP Select Holdings, LLC ("EBP"), a company owned and controlled by Petters. These assets were transferred to Defendant in furtherance of a multi-billion dollar Ponzi scheme. Plaintiff, based on actual knowledge and upon information and belief, states and alleges as follows:

# INTRODUCTION

1.    From the early 1990's, Petters ran what became a $3.8 billion Ponzi scheme, until one of his lieutenants revealed the fraud to federal law enforcement officials. Relying upon stolen money and a pyramid of lies, he appeared to amass a vast financial empire.  Petters' businesses survived not because of their financial success, but rather because they were supported with massive amounts of stolen money.  In order to keep the Ponzi scheme going, Petters needed an ever-increasing supply of new investor money to pay interest to previous investors, run his front of businesses, and to replace the money he was siphoning off for himself, his close friends and business partners.

2.    To pull off this massive fraud, Petters created a public aura of financial success to ensure a ready supply of new investors and to allay any suspicions of established investors.  He gave lavishly from this pool of stolen money to universities and other charitable causes, and paid exorbitant sums of money to surround himself with executives, partners and friends who helped create the essential air of success and wealth required to sustain the fraud, as well as the expertise to maintain it.

3.    Defendant Paul Traub was one of these people.  Traub was the founding member and managing partner of Traub, Bonacquist & Fox, LLP, a New York based law firm specializing in bankruptcy and business reorganization matters.  There Traub represented creditors in the eToys.com bankruptcy.  In 2005, his representation came under scrutiny when the U.S. Trustee and another party accused his law firm of a conflict of interest, non-disclosure of certain business relationships, and other misconduct.  The U.S. Trustee ultimately settled with Traub's law firm, and the court approved.  Although

the court approved the settlement, the judge commented that the failure to disclose the serious conflicts present in Traub's case would in the future lead to sanctions.[1]  In 2006, Traub, Bonacquist & Fox, LLP was acquired by Dreier L.L.P.  Traub became a partner at the firm and co-chair of the firm's Bankruptcy and Business Reorganization group.  In 2008 the Dreier firm was found to be involved in a fraudulent scheme to sell fictitious promissory notes to hedge funds and other investors.  The firm dissolved in the wake of the fraud and Traub turned his attention to Asset Disposition Advisors ("ADA"), a consulting firm he founded with another infamous businessman, Barry Gold.  The consulting firm advised retailers on the sale of distressed assets.

4.      At the same time Traub was working for Dreier L.L.P and ADA, Traub was also working for Petters as a "Strategic Partner."  According to his May 9, 2005 consulting agreement with Petters, Traub was to provide "consulting services in assessment of new business opportunities, consult on key business issues, operational challenges and strategy, acquisition negotiation and integration, and the capital needs of the organization."   For this part-time work, Traub was to be paid an astonishing $125,000 per month ($1.5 million annually).  A copy of the consulting agreement is attached hereto as Exhibit A.

5.      Petters considered Traub part of his close network of advisors and consultants and, consequently, Traub possessed considerable control over Petters.  He leveraged his position with Petters to receive massive amounts of money and other gifts.

---

[1] *See In re eToys, Inc.,* 331 B.R. 176 (Bkrtcy. D. Del. 2005).

From August 2005 through May 2008, Traub received directly, and sometimes secretly, from Petters more than $2.46 million dollars.[2] These funds were from the proceeds of the ongoing Ponzi scheme. In return, Traub promoted Petters as a skilled businessman and "assist[ed] Tom by acting as a 'filter' between the portfolio companies, Petters personnel and third parties." Further, Traub claimed to have assisted Petters by "leverage[ing] [his] rolodex to create new opportunities and negotiate and implement those objectives" on behalf of Petters. In essence, Traub gave Petters business credibility and access to new potential victims for his fraudulent schemes.

6.     Traub knew of the fraud, or willingly ignored it, and accepted substantial payments and gifts from the scheme, including payments in excess of $726,000 directly from Petters' personal accounts. In total, the Receiver seeks disgorgement of more than $803,966.00 in fraudulent transfers from the Receivership Estate to Traub.

## NATURE OF THE PROCEEDING

7.     On October 3, 2008, pursuant to 18 U.S.C. § 1345, the United States District Court of the District of Minnesota placed Petters, Petters Company, Inc. ("PCI"), Petters Group Worldwide ("PGW"), and various affiliated entities, among others, in receivership in civil litigation commenced by the United States of America (Court File No. 08-CV-5348) (the "Receivership Action").

---

[2] $1,658,333.39 was paid to Traub through Petters Group Worldwide, LLC ("PGW"), a company wholly owned by Petters. On October 11, 2008, PWG petitioned for Chapter 11 bankruptcy. Kelley, as Trustee of PGW, is seeking return of these payments in a separate adversary proceeding against Traub currently pending in the United States Bankruptcy Court for the District of Minnesota. *See Douglas A. Kelley, et al. v. Paul Traub,* Adv. No. 10-04404.

8. By Order of the United States District Court of the District of Minnesota in the Receivership Action dated October 6, 2008, as subsequently amended and restated on December 8, 2008, the United States District Court of the District of Minnesota duly appointed Douglas A. Kelley, Esq. as the equity receiver of multiple entities owned and/or controlled by Petters, including PCI, PGW, and numerous other Petters-related entities (collectively, the "Receivership Estate").

9. As the court-appointed Receiver, Kelley serves as an agent of the United States District Court for the District of Minnesota and in that capacity possesses exclusive custody, control and possession of the property, assets and estates of the Receivership Estate.

10. The Receiver brings this action against Defendant to recover fraudulent transfers of property by the Receivership Estate to Defendant.

11. The Receiver seeks to recover such transfers and preserve the property of the Receivership Estate for the benefit of individuals and organizations defrauded by the massive Ponzi scheme.

## THE PARTIES

12. Plaintiff Douglas A. Kelley, was appointed Receiver of the Receivership Estate on October 6, 2008, as amended in that certain Second Amended Order for Entry of Preliminary Injunction, Appointment of Receiver, and Other Equitable Relief (the "Receivership Order"), dated December 8, 2008, (Court File No. 08-CV-5348) [Docket No. 127]. Pursuant to the Receivership Order, the Court vests the Receiver with the full power of an equity Receiver and requires the Receiver to "[t]ake exclusive immediate

custody, control, and possession of all property, assets, and estates belonging to or in the possession, custody, or under the control of Defendants, wherever situated." Receivership Order at 13. "The Receiver shall have full power to . . . sue for, collect, receive, take in possession . . . all assets of Defendants." *Id*.

13.     Defendant Paul Traub is a resident of the State of New Jersey, residing at 31 Old Farms Road, Woodcliff Lake, New Jersey 07677.

## JURISDICTION, VENUE AND STANDING

14.     The Receiver has the capacity to commence this action pursuant to 28 U.S.C. § 754, 28 U.S.C. § 1692 and the Receivership Order.

15.     The Court has ancillary jurisdiction over this action as it is instituted by a federal equity receiver to execute his duties as set forth in the Receivership Order and pursuant to 18 U.S.C. § 1345.  This action seeks to accomplish the ends sought by the civil case in which Kelley was appointed as Receiver, *United States v. Petters, et al.*, 08-cv-5348 (D. Minn.).

16.     Jurisdiction of this action is also based upon 28 U.S.C. § 1332 in that there is complete diversity between the Plaintiff and Defendant, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

17.     Venue in this district is proper under 28 U.S.C. § 1391(b) because a substantial part of the events and transfers giving rise to Plaintiff's claims occurred in Minnesota.

18.     Venue for this action is also proper in this District because i) this action is ancillary to the United States' proceedings pending in this District; ii) the Receiver was

appointed in this District; and iii) the Receivership Estate made all of the transfers at issue in this action from this District.

## STATEMENT OF FACTS

### THE PONZI SCHEME

19.     This proceeding arises from a massive fraud and Ponzi scheme designed and orchestrated principally by Petters, Deanna Coleman aka Deanna Munson, Robert White, James Wehmhoff,  Larry Reynolds (collectively, the "Receivership Individuals") and business organizations that they operated (the "Ponzi Scheme").

20.     Petters operated the Ponzi scheme with the assistance of other individuals within certain Petters organizations, including the Receivership Individuals, from approximately 1993 through the date of his arrest by federal agents on October 3, 2008.

21.     Commencing in or about 2001 and continuing to in or about September 2008, Petters, through various entities that he controlled, including PCI and PGW, and with the assistance of others, laundered what is estimated to be an amount in excess of $40 billion.

22.     On December 1, 2008, Petters was indicted by a Federal Grand Jury in the District of Minnesota that charged him with 20 separate counts of mail and wire fraud, money laundering and conspiracy to commit mail and wire fraud and money laundering in connection with the perpetration of the Ponzi Scheme.

23.     On December 2, 2009, a jury in the United States District Court of the District of Minnesota found Petters guilty of all 20 counts charged in the Indictment.

24.     At various times during the course of the Ponzi Scheme, Petters was assisted in the operation of the scheme by numerous individuals, including, but not limited to, Coleman, Reynolds and Wehmhoff (collectively, Petters' "Associates").

25.     In 2008, Coleman, Reynolds and Wehmhoff each pleaded guilty to various crimes directly arising from, and connected to, the perpetration of the Ponzi Scheme and their affiliation with Petters and entities that he owned and operated to further the Ponzi Scheme.

26.     The scheme orchestrated by the Receivership Individuals, through a multitude of entities owned and operated by Petters, was a common species of fraud with the nefarious trademark of a Ponzi Scheme.  Petters, through a number of his entities and in concert with his Associates, would repay initial investors not with the fruits of their investment, but with false profits harvested from funds obtained from other investors.

27.     Petters and his Associates, through PCI, PGW and a multitude of shell companies intended that the payments to early investors would induce ongoing, repeated and more widespread investment in the Ponzi Scheme and thereby further perpetrate and extend the life of the fraud.

28.     To obtain investors in the Ponzi Scheme, Petters, his Associates, PCI and its agents and PGW and its agents, made numerous false statements, false representations and material omissions to fraudulently induce investors to provide PCI and PGW with billions of dollars.

8

29.     Petters portrayed to investors that the funds were to be used to purchase merchandise which would then be sold to retailers at a profit.  Instead, Petters, his Associates, PCI, PGW and others would divert the funds to other purposes.

30.     Funds received by PCI, PGW, and Petters from lenders were not used to purchase electronic goods as represented, but instead were used to repay other investors their principal and interest, to purchase and/or support other business operations owned or controlled by Petters, to finance Petters' extravagant lifestyle and were otherwise paid, as income, to the other Receivership Individuals and to Defendant.

31.     As part of the Ponzi scheme and in furtherance of it, on multiple occasions Petters or his Associates caused the proceeds of the Ponzi scheme to be transferred to Petters' controlled businesses, including but not limited to PCI, PGW and their subsidiaries or affiliates, to enable those businesses to make payroll and to pay employee bonuses, consulting fees and commissions and to make loans, gifts or other incentives to employees, directors, officers, consultants, relatives and friends.  Petters or his Associates also transferred Ponzi scheme money to Petters personal accounts to finance a lavish lifestyle and to make payments directly to individuals, including enormous sums to Defendant.  These transfers were made with the intent to defraud and to further the Ponzi scheme.

32.     The aggregate amount of funds transferred by Petters and PGW to Defendant is at least $2,462,299.  Of this amount, $1,658,333 was paid to Defendant through PGW accounts.  These transfers are being sought through a separate proceeding initiated by Kelley as Trustee of PGW in the United States Bankruptcy Court for the

District of Minnesota, *Douglas A. Kelley, et al. v. Paul Traub,* Adv. No. 10-04404. The allegations of that adversary complaint are incorporated herein by reference. The Receiver in this action seeks to recover transfers to Defendant from Petters' personal accounts and from the Receivership Estate in the amount of $726,000.00, as well as a transfer of interest in EBP to Defendant from the Receivership Estate, believed to be worth approximately $77,966.00 (collectively, the "Fraudulent Transfers").

33. Because Petters was perpetrating a Ponzi Scheme, and all of his income was derived from proceeds of the fraudulent Ponzi Scheme, all of the Fraudulent Transfers to Defendant were made with the actual intent to hinder, delay or defraud Petters' creditors.

34. Petters' Fraudulent Transfers to Defendant were intended, among other things, to create the appearance of success and a continuing profitable enterprise on behalf of PCI, PGW or the other multitude of entities created by Petters and the other Receivership Individuals.

35. Petters and his Associates fraudulently and intentionally concealed the ongoing fraud in an effort to hinder and delay authorities and most current and prospective investors and most other creditors of PCI, PGW, and other entities from discovering the fraud.

36. The concealment of the fraud, whether by Petters' silence, by the fraudulent intentional concealment of the facts constituting the fraud, or by the adverse domination of PCI, PGW, and other entities by Petters and his Associates, prevented authorities and most creditors and investors from discovering the ongoing fraud until the Receiver was

appointed and placed in control of the entities and was able to discover facts constituting the fraud alleged in this Complaint.

37.    The Receiver has acted diligently to discover facts constituting the fraud alleged in this Complaint.

38.    Any temporal limitations, statutory or otherwise, on the Receiver's ability to bring the causes of action set forth below are tolled by, among other things, Petters' breach of fiduciary duty in failing to disclose the fraud, the actions of Petters, or Petters and the Receivership Individuals, in fraudulently and intentionally concealing the fraud, or the adverse domination of PCI, PGW, and other entities by Petters, or his Associates, until the appointment of the Receiver.

## THE FRAUDULENT TRANSFERS

39.    As part of the Ponzi scheme and in furtherance of it, on multiple occasions Petters, or Petters and his Associates, caused monies from PCI – the proceeds of the Ponzi scheme – to be transferred to Petters or Petters' controlled businesses, including but not limited to PGW and its subsidiaries or affiliates, to enable those businesses to make payroll and to pay bonuses, severance payments, commissions or other incentives to employees, directors and officers and consultants, or to Petters so that he could directly pay such sums to employees, directors, and officers and consultants for such purposes. These transfers were made with the intent to defraud and to further the Ponzi scheme.

40.    To the extent that an employment contract, bonus plan or agreement, incentive plan or agreement, or other compensation plan or agreement existed between the Defendant and the Receivership Estates, which the Defendant claims created an obligation

11

incurred by the Receivership Estates (the "Obligations"), Defendant gave nothing of value or provided value that was less than reasonably equivalent in exchange for the Obligations.

41.     During the course of the Ponzi Scheme, on or about June 5, 2006, Defendant received and deposited a check from Petters' Northern Trust Bank account in the amount of $225,000.00.  *See* copy of check attached hereto as Exhibit B.

42.     On or about May 8, 2008, Defendant received and deposited a check from Petters' Crown Bank account in the amount of $501,000.00.  *See* copy of check attached hereto as Exhibit C.

43.     Additionally, on or about May 15, 2007, Defendant received a 0.7353% interest in EBP Select Holdings, LLC ("EBP") from Petters.  EBP is a Delaware limited liability company.  EBP holds shares of Bluestem Brands, Inc. f/k/a Fingerhut Direct Marketing, Inc. ("Bluestem") and uBid.Com Holdings, Inc. ("uBid"), additional entities owned and controlled by Petters.  The Receiver estimates the value of this transfer at $77,966.00.

44.     Petters was insolvent on the dates of any Obligations and on the dates the Fraudulent Transfers were made, or the Fraudulent Transfers left Petters and the Receivership Estates with an unreasonably small amount of capital with which to operate. At the time of any Fraudulent Transfers, Petters, PGW and Petters' other affiliates owed hundreds of millions of dollars to as much as $3.8 billion to creditors and possessed fraudulently pledged and vastly insufficient assets to repay their debts.

45.    Defendant was legal counsel to Petters, PCI and PGW, a managing partner in PGW, a uBid board member, and a member of Petters' inner circle a/k/a the "Dream Team" and a "Strategic Partner."  In these roles, Defendant served as a close and trusted advisor of Petters.  Consequently, Defendant had special knowledge or access to information regarding the Ponzi Scheme, was a control person of PGW and its affiliates, and an insider within the meaning of Minn. Stat § 513.41(7).

46.    By virtue of Defendant's close relationship with Petters and his participation in the Ponzi scheme, Defendant was able to exert influence over the Receivership Estates and attain these Fraudulent Transfers.

47.    The Fraudulent Transfers are disproportionately large relative to Defendant's salary, work duties and performance, and were not a result of arm's length transactions, or made in furtherance of a legitimate business purpose, but rather were gratuitous, were made in furtherance of the fraud, and paid to Defendant to reward his loyalty to the Ponzi scheme.

48.    Although the 2005 consulting agreement purported to pay Defendant $125,000 per month, the agreement did not provide for a bonus.  Nevertheless, Defendant received an additional $225,000 from Petters over and above the $1.5 million he received from PGW.

49.    Notably, the $225,000 payment to Defendant was not made by PGW, the company that purportedly employed Defendant, but rather was made directly by Petters, using his own personal checking account.  It is believed that this payment came from Petters directly in order to avoid detection by other PGW employees and management,

13

conceal Defendant's relationship with Petters, and maintain the fraud.  For instance, on the same day that Petters wrote the $225,000 check to Defendant, a deposit of equal amount was made by PGW into Petters' personal account, presumably to cover the payment to Defendant.

50.    In October 2006, Traub executed a new consulting agreement with PGW. Under that agreement, Traub's services became even less defined.  According to the new arrangement, Traub was to "deliver consulting services by way of making introductions or for general strategic advice as requested by Tom Petters."  A copy of the agreement is attached hereto as Exhibit D.  The consulting agreement reduced Traub's compensation to $10,416 per month ($125,000 annually).  However, a discretionary bonus was now available to Traub and was to be measured by "network introductions, dollar savings, [and] projects that result in significant upside for the company."  In 2007, Traub received a $501,000 bonus from Petters, which was paid in the first quarter of 2008.  The bonus was more than four times the stated salary of $125,000 annually.  Again, the payment did not come from PGW, the entity he contracted with, but rather from Petters directly. Like the previous payment, it is believed that this payment was made from Petters directly to avoid detection by other PGW employees and management, conceal Defendant's relationship with Petters, and maintain the fraud.

51.    The Fraudulent Transfers to Defendant exceeded the market value of equivalent types of payments for equivalent performance during the relevant time period.

52.     Defendant knew, or should have known, that the Fraudulent Transfers he received from Petters were not made in the ordinary course of business or through an arm's-length transaction.

53.     Defendant received and accepted the Fraudulent Transfers despite the unreasonable amounts of the payments and failed to exercise reasonable due diligence with respect to the source and amount of the payments.

54.     Defendant knew or should have known that he was benefiting from fraudulent activity or, at a minimum, failed to exercise reasonable due diligence with respect to Petters, PCI and PGW in connection with the Ponzi scheme.  Defendant ignored numerous indicia of fraud from the general manner in which Petters, PCI and PGW operated.

55.     Any Obligations and the Fraudulent Transfers to Defendant, and to employees, directors, officers and consultants, were made as part of the Ponzi scheme to impress existing and future investors, add credibility to the massive Ponzi scheme, and convey that Petters, PCI and PGW were trustworthy, impressive and profitable.

56.     To the extent that any of the recovery counts may be inconsistent with each other, they are to be treated as being pled in the alternative.

57.     During the course of this adversary proceeding, the Receiver may learn (through discovery or otherwise) of additional transfers made to Defendant.  The Receiver intends to avoid and recover all transfers made by the Receivership Estates of an interest of Receivership Estates in property and to or for the benefit of the Defendant or any other transferee. Similarly, the Receiver intends to avoid any Obligations made by the

15

Receivership Estates. The Receiver reserves the right to amend this original Complaint to include: (i) further information regarding the Fraudulent Transfers, (ii) additional transfers, (iii) modifications or revisions to Defendant's name, (iv) additional defendants, or (v) additional causes of action, that may become known to the Receiver at any time during this adversary proceeding, through formal discovery or otherwise, and for the amendments or additional causes of action to relate back to this original Complaint.

## COUNT I — FRAUDULENT TRANSFERS

### Insider Transfers - Minn. Stat. §§ 513.45(b) and 513.47 or Other Governing Fraudulent Transfer Laws

58. The Receiver realleges and incorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

59. Defendant is an "insider" within the meaning of Minn. Stat. § 513.41(7).

60. The Fraudulent Transfers were made to an insider for an antecedent debt, the Receivership Estates were insolvent at the time, and the insider had reasonable cause to believe the Receivership Estates were insolvent.

61. As a result of the foregoing, the Receiver is entitled to judgment pursuant to Minn. Stat. §§ 513.45(b)(1) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states: (a) avoiding any Obligations and avoiding and preserving the Fraudulent Transfers free and clear from any claimed interest of Defendant, (b) directing that any Obligations and the Fraudulent Transfers be set aside, (c) recovering such Fraudulent Transfers or the

value thereof from Defendant for the benefit of the Receivership, and (d) recovering pre-judgment and post-judgment interest, attorneys' fees and costs from Defendant.

## COUNT II – FRAUDULENT TRANSFERS

### Actual Fraud - Minn. Stat. §§ 513.44(a)(1) and 513.47 or Other Governing Fraudulent Transfer Laws

62.     The Receiver realleges and incorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

63.     The Fraudulent Transfers or Obligations were made or incurred with actual intent to hinder, delay or defraud a creditor to which the Receivership Entity was or became indebted on or after the date of the Fraudulent Transfers.

64.     The Fraudulent Transfers or Obligations were made to or for the benefit of Defendant in furtherance of a fraudulent investment scheme.

65.     As a result of the foregoing, the Receiver is entitled to judgment pursuant to Minn. Stat. §§ 513.44(a)(1) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states: (a) avoiding any Obligations and avoiding and preserving the Fraudulent Transfers free and clear from any claimed interest of Defendant, (b) directing that any Obligations and the Fraudulent Transfers be set aside, (c) recovering such Fraudulent Transfers in the value thereof from Defendant for the benefit of the Receivership, and (d) recovering pre-judgment and post-judgment interest, attorneys' fees and costs from Defendant.

## COUNT III – FRAUDULENT TRANSFERS

### Constructive Fraud - Minn. Stat. §§ 513.44(a)(2)(i) and 513.47 or Other Governing Fraudulent Transfer Laws

66.     The Receiver realleges and incorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

67.     At all times material hereto, Petters was engaged in businesses or transactions, or was about to engage in businesses or transactions, for which the property remaining with Petters after the Transfers and Obligations were effectuated constituted unreasonably small capital.

68.     Petters and PGW received less than a reasonably equivalent value in exchange for the Fraudulent Transfers and Obligations.

69.     As a result of the foregoing, the Receiver is entitled to judgment pursuant to Minn. Stat. §§ 513.44(a)(2)(i) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states:  (a) avoiding any Obligations and avoiding the Fraudulent Transfers free and clear from any claimed interest of Defendant, (b) directing that any Obligations and the Fraudulent Transfers be set aside, (c) recovering such Fraudulent Transfers or the value thereof from Defendant for the benefit of the Receivership, and (d) recovering prejudgment and post-judgment interest, attorneys' fees and costs from Defendant.

## COUNT IV – FRAUDULENT TRANSFERS

### Constructive Fraud - Minn. Stat. §§ 513.44(a)(2)(ii) and 513.47 or Other Governing Fraudulent Transfer Laws

70.     The Receiver realleges and incorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

71.     At all times material hereto and at the time of the Fraudulent Transfers and Obligations, Petters intended to incur, or believed that he would incur, debts that would be beyond his ability to pay as the debts matured.

72.     Petters received less than a reasonably equivalent value in exchange for the Fraudulent Transfers and Obligations.

73.     As a result of the foregoing, the Receiver is entitled to judgment pursuant to Minn. Stat. §§ 513.44(a)(2)(ii) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states:  (a) avoiding any Obligations and avoiding and preserving the Fraudulent Transfers free and clear from any claimed interest of Defendant, (b) directing that any Obligations and the Fraudulent Transfers be set aside, (c) recovering such Fraudulent Transfers or the value thereof from Defendant for the benefit of the Receivership, and (d) recovering pre-judgment and post-judgment interest, attorneys' fees and costs from Defendant.

## COUNT V – FRAUDULENT TRANSFERS

### Constructive Fraud - Minn. Stat. §§ 513.45(a) and 513.47 or Other Governing Fraudulent Transfer Laws

74.     The Receiver realleges and incorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

75.     At all times material hereto and at the time of the Fraudulent Transfers and Obligations, Petters was insolvent or, in the alternative, Petters became insolvent as a result of the Transfers.

76.     Petters received less than a reasonably equivalent value in exchange for the Fraudulent Transfers and Obligations.

77.     As a result of the foregoing, the Receiver is entitled to judgment pursuant to Minn. Stat. §§ 513.45(a) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states:  (a) avoiding and Obligations and avoiding and preserving the Fraudulent Transfers free and clear from any claimed interest of Defendant, (b) directing that any Obligations and the Fraudulent Transfers be set aside, (c) recovering such Fraudulent Transfers or the value thereof from Defendant for the benefit of the Receivership, and (d) recovering pre-judgment and post-judgment interest, attorneys' fees and costs from Defendant.

## COUNT VI – UNJUST ENRICHMENT/EQUITABLE DISGORGEMENT

78.     The Receiver realleges and incorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

79.     At all times relevant hereto, the Fraudulent Transfers received by Defendant were part and parcel of the Ponzi scheme and were derived from monies fraudulently obtained by Petters from other investors or participants in the Ponzi scheme.

80.     Defendant, as the recipient of fraudulently obtained proceeds of the Ponzi scheme, has no rightful or legitimate claim to such monies.

81.     Defendant knowingly accepted the benefit.

20

82. Defendant received the Fraudulent Transfers from Petters knowing that the funds were derived from the Ponzi scheme, and Defendant was unjustly enriched through his receipt of the Fraudulent Transfers to the detriment of the Receivership, and in equity and good conscience must be required to repay the proceeds received.

83. Defendant would be unjustly enriched to the extent he is allowed to retain the Fraudulent Transfers received during his participation in the Ponzi scheme.

69. Defendant must, therefore, in equity be required to disgorge all proceeds and assets received through the operation of the Ponzi scheme, so as to allow the Receiver to distribute in equity any such ill-gotten gains among all innocent investors and creditors of the Receivership.

70. Defendant's acceptance and retention of the benefit is inequitable and violates principles of justice, equity and good conscience.

## **PRAYER FOR RELIEF**

WHEREFORE, the Receiver respectfully requests this Court enter judgment in favor of Plaintiff and against Defendant as follows:

A. Count I (Insider Transfers): pursuant to pursuant to Minn. Stat. §§ 513.45(b) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states: (a) avoiding any Obligations and avoiding and preserving the Fraudulent Transfers free and clear from any claimed interest of Defendant, (b) directing that any Obligations and the Transfers be set aside, (c) recovering such Fraudulent Transfers or the value thereof from Defendant

21

for the benefit of the Receivership, and (d) recovering pre-judgment and post-judgment interest, attorneys' fees and costs from Defendant.

      B.      Count II (Fraudulent Transfers – Actual Fraud): pursuant to Minn. Stat. §§ 513.44(a)(1) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states:  (a) avoiding any Obligations and avoiding and preserving the Fraudulent Transfers free and clear from any claimed interest of Defendant, (b) directing that any Obligations and the Fraudulent Transfers be set aside, (c) recovering such Fraudulent Transfers or the value thereof from Defendant for the benefit of the Receivership, and (d) recovering pre-judgment and post-judgment interest, attorneys' fees and costs from Defendant.

      C.      Count III (Fraudulent Transfers - Constructive Fraud): pursuant to Minn. Stat. §§ 513.44(a)(2)(i) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states:  (a) avoiding any Obligations and avoiding and preserving the Fraudulent Transfers free and clear from any claimed interest of Defendant, (b) directing that any Obligations and the Fraudulent Transfers be set aside, (c) recovering such Fraudulent Transfers or the value thereof from Defendant for the benefit of the Receivership, and (d) recovering prejudgment and post-judgment interest, attorneys' fees and costs from Defendant.

      D.      Count IV (Fraudulent Transfers - Constructive Fraud): pursuant to Minn. Stat. §§ 513.44(a)(2)(ii) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states:  (a) avoiding and preserving the Fraudulent Transfers free and clear from any claimed interest

22

of Defendant, (b) directing that the Fraudulent Transfers be set aside, (c) recovering such Transfers or the value thereof from Defendant for the benefit of the Receivership, and (d) recovering pre-judgment and post-judgment interest, attorneys' fees and costs from Defendant.

E.     On Count V (Fraudulent Transfers - Constructive Fraud): pursuant to Minn. Stat. §§ 513.45(a) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states:  (a) avoiding and preserving the Fraudulent Transfers free and clear from any claimed interest of Defendant, (b) directing that any Obligations and the Fraudulent Transfers be set aside, (c) recovering such Fraudulent Transfers or the value thereof from Defendant for the benefit of the Receivership, and (d) recovering pre-judgment and post-judgment interest, attorneys' fees and costs from Defendant.

F.     Count VI (Unjust Enrichment/Equitable Disgorgement): declaring and ordering that the Receiver shall recover the Fraudulent Transfers and any other monies received by Defendant, directly or indirectly, from the fraud perpetrated through the Ponzi scheme, or the value thereof, for the benefit of the Receivership; and that Defendant shall be liable to the Receivership in an amount equal to the Fraudulent Transfers and shall be required to disgorge the same for the equitable distribution to all investors of the Receivership.

G.     On all Claims for Relief, establishment of a constructive trust over the proceeds of the Fraudulent Transfers in favor of the Receiver for the benefit of the Receivership;

23

H.     Awarding the Receiver all applicable interest (including pre-judgment and

post-judgment interest), attorneys' fees, costs and disbursements in this action; and

I.     Granting the Receiver such other, further and different relief as the Court

deems just, proper and equitable.


DATED:          June 5, 2012                 FRUTH, JAMISON & ELSASS, PLLC


                                             By:   s/ K. Jon Breyer
                                                   Thomas E. Jamison (#220061)
                                                   Douglas L. Elsass (#219241)
                                                   K. Jon Breyer (#302259)
                                             3902 IDS Center
                                             80 South Eighth Street
                                             Minneapolis, MN 55402-2274
                                             Telephone: (612) 344-9700
                                             Facsimile: (612) 344-9705

                                             *ATTORNEYS FOR DOUGLAS A.*
                                             *KELLEY COURT-APPOINTED*
                                             *RECEIVER*